1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

IN RE NJOY, INC. CONSUMER CLASS
ACTION LITIGATION

)
)
)
)
)
)
)
)
)
)

CASE NO. CV 14-00428 MMM (JEMx)

ORDER DENYING PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION

On January 17, 2014, Ben Z. Halberstam filed this putative class action on his own behalf and

on behalf of a class of similarly situated Californians against NJOY, Inc., and Sottera, Inc. (collectively,

"NJOY").[1] On April 29, 2014, pursuant to the parties' stipulation,[2] the court consolidated Halberstam's

action with *Eric McGovern v. NJOY, Inc., et al.*, Case No. CV 14-00427 MMM (RZx).[3] Halberstam and

McGovern filed a first amended consolidated complaint on May 30, 2014.[4] Thereafter, on July 9, 2014,

they filed a second amended consolidated complaint, joining Kathryn Thomas and Paula Kolano as

[1]Complaint, Docket No. 1 (Jan. 17, 2014).

[2]Joint Stipulation to Consolidate Cases as to 14-00428, 14-00427, Docket No. 41 (Apr. 25, 2014).

[3]Order Consolidating Actions, Docket No. 50 (Apr. 29, 2014).

[4]First Amended Consolidated Complaint ("FAC"), Docket No. 58 (May 30, 2014).

named plaintiffs.[5]  Thomas seeks to represent a Florida class, while Kolano seeks to represent a New York class.  On August 11, 2014, NJOY filed a motion to dismiss the second amended complaint,[6] which the court granted on October 20, 2014.[7]  As a result, on November 10, 2014, Halberstam, Thomas, and McGovern filed a third amended consolidated complaint omitting certain claims and dropping Kolano as a plaintiff.[8]  On December 10, 2014, NJOY filed a motion to dismiss the third amended complaint.[9]

On May 20, 2015, while the motion to dismiss was still under submission, plaintiff Eric McGovern filed a notice of voluntary dismissal of his individual claims pursuant to Rule 41(a)(1) of the Federal Rules of Civil Procedure.[10]  Seven days later, on May 27, 2015, the court granted in part and denied in part NJOY's motion to dismiss the third amended complaint.[11]  It denied the motion to dismiss Halberstam's and Thomas' (collectively, "plaintiffs") claims to the extent they were based on fraudulent omissions, and/or on NJOY's "Resolution Solution" and "Friends Don't Let Friends Smoke" advertisements.[12]  The court granted the motion to the extent the claims were based on NJOY's "Try Something New in Bed" advertisement.[13]  On June 16, 2015, plaintiffs filed a fourth amended

---

[5]Second Amended Consolidated Complaint ("SAC"), Docket No. 66 (July 9, 2014).

[6]Motion to Dismiss Second Amended Consolidated Complaint, Docket No. 72 (Aug. 11, 2014).

[7]Order Granting Defendant's Motion to Dismiss, Docket No. 81 (Oct 20, 2014).

[8]Third Amended Consolidated Complaint ("TAC"), Docket No. 82 (Nov. 10, 2014).

[9]Motion to Dismiss Third Amended Consolidated Complaint ("Motion"), Docket No. 84 (Dec. 10, 2014) at 1.

[10]Notice of Dismissal by Eric McGovern, Docket No. 114 (May 20, 2015).

[11]Order Granting in Part and Denying in Part Motion to Dismiss, Docket No. 119 (May 27, 2015).

[12]*Id*. at 42.

[13]*Id*.

2

complaint,[14] which NJOY answered on July 6, 2015.[15]

On May 21, 2015, plaintiffs filed a motion for class certification.[16] NJOY opposes the motion.[17] It also filed two motions to strike declarations filed in support of class certification,[18] which plaintiffs oppose.[19]

# I. FACTUAL BACKGROUND

## A.    Background Concerning Electronic Cigarettes

An electronic cigarette ("e-cigarette") is a device that simulates a traditional tobacco cigarette.[20] E-cigarettes use a battery-operated heating mechanism to convert a cartridge containing glycerin, glycol, natural and artificial flavors, and usually nicotine, into vapor, which the user inhales as he or she would a traditional cigarette.[21]   Since 2011, e-cigarettes have grown in popularity among smokers in the United States.[22]   NJOY is the most popular brand of e-cigarette in the nation, and has captured more than forty percent of the e-cigarette market.[23]   This action concerns

---

[14]Fourth Amended Consolidated Complaint ("FAC"), Docket No. 127 (June 16, 2015).

[15]Answer to Fourth Amended Consolidated Complaint, Docket No. 151 (July 6, 2015).

[16]Motion For Class Certification ("Certification Motion"), Docket No. 115-1 (May 21, 2015).

[17]Opposition to Motion for Class Certification ("Certification Opposition"), Docket No. 130 (June 22, 2015).

[18]Motion to Strike Declaration of Jeffrey Harris ("MTS Harris"), Docket No. 138 (June 29, 2015); Motion to Strike Declaration of Thomas Maronick ("MTS Maronick"), Docket No. 140 (June 29, 2015).

[19]Opposition to Motion to Strike Declaration of Thomas Maronick ("MTS Maronick Opposition"), Docket No. 156 (July 10, 2015); Opposition to Motion to Strike Declaration of Jeffrey Harris ("MTS Harris Opposition"), Docket No. 157 (July 10, 2015).

[20]FAC, ¶ 23.

[21]Id.

[22]Id., ¶¶ 24-27.

[23]Id., ¶ 27.

NJOY e-cigarettes marketed under the trade names "NJOY," "NJOY Kings," "OneJoy," and "NPRO."[24]

As a result of the increasing popularity of e-cigarettes among consumers, government agencies and research facilities have conducted several studies regarding their potential health impacts and risks.[25] These studies have concluded, among other things, that: (1) e-cigarettes contain measurable amounts of carcinogens, toxins, and other contaminants that are, or potentially are, disease-causing; (2) e-cigarettes have potentially harmful side effects; and (3) more studies are needed to determine the full range of health dangers associated with the use of e-cigarettes.[26]

In 2009, for example, the United States Food and Drug Administration ("FDA") conducted a study of two brands of e-cigarettes, one of which was NJOY.[27]  The FDA study concluded that NJOY e-cigarettes contained detectable levels of known carcinogens and toxic chemicals, and that the quality control processes used to manufacture them were  inconsistent or non-existent, as evidenced by the varying levels of nicotine inhaled with each puff.[28]  Following the study, the FDA released a consumer health brochure and safety alert reflecting the study's findings.[29]  In June 2012, a study published in the Journal of the American College of Chest Physicians concluded that e-cigarettes have "immediate adverse physiologic[al] effects after short-term use that are similar to some of the effects seen in tobacco smoking," and urged that further research be conducted concerning the health effects of e-cigarettes.[30]

In 2013, the German Cancer Research Center published a comprehensive report on e-cigarettes that reviewed studies and literature in the field.[31]  The report concluded, *inter alia*, that e-cigarettes

---

[24]*Id.*, ¶ 22.

[25]*Id.*, ¶ 30.

[26]*Id.*

[27]*Id.*, ¶ 31.

[28]*Id.*, ¶ 32.

[29]*Id.*, ¶ 33.

[30]*Id.*, ¶ 42.

[31]*Id.*, ¶ 40.

could not currently be "rated as safe"; that consumers typically do not have access to reliable information concerning product quality; that e-cigarettes have technical flaws (e.g., leaking cartridges, accidental intake of nicotine when replacing cartridges, and the possibility of unintended overdose); and that manufacturers provide insufficient information about the ingredients used in e-cigarettes.[32]  The report also noted that the liquids in e-cigarettes contain harmful substances and ingredients that irritate a user's airways and can lead to allergic reactions; that adverse health effects for third party bystanders could not be excluded; and that continuing health effects on users were unknown given the lack of studies concerning the effects of long-term use of e-cigarettes.[33]

The World Health Organization ("WHO") expressed concerns regarding the presence of carcinogens and other toxic chemicals in e-cigarettes in May and July 2013,[34] concerns which were raised again in August 2013 in a separate French report on the subject.[35]  The University of California at Riverside also published a study in 2013, reporting that there were "harmful and potentially harmful chemicals," as well as metal and silicate particles, in e-cigarette aerosols inhaled by users.[36]  Additionally, two studies published at the end of 2013 concluded that e-cigarettes may pose health risks not associated with the use of traditional cigarettes,[37] and that they may not significantly reduce the risk for heart disease associated with traditional cigarettes.[38]

## B.    Allegedly Misleading Advertisements and Representations During the Class Period

Plaintiffs allege that, during the class period, NJOY has engaged in a continuous, widespread campaign deceptively to promote NJOY e-cigarettes as "everything you like about smoking without the

---

[32] *Id.*

[33] *Id.*, ¶¶ 40-41.

[34] *Id.*, ¶¶ 37-38.

[35] *Id.*, ¶ 43.

[36] *Id.*, ¶¶ 44-45.

[37] *Id.*, ¶ 46.

[38] *Id.*, ¶ 47.

1   things you don't."[39]   Plaintiffs contend the advertisements convey the message that using NJOY e-

2   cigarettes is known to be safer than smoking traditional cigarettes.[40]   Specifically, they assert that, given

3   the multiple studies concluding that e-cigarettes contain carcinogens, toxins, and other potentially

4   harmful impurities also found in traditional cigarettes, the advertisements are false and misleading.[41]

5   Plaintiffs also contend NJOY's marketing message is false and misleading because there is insufficient

6   research regarding the long-term effects of e-cigarettes for NJOY to assert that its products do not pose

7   the same health risks as traditional cigarettes.[42]   NJOY made the purportedly false and misleading

8   statements: (1) on e-cigarette packaging; (2) in inserts to product packaging and on shipping materials;

9   (3) in press releases; (4) in print advertisements; (5) in television advertisements; (6) in radio

10   advertisements;  and (7) on the NJOY website.[43]   Some of plaintiffs' specific allegations concerning

11   each of these forms of advertising are detailed below.

12        In December 2012, NJOY purportedly introduced a new product – NJOY Kings.[44]   Plaintiffs

13   allege that NJOY designed Kings to look like traditional cigarettes in order to capitalize on consumers'

14   desire to smoke, but avoid the health dangers of traditional tobacco.[45]   NJOY purportedly launched this

15   product in a widespread marketing campaign, the core message of which was that a consumer would

16   "get to keep all the things [he] like[d] about smoking while losing the things [he didn't]."[46]

17        <u>Packaging</u>: Plaintiffs assert that the warnings on NJOY's product packaging omit material

18   information – e.g., a list of product ingredients – and in this way conceal the health risks associated with

19

20        [39]*Id.*, ¶ 58.

21        [40]*Id.*

22        [41]*Id.*

23        [42]*Id.*

24        [43]*Id.*

25        [44]*Id.*, ¶ 65.

26        [45]*Id.*

27        [46]*Id.*, ¶¶ 66-67.

28

1   the chemicals the product contains.[47]  They contend that by failing to reference carcinogens, toxins, and

2   impurities, and warning only of risks from nicotine and swallowing the concentrated contents of the

3   cartridge, the packaging implies that these are the only health-related risks associated with use of the

4   product.[48]  Plaintiffs assert that NJOY also utilized small print on the back of its packaging, which was

5   difficult for consumers to read.[49]

6        Plaintiffs contend that these material omissions are reinforced by misleading statements on

7   NJOY packaging inserts, such as: "The NJOY King provides everything you like about smoking without

8   the things you don't"; "Be sure to tell your friends and family about the positive impact that NJOY

9   products are having on your life"; and "the NJOY King gives you everything you love about the

10  smoking experience."[50]

11       NJOY's Advertising Campaigns: Plaintiffs allege that, beginning in December 2012 and January

12  2013, NJOY circulated advertisements that were false and misleading because they highlighted the

13  positive aspects of e-cigarettes without referencing the negative side effects and health consequences

14  associated with their use.[51]  Specifically, plaintiffs contend that the following NJOY advertisements and

15  statements on the company website were misleading: (1) an advertisement stating that "[t]he most

16  amazing thing about this cigarette . . . [is that] [i]t isn't one," and that NJOY Kings allow users "to keep

17  all the things [they] like about smoking while losing the things [they] don't";[52] (2) an advertisement

18  stating that "[f]inally, smokers have a real alternative. . . . [Y]ou get to keep the things you like about

19  smoking, while losing the things you don't. . . .   Cigarettes, you've met your match";[53] (3) an

20  _____

21       [47]Id., ¶ 59.

22       [48]Id., ¶ 63.

23       [49]Id., ¶ 62.

24       [50]Id., ¶¶ 81-82.

25       [51]Id., ¶ 74.

26       [52]Id., ¶ 67.  Plaintiffs assert this advertisement ran in the June 2013 edition of *Out Magazine*.

27  (*Id.*, ¶ 68.)

28       [53]Id., ¶ 68.

7

1 advertisement that invited consumers to "[s]tart a new relationship. . . .  You get to keep the things you

2 like about cigarettes while losing the things you don't";[54] (4) an advertisement stating that NJOY Kings

3 "provide[ ] everything you like about smoking without the things you don't";[55] (5) an advertisement

4 stating:  "Try something new in bed.  Finally smokers have a real alternative . . . What's not to love?

5 Cigarettes, you've met your match";[56] and (6) an advertisement that stated: "Turning New York City

6 into the City that Never Smokes" above the statement "Cigarettes, you've met your match."[57]

7 Plaintiffs contend that an advertisement with the caption "Resolution Solution" was also false

8 and misleading because it represented that NJOY e-cigarettes are a smoking cessation aid when, in fact,

9 they are not.[58]  Finally, they assert that an NJOY commercial titled "Friends Don't Let Friends Smoke,"

10 which first aired in January 2014, would cause a reasonable consumer to believe that "friends don't let

11 friends smoke" because of the health risks associated with traditional cigarettes, suggesting that e-

12 cigarettes do not pose similar health risks.[59]

13 NJOY's Website: Plaintiffs allege that NJOY's website contains multiple materially false and

14 misleading statements concerning the ingredients in e-cigarettes.[60]  Specifically, they assert that NJOY's

15 representations that propylene glycol, glycerin, nicotine, and natural and artificial flavors are recognized

16 as safe for use in food or occur naturally in plants and food creates the false and misleading impression

17

18

19 [54]*Id.*, ¶ 70.  Plaintiffs contend this statement ran in *USA Today* in April 2013 and *Out Magazine* in May 2013. (*Id.*, ¶ 70.)

20

21 [55]*Id.*, ¶ 64.

22 [56]*Id.*, ¶ 68.  Plaintiffs allege this statement ran in *New York Magazine* in February 2013.  (*Id.*, ¶ 69.)

23

24 [57]*Id.*, ¶ 72. Plaintiffs assert this statement ran in at least two editions of *New York Magazine* in September 2013.  (*Id.*)

25 [58]*Id.*, ¶¶ 74-77.  Plaintiffs contend this advertisement ran in *Sports Illustrated* in December 2012 and January 2013, and in *Rolling Stone* in January 2013.  (*Id.*, ¶ 77.)

26

27 [59]*Id.*, ¶ 88.

28 [60]*Id.*, ¶ 89.  Plaintiffs allege that the product description for NJOY Kings on NJOY's website states: "It provides everything you like about smoking without the things you don't."  (*Id.*, ¶ 85.)

that they are safe for inhalation, when the FDA has not recognized them as safe for that purpose.[61] Plaintiffs also allege that NJOY's representations on its website about "regulatory compliance" misstate various district court and appellate rulings concerning its marketing practices, and mislead consumers by implying that the FDA or courts have approved NJOY's past advertising, or changes to its advertising that post-date the opinions.[62]

Plaintiffs concede that NJOY had modified its website as of the date of the filing of their complaint; they contend, however, that it remains deceptive.[63]  For example, the website purportedly states that propylene glycol "provides the vapor mist that looks like tobacco smoke" without mentioning its adverse health consequences.[64]

Finally, plaintiffs assert that NJOY knew its advertising campaign would convey to reasonable consumers that its products were safer than traditional cigarettes.[65]  On July 26, 2012, NJOY's executive vice president, Roy Anise, purportedly stated in an email that the company's marketing "strategy separates NJOY from cigarettes, makes NJOY the solution, [and] will get across the 'safer' message."[66] For this reason, plaintiffs allege that NJOY and its agents intended that consumers read a safety message into its advertisements.[67]

### C.     The Individual Plaintiffs and Class Claims

Halbertstam purportedly saw NJOY's packaging and read the warnings prior to purchasing its

---

[61]*Id.*, ¶¶ 89-94.  Plaintiffs contend that the frequently asked questions page of NJOY's website states the following: "Nicotine - is an alkaloid found in certain plants, predominately tobacco, and in lower quantities, tomatoes, potatoes, eggplants, cauliflower, bell-peppers, and some teas."  (*Id.*, ¶ 91.)

[62]*Id.*, ¶¶ 95-96.

[63]*Id.*, ¶ 102

[64]*Id.*

[65]*Id.*, ¶ 103.

[66]*Id.*, ¶ 104.

[67]*Id.*, ¶ 106.

e-cigarettes.[68]   Plaintiffs allege that Halberstam has subscribed to *Rolling Stone* magazine since approximately June 2012, and that he saw the NJOY advertisement that ran in *Rolling Stone* between December 2012 and January 2013.[69]   Halberstam also purportedly read *Sports Illustrated* and *ESPN Magazine* between December 2012 and early 2013, and saw NJOY's "Resolution Solution" and "Try Something New in Bed" advertisements.[70]   Halberstam purchased NJOY Kings in September 2013 in Los Angeles, California; he allegedly purchased five packages of e-cigarettes intermittently on other occasions.[71]   Plaintiffs assert that, relying on NJOY's core marketing message, Halberstam purchased the e-cigarettes because he believed them to be safe.[72]   They contend Halberstam would not have purchased NJOY e-cigarettes had he known about the potentially harmful side effects.[73]

Halberstam alleges two claims on his behalf and on behalf of a California class: (1) violation of the California Consumers Legal Remedies Act ("CLRA"), California Civil Code §§ 1770(a)(5), (a)(7), and (a)(9); and (2) violation of California's Unfair Competition Law ("UCL"), California Business and Professions Code § 17200 *et seq.*[74]

Thomas purchased one NJOY "OneJoy" e-cigarette in Jacksonville, Florida, in the summer of 2012.[75]   Plaintiffs allege that Thomas saw NJOY's packaging and read the warnings prior to making the purchase;[76] they assert she believed that the only risks associated with NJOY e-cigarettes were those

---

[68]*Id.*, ¶ 108.

[69]*Id.*, ¶ 109.

[70]*Id.*

[71]*Id.*, ¶ 17.

[72]*Id.*, ¶ 110.

[73]*Id.*, ¶¶ 106, 110.

[74]*Id.*, ¶¶ 123-154.

[75]*Id.*, ¶ 18.

[76]*Id.*, ¶ 111.

1   disclosed on the packaging, and that e-cigarettes were generally safer than traditional cigarettes.[77]

2   Thomas alleges a single claim on her behalf and on behalf of a Florida class for violation of Florida's

3   Deceptive and Unfair Trade Practices Act ("FDUTPA"), § 501.201, Florida Statutes, *et seq.*[78]

4           **D.      Plaintiffs' Request for Judicial Notice**

5           Plaintiffs filed a request for judicial notice along with their reply in support of class certification.

6   In it, they ask the court to take judicial notice of an *amicus curiae* brief of economists Robert Solow and

7   George Akerlof filed in support of plaintiffs-appellees in *Price v. Philip Morris*, 219 Ill.2d 182 (2005).[79]

8   NJOY does not oppose the request.

9           Under Rule 201 of the Federal Rules of Evidence, "the [c]ourt may take judicial notice of

10  matters of public record if the facts are not subject to reasonable dispute."   *Olds v. Metlife Home*

11  *Loans*, No. SACV 12-55 JVS (RNBx), 2012 WL 10420298, *1 n. 1 (C.D. Cal. Mar. 19, 2012) (citing

12  *Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001)).   Court orders and filings are proper

13  subjects of judicial notice.   See, e.g., *United States v. Black*, 482 F.3d 1035, 1041 (9th Cir. 2007)

14  (noting that a court "may take notice of proceedings in other courts, both within and without the

15  federal judicial system, if those proceedings have a direct relation to matters at issue"); *Reyn's Pasta*

16  *Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n. 6 (9th Cir. 2006) (taking judicial notice of pleadings,

17  memoranda, and other court filings); *Asdar Group v. Pillsbury, Madison & Sutro*, 99 F.3d 289, 290 n.

18  1 (9th Cir. 1996) (court may take judicial notice of pleadings and court orders in related proceedings).

19  Courts have taken judicial notice of amicus briefs in other actions under Rule 201 as court records.

20  See *Natural Resources Defense Council v. Southwest Marine, Inc.*, 39 F.Supp.2d 1235, 1235 n. 1

21  (S.D. Cal. 1999) ("The Court takes judicial notice of . . . the U.S. Government's amicus curiae brief

22  in the same matter.   As the brief is not a 'fact,' legal or adjudicative, but only legal argument,

23  Fed.R.Evid. 201 is not a bar"), aff'd, 236 F.3d 985 (9th Cir. 2000); *Gooden v. SunTrust Mortg., Inc.*,

24  No. 2:11-CV-02595-JAM, 2013 WL 6499250, *2 (E.D. Cal. Dec. 11, 2013) (taking judicial notice

25  ─────────────

26  [77]*Id.*

27  [78]*Id.*, ¶¶ 155-163.

28  [79]Plaintiffs' Request for Judicial Notice, Docket No. 149-4 (July 6, 2015).

of an amicus curiae brief on the grounds that the brief is not a fact, "but only legal argument").  The
court therefore grants plaintiffs' request for judicial notice.

## II.  DISCUSSION

### A.    Motions to Strike and Evidentiary Objections

Before addressing the merits of the certification motion, the court must first consider the
parties' challenges to declarations filed by their respective experts.  NJOY contends that the expert
declarations of Thomas Maronick and Jeffrey Harris, which plaintiffs submitted in support of their
motion for class certification, should be stricken because they are inadmissible and unreliable.
Plaintiffs counter that the Maronick and Harris declarations are admissible expert testimony.  They
object to the declaration of Carol Scott, NJOY's rebuttal economic expert.[80]

### 1.    Motions to Strike the Testimony of Plaintiffs' Experts

The court first considers NJOY's challenges to plaintiffs' experts.  While courts in this circuit
previously held that expert testimony was admissible in evaluating class certification motions
without conducting a rigorous analysis under *Daubert v. Merill Dow Pharmaceuticals, Inc.*, 509
U.S. 579, 591 (1993), the Supreme Court in *Dukes* expressed "doubt that this [was] so." *Wal-Mart
Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2554 (2011).   After *Dukes*, the Ninth Circuit approved
analysis under *Daubert* of the admissibility of expert testimony presented in support of or opposition
to a motion for class certification.  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir.
2011) ("In its analysis of Costco's motions to strike, the district court correctly applied the
evidentiary standard set forth in *Daubert*. . .").  As a result, the court applies that standard to the
proffered testimony of the parties' expert witnesses.

Under Rule 702,

"[i]f scientific, technical, or other specialized knowledge will assist the trier of fact

---

[80]Plaintiffs object to Scott's declaration, asserting that she is not qualified under *Daubert* to opine
on economic damages methodologies, and that she does not provide any foundation to support her
conclusions.  (Objections to the Testimony of Carol A. Scott, Docket No. 162 (July 10, 2015).)  The
court addresses these objections *infra*.

to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

FED.R.EVID. 702.

See also *United States v. Finley*, 301 F.3d 1000, 1007 (9th Cir. 2002) ("[Rule 702] consists of three distinct but related requirements: (1) the subject matter at issue must be beyond the common knowledge of the average layman; (2) the witness must have sufficient expertise; and (3) the state of the pertinent art or scientific knowledge permits the assertion of a reasonable opinion"); *Sterner v. U.S. Drug Enforcement Agency*, 467 F.Supp.2d 1017, 1033 (S.D. Cal. 2006) ("There are three basic requirements that must be met before expert testimony can be admitted. First, the evidence must be useful to a finder of fact. Second, the expert witness must be qualified to provide this testimony. Third, the proposed evidence must be reliable or trustworthy" (citations omitted)).

Before admitting expert testimony, the trial court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93; see also *Ellis*, 657 F.3d at 982 ("Under *Daubert*, the trial court must act as a 'gatekeeper' to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards by making a preliminary determination that the expert's testimony is reliable"). In conducting this preliminary assessment, the trial court is vested with broad discretion. See, e.g., *General Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997); *United States v. Espinosa*, 827 F.2d 604, 611 (9th Cir. 1987) ("The decision to admit expert testimony is committed to the discretion of the district court and will not be disturbed unless manifestly erroneous").

"The party offering the expert bears the burden of establishing that Rule 702 is satisfied." *Sundance Image Tech., Inc. v. Cone Editions Press, Ltd.*, No. CV 02-2258 JM (AJB), 2007 WL 935703, *4 (S.D. Cal. Mar. 7, 2007) (citing *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999) (in turn citing *Daubert*, 509 U.S. at 592 n. 10)); see also *Walker v. Contra Costa*

*County*, No. C 03-3723 TEH, 2006 WL 3371438, *1 (N.D. Cal. Nov. 21, 2006) (same, citing *Bourjaily v. United States*, 483 U.S. 171, 172 (1987), and *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994)).[81]

"In determining whether expert testimony is admissible under Rule 702, the district court must keep in mind [the rule's] broad parameters of reliability, relevancy, and assistance to the trier of fact." *Sementilli v. Trinidad Corp.*, 155 F.3d 1130, 1134 (9th Cir. 1998) (internal quotation marks omitted); see also *Jinro Am. Inc. v. Secure Invests., Inc.*, 266 F.3d 993, 1004 (9th Cir. 2001) ("Rule 702 is applied consistent with the 'liberal thrust' of the Federal Rules and their general approach of relaxing the traditional barriers to opinion testimony" (internal quotation marks omitted)). On a motion for class certification, it is not necessary that expert testimony resolve factual disputes going to the merits of plaintiff's claims; instead, the testimony must be relevant in assessing "whether there was a common pattern and practice that could affect the class as a whole." *Ellis*, 657 F.3d at 983.

### a. Plaintiffs' Expert Jeffrey Harris

Jeffrey Harris is plaintiffs' economic expert. Harris is a Professor of Economics at Massachusetts Institute of Technology ("MIT"). He has been a tenured full professor since 1998, and regularly teaches courses in health economics and microeconomics.[82] He holds a Ph.D. in Economics from the University of Pennsylvania, an M.D. from the University of Pennsylvania, and a bachelor of arts degree from Harvard University.[83] Harris has testified as an expert in federal and state courts, and before U.S. Congressional committees; he has also advised numerous government agencies, and served as an invited member of the National Academy of Sciences, where he was a contributor and senior reviewer of the U.S. Surgeon General's reports on smoking and health in 1979-83, 1986, 1988, 1989, and 1996.[84]

---

[81]This showing must be by a preponderance of the evidence. See *Daubert*, 509 U.S. at 594 n. 10 (citing *Bourjaily*, 483 U.S. at 175-76).

[82]Certification Motion, Exh. 14 (Declaration of Jeffrey Harris ("Harris Decl.")), ¶ 1.

[83]Harris Decl., Exh. A (Currivulum Vitae).

[84]*Id.*, ¶ 3.

NJOY contends that Harris's declaration is unreliable under *Daubert* for two reasons. First, it asserts that Harris assumes the price premium associated with the misleading statements can be calculated by relying on other surveys and not conducting his own. Second, it argues that Harris's model is unreliable because it fails to provide a restitutionary measure of damages, i.e., benefit of the bargain damages.[85] The court addresses each contention in turn.

### (1)   Whether Harris Can Calculate a Price Premium

Harris opines that a "reasonable consumer would be willing to pay a price premium for the perceived value of [NJOY's] safety claim," and that

> "[t]here are scientifically reliable methods to measure the price premium that class members paid for the perceived value of the safety claim during the class period. . . . In combination with data on Defendant's sales to class members during the class period, the estimates of the price premium paid for Defendant's safety claim can be used to calculate class-wide damages."[86]

Harris asserts it is possible to determine the damages attributable to NJOY's purportedly false safety claims by using "conjoint analysis."[87]

NJOY challenges Harris's declaration on a number of bases. First, it contends that Harris relies on a "demonstrably false factual premise," i.e., that NJOY's advertising campaign began in 2007 and that the advertisements were widespread.[88] Harris states in his declaration:

> "Plaintiffs' counsel have asked me to assume that beginning in 2007, and continuing during the class period, [NJOY] 'has engaged in a consistent and pervasive marketing campaign that promotes its core marketing message that NJOY E-Cigarettes are known

---

[85]MTS Harris at 6-11. NJOY proffers the declaration of its expert, Carol Scott, in support of its motion to strike Harris's declaration. (Declaration of Carol Scott ("Scott Decl."), Docket No. 130-6 (June 22, 2015).)

[86]*Id.*, ¶¶ 17(a)-(c).

[87]*Id.*, ¶ 30.

[88]MTS Harris at 4-5.

to be safer than traditional tobacco cigarettes or generally safe.' I refer to this core marketing message as the [ ] safety claim."[89]

NJOY asserts it "did not begin advertising its products until December 2012 (not 2007), and even then, [its] market was disparate and the ads were limited in duration."[90] In *Micro Chemical, Inc. v. Lextron, Inc.*, 317 F.3d 1387 (Fed. Cir. 2003), the Federal Circuit considered somewhat similar facts. Defendants filed a motion *in limine* to exclude plaintiff's expert testimony regarding damages alleging, *inter alia*, that the expert relied on "insufficient facts or data." *Id.* at 1392-93. Respecting the contention that the expert had relied on insufficient facts, the court noted that "it is not the role of the trial court to evaluate the correctness of [the] facts underlying one expert's testimony." *Id.* at 1392. Moreover, the Advisory Committee notes to Rule 702 concerning the 2000 amendment explains that the addition of a requirements that the expert's testimony be based on "'sufficient facts or data' [was] not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other." Thus, "when the parties' experts rely on conflicting sets of facts, an expert may testify on his party's version of the disputed facts." *DSU Med. Corp. v. JMS Co*., 296 F.Supp.2d 1140, 1147-48 (N.D. Cal. 2003) (citing *Lextron*, 317 F.3d at 1392). All that NJOY has shown is that, under its view of the facts, Harris's testimony may not be convincing; that is not a valid basis for excluding Harris as an expert. The court therefore declines to do so. See *IGT v. Alliance Gaming Corp*., No. 2:04 CV 1676 RCJ RJJ, 2008 WL 7071468, *14 (D. Nev. Oct. 21, 2008) ("When the parties' experts rely on conflicting sets of facts, an expert may testify on his party's version of the disputed facts. For the foregoing reasons, Dr. Adams's expert opinion is not improper under Rule 702"); *Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc*., No. C 03 1431 SBA, 2006 WL 1390416, *7 (N.D. Cal. May 18, 2006) ("Thus, all that Baxter has shown is that, under Baxter's interpretation of the facts, Dr. Rubinfeld's testimony regarding the 2008K may not be convincing. However, '[w]hen, as here, the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate

---

[89]Harris Decl., ¶ 14 (citing FAC, ¶ 10).

[90]*Id.* at 5 (citing Declaration of Francesca Vaccari ("Vaccari Decl."), Docket No. 130-2 (June 22, 2015), ¶¶ 2-9).

the correctness of facts underlying one expert's testimony.'   As such, Baxter has not convincingly

established that this is a valid basis for excluding Dr. Rubinfeld as an expert"); see also *Nova Consulting*

*Group, Inc. v. Engineering Consulting Servs., Ltd.*, 290 Fed. Appx. 727, 733 (5th Cir. Aug. 22, 2008)

(Unpub. Disp.) ("ECS, however, cites nothing to show any of those assumptions render an expert's

opinion unreliable in these circumstances.   Moreover, [w]hen, as here, the parties' experts rely on

conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying

one expert's testimony.   Rather, [v]igorous cross-examination, presentation of contrary evidence, and

careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky

but admissible evidence" (internal quotation marks omitted)).   Second, NJOY contends that Harris's

opinion that a "reasonable consumer would be willing to pay a price premium for the perceived value

of the [ ] safety claim," is flawed because he did not conduct an independent survey or analysis to reach

that conclusion.[91]   NJOY contends this is "contrary to sound scientific practice," and that Harris "did

not 'demonstrate that he followed a scientific method embraced by at least some other experts in the

field.'"   *Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534, 547 (C.D. Cal. 2012) (quoting

*Cabrera v. Cordis Corp*., 134 F.3d 1418, 1423 (9th Cir. 1998)).   The court does not agree.

NJOY is correct that Harris did not conduct a survey to determine whether a reasonable

consumer would be willing to pay a price premium for the perceived value of a safety claim.   This does

not automatically render his opinion or methodology unreliable, however.   "An expert is of course

permitted to testify to an opinion formed on the basis of information that is handed to rather than

developed by him – information of which he lacks first-hand knowledge and which might not be

admissible in evidence no matter by whom presented."   See *Matter of James Wilson Associates*, 965

F.2d 160, 172-73 (7th Cir. 1992).   Harris cites previously conducted surveys to support his conclusion

that a reasonable consumer would be willing to pay a price premium for the perceived value of a safety

claim.   He explains that "[e]conomists have used the concept of willingness to pay to measure the price

premium that consumers would be willing to pay for improved products or product attributes," and

further opines that such a conclusion is even more applicable in the context of e-cigarettes, "as

---

[91]MTS Harris at 6.

17

reasonable consumers cannot directly evaluate claims that [e-cigarettes] are safe or safer than conventional tobacco cigarettes."[92]  The studies he cites thus confirm that Harris *did* "follow[ ] a scientific method embraced by at least some other experts in the field." *Cholakyan*, 281 F.R.D. at 547.

Harris relies on several economic studies *involving tobacco smokers*, each of which found that consumers were willing to pay a price premium for purported health and safety improvements.  He cites (1) a Taiwanese study that found cigarette smokers were willing to pay a 152% increase over the average price of a pack of cigarettes for cigarettes that had a 50% lower risk of lung cancer; (2) a Swedish study that found smokers were willing to pay the equivalent of 29% to 121% of the price of a pack of premium cigarettes for a pack of "risk-free" cigarettes; and (3) a study that found 84% of smokers were willing to pay $50 per week ($20 per week more than the price of a nicotine patch) for a treatment that offered twice as great a chance they would successfully quit smoking than a nicotine patch.[93]  NJOY does not contend, nor would it appear that it could, that Harris lacks "the requisite scientific background and familiarity with survey methodolog[ies]" to understand the surveys on which he relies.  See *Elliott v. Google Inc.*, 45 F.Supp.3d 1156, 1168 (D. Ariz. 2014).  Far from demonstrating a fundamental flaw in his methodology, therefore, the studies support Harris's conclusion that a reasonable consumer would be willing to pay a price premium based on the perceived health benefits of e-cigarettes.

Harris also notes that NJOY's internal records suggest it has focused its marketing of e-cigarettes on the claim that they are "ultimately better than a cigarette, *without the harm*."[94]  For example, a June 2013 internal document titled "Brand Strategy and TV Brainstorm Session 5.28: Notes and Outcome" observes that "[f]or 75 years there hasn't been a solution to the problem of smoking.  Now there's the NJOY King Electronic Cigarette.  If you're a smoker or have a loved one that smokes . . . finally there is a real alternative."[95]  These documents indicate that NJOY knows consumers are willing to pay a price

---

[92]Harris Decl., ¶¶ 23-24.

[93]*Id*., ¶¶ 27-29.

[94]*Id*., ¶ 37.

[95]*Id*., ¶ 40.

18

premium for a healthier alternative to traditional tobacco cigarettes.  Thus, Harris's opinion that a price

premium can be calculated is supported not only by third party studies, but by NJOY's own marketing

documents as well.

NJOY repeatedly cites *Cholakyan*, 281 F.R.D. at 547, as support for its assertion that Harris was

required to conduct a survey to determine if consumers are willing to pay a price premium for a healthier

smoking alternative.  *Cholakyan* does not hold that a survey is required, and it is readily distinguishable.

There, an expert declaration "incorporate[d] wholesale the results of two investigations conducted at the

request of State Farm Insurance Company."  281 F.R.D. at 547.  The court noted that "the fact that [the

expert] quote[d] extensively from the reports indicate[d] not that he [wa]s using them to confirm the

validity of his opinions, but rather that he [sought] to serve as a mouthpiece for others."  *Id*.  The

declaration therefore "offer[ed] no independent analysis or opinion," and was unreliable.  *Id*.  Here, there

is no indication that Harris simply lifted his opinions wholesale from the work of others.  He offers an

in-depth discussion as to how, using conjoint analysis and direct method analysis, plaintiffs can isolate

the price premium attributable to NJOY's purported misstatements.

In sum, Harris's conclusion that a price premium can be calculated is not unreliable, nor is it the

result of impermissible reliance on the opinions of other experts.

**(2)      Whether Harris's Conjoint Analysis and Direct
Method Analysis Are Sufficiently Reliable for
Purposes of *Daubert***

NJOY next asserts that plaintiffs' damages model is not tied to their theory of liability, and thus

runs afoul of the Supreme Court's decision in *Comcast Corp. v. Behrend*, __ U.S. __, 133 S.Ct. 1426

(2013).  Harris proposes to calculate damages using either conjoint or direct method analysis.  "Conjoint

analysis is a statistical technique capable of using survey data to determine how consumers value a

product's individual attributes – often called the market's willingness to pay."  *Saavedra v. Eli Lilly &

Co.*, No. 12-CV-9366-SVW, 2014 WL 7338930,  *4 (C.D. Cal. Dec. 18, 2014), leave to appeal denied

(Mar. 25, 2015).  As Harris explains, "[i]n conjoint analysis, survey respondents are asked to make a

series of choices between different combinations of product attributes. . . .  Combining the responses

to all of the choice sets, the analyst can then use established statistical methods to estimate the separate

value (or part-worth) that consumers attach to each product attribute."[96]  He states that "[w]ith respect to the price attribute, the alternative levels can be expressed either in dollar units or in percentage terms."[97]  Harris contends that using a percentage makes more sense, given that the purchase price of NJOY e-cigarettes varied from year to year.  Thus, once the price premium for the safety messages is isolated, the resulting price premium attributable to the safety claim can be computed as a percentage of the purchase price – i.e., the safety message was "worth" X% of the purchase price.[98]

Direct method analysis is substantially similar.  "In the direct method, representative members of the class are directly asked what they would be willing to pay for additional safety."  Thus, like conjoint analysis, this method employs "valuation surveys to measure consumers' willingness to pay for private and public goods that could improve their personal health."[99]  Harris states that survey respondents are asked to calculate the price premium attributable to NJOY's safety message  by choosing between various safety profiles.[100]  Respondents who would buy an e-cigarette without a safety message are assigned a discount of 0 percent, reflecting a willingness to pay of 100%.  Respondents who prefer a product with a safety message are asked a series of questions to ascertain their willingness to pay for the product in the absence of the safety claim, i.e., "would you be willing to pay 10% less for the product without the claim," etc.[101]  The price premium attributable to the safety claim can then be computed as the average discount across respondents.[102]

NJOY asserts that courts have "rejected [Harris's] type of methodology for calculating damages"

---

[96]Harris Decl., ¶ 45.

[97]*Id.*, ¶ 52.

[98]*Id.*

[99]*Id.*, ¶¶ 54-55.

[100]*Id.*, ¶ 58.

[101]*Id.*, ¶ 59.

[102]*Id.*, ¶ 61.

because "it fails to incorporate data regarding market pricing of the products at issue."[103]  Whether or not NJOY's argument has merit, it "does not affect the *admissibility* of [Harris]'s opinions. Admissibility turns on whether [Harris]'s methodology is sufficiently reliable; whether it satisfies *Comcast* and shows that a class should be certified is another question altogether – one which the court will address *infra* in conducting a Rule 23(b)(3) predominance analysis." *In re ConAgra Foods, Inc.* ("*Conagra II*"), __ F.Supp.3d __, 2015 WL 1062756, *7 (C.D. Cal. Feb. 23, 2015); *In re Processed Egg Products Antitrust Litig.*, __ F.Supp.3d __, 2015 WL 337224, *22 (E.D. Pa. Jan. 26, 2015) ("Without making any pronouncements about the ultimate ability of Direct Purchaser Plaintiffs to clear the *Comcast* bar, the Court notes simply that, for *Daubert* purposes at least, the model proposed by Dr. Rausser is reliable and fits the case").

In fact, none of the cases NJOY cites find an expert's methodology unreliable for purposes of *Daubert*.  Two – which involve class actions – address the adequacy of the damages methodology in light of *Comcast* under Rule 23(b)(3).  See *ConAgra II*, 2015 WL 1062756 at *7 (expressly declining to conflate reliability under *Daubert* with whether a class should be certified under *Comcast*); *Saavedra v. Eli Lilly & Co.*, No. CV 12-9366 SVW, 2014 WL 7338930, *7 (C.D. Cal. Dec. 18, 2014) ("For all of these reasons, Plaintiffs[ ] have failed to present a method of calculating damages that is tied to their theory of liability.  The Court therefore DECLINES Plaintiff's motion to certify a damages class under Rule 23(b)(3)"), leave to appeal denied (9th Circ. Case No. 15-80000 Mar. 25, 2015).

The third decision NJOY cites concerns a preliminary injunction.  See *Apple, Inc. v. Samsung Electronics Co.*, No. CV 11-01846 LHK, 2014 WL 976898, *11 (N.D. Cal. Mar. 6, 2014), appeal dismissed (Fed. Cir. Case No. 14-1368 July 30, 2014).  The court concluded that the expert's "survey d[id] not provide a way to directly compare consumers' willingness to pay for particular features to the overall value of the infringing devices" because it "measure[d] the market demand for the patented features in a vacuum, without relation to the actual price or value of the devices."  *Id.*  The court made this observation, however, in "weighing the persuasiveness of [the expert's] survey as evidence of causal nexus," and expressly noted that it was not conducting a *Daubert* analysis.  *Id.* at *13 ("Here, of course,

---

[103]MTS Harris at 11.

the Court is not addressing a *Daubert* challenge").[104]   Thus, although each of these decisions is unquestionably relevant in assessing whether plaintiffs have shown that they can prove damages on a classwide basis, they do not support striking Harris's declaration as unreliable under *Daubert*.

NJOY makes one further argument.  It asserts that even if Harris's opinion that consumers would pay a price premium for a healthier smoking alternative is methodologically sound, it is nonetheless unreliable because he does not account for the fact that some (or perhaps many) class members did not see or rely on NJOY's marketing, or account for possible changes in consumer perceptions.  The court does not agree that any of these alleged flaws render the methodology unreliable under *Daubert*.

First, plaintiffs' theory of liability rests on allegations that NJOY engaged in mass marketing for a number of years and during that time employed substantially the same false and/or misleading safety message.[105]   Harris states in his declaration that he has assumed that plaintiffs' argument in this regard is true.[106]   In this regard, therefore, it appears Harris has remained true to the Supreme Court's mandate in *Comcast* that the damages calculation be tied to the plaintiffs' theory of liability.  His theory is not unreliable because it does not account for persons who may not have seen NJOY's advertisements.  He was told to presume that the advertisements had been seen, a fact plaintiffs will have to prove to prevail on the merits.  If, as NJOY contends, it turns out that many class members never saw the advertisements, then plaintiffs' theory of liability may prove unworkable.  That such a result is possible, however, does not make Harris's opinion unreliable.

---

[104]NJOY also cites *In re Zyprexa Products Liab. Litig.*, 253 F.R.D. 69, 165 (E.D.N.Y. 2008) rev'd on other grounds sub nom. *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121 (2d Cir. 2010). It contends the court in that case found a similar model by Harris "flawed." (MTS Harris at 16.)  NJOY is mistaken.  The court actually held that "[t]he jury w[ould] be in a position to assess the merits and deficiencies of Dr. Harris' analysis when computing the pricing overcharge for all class payors," and that "disagreements among competent experts are best left for jury resolution."  *Id*. at 166.

[105]See, e.g., Certification Motion at 10 ("The Safety Message pervaded Defendants' marketing. It was uniform in substance, regardless of the exact words used or the form that the marketing took").

[106]Harris Decl., ¶ 14 ("Plaintiffs' counsel have asked me to assume that beginning in 2007, and continuing during the class period, Defendant NJOY, Inc. 'has engaged in a consistent and pervasive marketing campaign that promotes its core marketing message that NJOY E-Cigarettes are known to be safer than traditional tobacco cigarettes or generally safe.' I refer to this core marketing message as the Defendant's safety claim").

More fundamentally, NJOY does not seriously contend that Harris's method fails to comport with accepted principles, or that his analysis is irrelevant to the issues in the case.[107]   Rather, it challenges the weight that should be given to his testimony.

For all these reasons, the court declines to strike Harris's declaration.[108]

### b.    Plaintiffs' Expert Thomas Maronick

NJOY also contends that the declaration of plaintiffs' expert Thomas Maronick should be stricken because it is unreliable and thus inadmissible under *Daubert*.  Maronick proffers opinions as to whether NJOY's purported misrepresentations were material to a reasonable consumer.[109]   Maronick is Professor of Marketing in the College of Business and Economics at Towson University in Towson, Maryland, where he teaches undergraduate and graduate courses in strategic marketing and marketing research; he has previously taught graduate and executive development courses in marketing, consumer behavior, and marketing research at a number of universities in the Baltimore and Washington DC area.[110]   His "educational background includes a BA in Philosophy from St. Thomas Seminary, an MSBA from the University of Denver, and a Doctorate in Business Administration [ ] from the University of Kentucky with a major in Marketing."[111]   He also holds a JD from the University of

---

[107]Although not raised by NJOY, the court notes that the fact Harris has not yet collected the survey data he will use in his conjoint analysis does not render his method unreliable. See *ConAgra II*, 2015 WL 1062756 at *69 ("The fact that Howlett intends to use future surveys to determine the 'relative importance' of a 'GMO–Free' interpretation of the '100% Natural' label does not make her methodology unreliable or fail to satisfy *Comcast*.  Any use of conjoint analysis for litigation purposes will have the same 'shortcoming' Ugone identifies"); *Guido v. L'Oreal, USA, Inc*., No. CV 11-1067 CAS (JCx), 2014 WL 6603730, *14 (C.D. Cal. July 24, 2014) (concluding that plaintiffs' proposed conjoint analysis satisfied *Comcast* and Rule 23(b)(3)'s predominance requirement where the analysis was to be based on future survey data and the product's historical price).

[108]At the hearing, NJOY did not raise the issue of Harris's declaration.

[109]Declaration of Thomas Maronick ("Maronick Decl."), Docket No. 115-13 (May 21, 2015), ¶ 3.

[110]*Id*., ¶ 1.

[111]*Id*.

Baltimore, School of Law.[112]

Maronick conducted an online survey to determine what messages consumers take from NJOY's advertising in order to assess the extent to which consumers found the safety message material.[113]  The universe for the survey "was a sample of individuals 18 or older who live in the United States and have smoked [e]-[c]igarettes in the past three months and have tried NJOY [e]-[c]igarettes" in the past.[114]  "[P]anel members who met the initial age criteria were sent an email message inviting them to participate in an online survey by clicking on a link included with the email invitation.  There was no mention of the topic of the survey in the email invitation. Respondents who clicked the link, i.e., agreed to participate in the online survey, were first asked screening questions to determine that they smoked [e]-[c]igarettes and specifically ha[d] tried NJOY brand [e]-[c]igarettes."[115] Qualified respondents were then randomly assigned to one of four "blocks."  Two of the blocks saw images of an NJOY print advertisement ("Resolution Solution" or "Try Something New in Bed"), one saw a 60-second television ad for NJOY E-Cigarettes ("Friends Don't Let Friends Smoke"), and the final block saw the front and back panel of a package of NJOY King e-cigarettes; no respondent was assigned to more than one block or asked about the images from more than one block.[116]

Respondents in each of the three advertising blocks (i.e., the print advertisements and commercial) were asked an open-ended question: "What does the ad say or suggest about NJOY E-Cigarettes?"[117]  Their verbatim responses was recorded.  They were then asked a closed-ended question: "Which of the following, if any, were said or suggested in the ad about NJOY

---

[112]*Id.*

[113]*Id.*, ¶ 19.

[114]*Id.*, ¶ 22.

[115]*Id.*

[116]*Id.*, ¶ 23.

[117]*Id.*, ¶ 24.

E-Cigarettes?"[118] Respondents who said the advertisement said or suggested the NJOY [e]-[c]igarettes were either "safe for your health" or "safer for your health than traditional tobacco cigarettes" were then asked: "How important, if at all, is it that NJOY [e]-[c]igarettes are safe (or safer) for your health in a person's decision to smoke NJOY [e]-[c]igarettes[?]"[119]  The options ranged from "Very important" to "Not at all important."  Finally, respondents in each of the two print advertisement blocks were shown the ad a second and third time, with specific claims highlighted and asked what the claims said or suggested about NJOY e-cigarettes.  Their verbatim responses were recorded.[120]

Respondents randomly assigned to the commercial block were directed to watch the video and then asked: "The NJOY ad says 'Friends don't let friends smoke.'  Based on what is said or suggested in the ad, what is the reason why 'Friends don't let friends smoke?'" Their verbatim responses were recorded.[121]  They were then asked the same questions as respondents in the print advertisement block concerning the message communicated by the commercial and the same importance questions.  Finally, they were asked to interpret the "cigarettes you've met your match" claim.[122]

Respondents randomly assigned to the "package block" were shown the front and back label of an NJOY Kings package and asked: "Does the label say or suggest anything about the ingredients in NJOY [e]-[c]igarettes?'"[123]  Those respondents who said "Yes" were shown a list of ingredients and asked: "Based on what is said or suggested on the label, which of the following ingredients, if any, do you believe are in NJOY [e]-[c]igarettes?"  The list included four ingredients found in NJOY e-cigarettes, namely "Nicotine," "Propylene glycol," "Glycerin," and "Flavoring"; respondents were

---

[118]*Id.*

[119]*Id.*

[120]*Id.*

[121]*Id.*, ¶ 25.

[122]*Id.*

[123]*Id.*, ¶ 26.

also given "an option to specify other ingredients the[y] . . . believed were in NJOY [e]-[c]igarettes.[124]
They were then asked: "If there are health risks associated with the ingredients in NJOY E-Cigarettes,
other than those listed on the NJOY Ecigarette package, how important, if at all, would it be to you that
those ingredients also be listed on the NJOY package?"[125]   Possible answers ranged from "Very
important" to "Not at all important."   A total of 601 respondents completed the survey, and Harris
compiled the results in various tables and tabulated percentages attributable to the various responses.[126]

A survey is admissible provided it is: (1) "conducted according to accepted principles"; and (2)
"relevant" to the issues in the case.   *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt.,
Inc*., 618 F.3d 1025, 1036 (9th Cir. 2010).   As the Ninth Circuit has repeatedly held, "[c]hallenges to
survey methodology [typically] go to the weight given the survey, not its admissibility." *Wendt v. Host
Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir. 1997).   See *Southland Sod Farms v. Stover Seed Co.,* 108 F.3d
1134, 1143 n. 8 (9th Cir. 1997) ("However, 'as long as they are conducted according to accepted
principles,' survey evidence should ordinarily be found sufficiently reliable under *Daubert*.   Unlike
novel scientific theories, a jury should be able to determine whether asserted technical deficiencies
undermine a survey's probative value," quoting *Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1292
(9th Cir. 1992)); *id.* at 1143 (the fact that a survey that was conducted only in the southern portion of
the state and asked leading questions went to the weight of the evidence, not the admissibility of the
survey); see also *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1263 (9th Cir. 2001)
("Treatment of surveys is a two-step process.   First, is the survey admissible?   That is, is there a proper
foundation for admissibility, and is it relevant and conducted according to accepted principles?   This
threshold question may be determined by the judge.   Once the survey is admitted, however, follow-on
issues of methodology, survey design, reliability, the experience and reputation of the expert, critique
of conclusions, and the like go to the weight of the survey rather than its admissibility. These are issues
for a jury or, in a bench trial, the judge"); *ConAgra II*, 2015 WL 1062756 at *8 ("The Ninth Circuit has

[124]*Id.*

[125]*Id.*

[126]*Id.*, ¶ 28.

26

held that typically '[c]hallenges to survey methodology go to the weight given the survey, not its admissibility'"); *Alcantar v. Hobart Serv.*, No. ED CV 11–1600 PSG (SPx), 2013 WL 156530, *4 (C.D. Cal. Jan. 15, 2013) ("[A]ny problems with the response rate affect the weight, and not the admissibility of the study"); *Microsoft Corp. v. Motorola Inc*., 904 F.Supp.2d 1109, 1120 (W.D. Wash. 2012) (concluding that criticisms of an expert's conjoint analysis concerned "issues of methodology, survey design, reliability, and critique of conclusions, and therefore [went] to the weight of the survey rather than admissibility"); *Harris v. Vector Marketing Corp.*, 753 F.Supp.2d 996, 1001–02 (N.D. Cal. 2010) ("[Plaintiff] criticizes the content of the survey conducted and prepared by [defendant's expert] as well as the response rate to the survey.  The problem for [Plaintiff] is that, as she herself admits in her brief, even challenges to defects in methodology normally affect the weight to be accorded the survey and not its admissibility"); *Lewis Galoob Toys, Inc. v. Nintendo of America, Inc*., 780 F.Supp. 1283, 1296 (N.D. Cal. 1991) (holding that the alleged under-inclusiveness of a survey in a copyright infringement action affected "the weight of the survey, not its admissibility"), aff'd, 964 F.2d 965 (9th Cir. 1992).  NJOY challenges Maronick's declaration on a number of grounds.  None has any merit.

First, NJOY asserts that Maronick's survey does not utilize a control group or include proper control questions to account for preconceived notions that consumers might have about NJOY's products.  It also contends that Maronick improperly defined the target audience.[127]  As a result, NJOY contends, the entire survey is inherently unreliable.  Each of the concerns NJOY raises relates to "[t]echnical unreliability[, which] goes to the weight accorded a survey, not its admissibility." *E. & J. Gallo Winery*, 967 F.2d at 1292  (quoting *Prudential Ins. Co. v. Gibraltar Fin. Corp*., 694 F.2d 1150, 1156 (9th Cir. 1982)); *PixArt Imaging, Inc. v. Avago Tech. Gen. IP (Singapore) Pte. Ltd.*, No. CV 10-00544 JW, 2011 WL 5417090, *5 (N.D. Cal. Oct. 27, 2011) ("PixArt contends that the survey and resulting analysis should nonetheless be excluded because the survey: (1) fails to address the correct universe; (2) fails to use a sample of a representative population; (3) improperly skews the survey over time; and (4) fails to use a control group.  The Court finds, however, that these are precisely the sorts of technical considerations that affect only the weight, and not the admissibility of a survey.  In addition,

_____

[127]MTS Maronick at 5-14.

each other alleged deficiency is precisely the sort of deficiency that juries are expected to evaluate in assessing the probative value of a survey.  Thus, the Court finds that all of PixArt's objections go to the weight of Egan's testimony and not its admissibility"); see *Moroccanoil, Inc. v. Marc Anthony Cosmetics, Inc*., No. CV 13-02747 DMG (AGRx), 2014 WL 5797541, *9 (C.D. Cal. Oct. 7, 2014) ("In any case, the lack of a control group alone does not render a confusion survey so fatally flawed as to be inadmissible"); *Mattel, Inc. v. MCA Records, Inc*., 28 F.Supp.2d 1120, 1135 (C.D. Cal. 1998) ("Defendants also object that plaintiff did not use a control group to take account of those respondents who are confused 'regardless of the stimuli present.' . . . Although the survey contains flaws, 'technical unreliability' goes to the weight the Court is to afford the survey, rather than its admissibility") aff'd, 296 F.3d 894 (9th Cir. 2002).  In addition, Maronick used other methods to prevent bias, e.g., including "none of the above," "don't know/can't recall" and "other" as possible answers to closed-ended questions.[128]  This mitigates the significance of his decision not to employ other controls.

The cases cited by NJOY do not compel a different conclusion.  In *Brighton Collectibles, Inc. v. RK Texas Leather MFG*, 923 F.Supp.2d 1245, 1257-58 (S.D. Cal. 2013), the court excluded a handbag trade dress confusion survey that included a "line-up in which only one bag share[d] the most prominent and eye-catching features – two colors and silver hearts – [and this] improperly suggested to the participants that [d]efendants' bag was the 'correct' answer."  *Id*. at 1257.  After reaching this conclusion, the court noted that the "problem was exacerbated because [the expert] did not use a control to test the accuracy of his survey."  *Id*. at 1257-58.  See also *THIOP v. Walt Disney Co.*, 690 F.Supp.2d 218, 241 (S.D.N.Y. 2010) ("Because the Ford Survey failed to replicate actual marketplace conditions in which consumers encountered the products at issue here and failed to use an adequate control, it is not a reliable indicator of consumer confusion.  Accordingly, the Ford Survey is inadmissible").  Unlike in *Brighton*, there is no basis for concluding that Maronick's survey suggested which answer was "correct."  In fact, NJOY maintains that Maronick's survey results are so weak they do not even suggest materiality.  *Brighton* is therefore inapposite because the fact that the survey in that case was improperly suggestive was *exacerbated* by the fact there was no control group; lack of a control group alone was

---

[128]Maronick Decl., ¶ 53.

not a basis for exclusion.  Similarly, in *THIOP*, the issue was not simply lack of a control group, but the fact that the consumer confusion survey failed to replicate market conditions.  Neither case supports NJOY's assertion that lack of a control group alone renders a survey inadmissible.

NJOY's motion to strike Maronick's declaration really addresses the merits of plaintiffs' certification motion rather than the motion to exclude under *Daubert*.  Addressing questions Maronick asked regarding the results of NJOY's "Return the Favor" television advertisement, NJOY asserts that his control or validation question was wrong.  His survey design permitted respondents to answer questions concerning the advertisement only if they indicated that they had heard the phrase "friends don't let friend's smoke" in the commercial.  NJOY takes issue with Harris's choice of a validation question because it "is spoken in under two seconds towards the latter half of the sixty-second spot, and is not displayed on screen."[129]  It contends this renders the survey flawed because Maronick could have used a timer to detect whether respondents watched the whole video, or could have asked respondents whether they saw or heard the statement "cigarettes, you've met your match" – a voiceover line that was displayed on screen at the end of the commercial twice as long as the "friends don't let friend's smoke" statement.  This argument may well convince a jury.  Whether the control question was the best or most fitting question, however, does not require exclusion of Maronick's opinion under *Daubert.*

NJOY also maintains that the sample size of the televison commercial block – 91 respondents – is too small.[130]  Courts have found comparable sample sizes sufficiently reliable to warrant admission of an opinion under *Daubert*.  *Fujifilm Corp. v. Motorola Mobility LLC*, No. 12 CV 03587 WHO, 2015 WL 1737951, *10 (N.D. Cal. Apr. 8, 2015) ("Motorola argues[, *inter alia*, that] the September 2011 Survey is irrelevant and unreliable because (i) its 122 person sample size 'is not big enough to be statistically significant.'. . .  Each of these challenges goes to weight, not admissibility"); *In re Countrywide Financial Corp. Mortgage Backed Securities Litig.*, 984 F.Supp.2d 1021, 1034 (C.D. Cal. 2013) ("a 100 item sample size comprises sufficient data for a sample of a large population"); *Lisa Frank, Inc. v. Impact Int'l, Inc.*, 799 F.Supp. 980, 994 (D. Ariz. 1992) (stating that while the fact that

---

[129]MTS Maronick at 18.

[130]*Id.*

only 32 persons were sampled reduced the evidentiary weight accorded a survey, it was nonetheless of "some probative evidence").  NJOY's concerns thus go to the weight of the evidence, not admissibility. See *Fujifilm Corp.*, 2015 WL 1737951 at *10.

The fact that NJOY has not raised a legitimate concern under *Daubert* is highlighted by its repeated citation of *Procter & Gamble Co. v. Ultreo, Inc*., 574 F.Supp.2d 339, 351 (S.D.N.Y. 2008).[131] The *Ultreo* court did not conduct a Rule 702 or *Daubert* analysis; neither the rule nor the case is mentioned.  Rather, the court assessed the weight and credibility of survey evidence in determining whether to enter a preliminary injunction.  Ultimately, the court "reject[ed] [the survey] as a basis to conclude that Ultreo's allegedly false advertising [was] likely to mislead consumers . . . , " given that "several of the responses to the [s]urvey reveal[ed] that respondents did in fact have preexisting beliefs concerning" the issues in the case, and that it used leading questions.  *Id*.  In deciding NJOY's motions to strike, the court is not assessing the weight or credibility of plaintiffs' evidence.  Thus, NJOY's serial attacks on the sufficiency of the evidence to support certification of a class are not relevant in assessing admissibility under *Daubert*.

NJOY also asserts that Maronick failed properly to disguise the survey selection criteria. Respondents were asked in an unbiased way what types of tobacco products they used (i.e., traditional cigarettes or e-cigarettes); only those who identified e-cigarettes as a product they had used were directed to proceed.  NJOY contends this is problematic because "a respondent would easily conclude that the survey involved tobacco products and that they should check 'yes' to all products they purportedly used in the last three months."[132]  It is unclear why NJOY is troubled by the fact that respondents knew the survey concerned tobacco products.  Respondents were given a randomized list of fifteen brands of e-cigarettes, and those who said they had used e-cigarettes in the past three months, and NJOY at any time, were surveyed.  NJOY does not argue that the survey improperly indicated to respondents that it concerned *NJOY e-cigarettes*, nor does the court discern any basis for such an argument.  The fact that the survey purportedly suggested to respondents, from an early point, that it

---

[131]*Id*. at 5, 8, 12, 20.

[132]*Id*. at 16.

30

concerned tobacco products is not a reason to exclude the results as unreliable.

NJOY also complains that Maronick's survey, although designed and analyzed by him, was carried out by a third party survey company, Qualtrics.com.  It cites no case law holding that surveys conducted by third parties are inherently "flawed" or unreliable, and the court has located none.  What little case law there is on the subject in fact suggests there is nothing inherently problematic with having a survey conducted by a third party.  Cf. *Ortega v. Ogden Clinic Prof'l Corp.*, No. CV 13-0066 CW, 2014 WL 6751114, *1 (D. Utah Dec. 1, 2014) (relying on evidence from "retained a third-party health care consulting company t[hat] conduct[ed] a patient survey").  More fundamentally, NJOY's own expert – Kent Van Liere – also used a third party survey company to conduct his survey.[133]  And for his part, Maronick contends that using internet panels such as those offered by Qualtrics.com is "a well-accepted approach in the field of consumer advertising and consumer research."[134]  The court has no reason to conclude otherwise.

Finally, NJOY appears to assert that Maronick's survey fails to demonstrate that its advertising actually caused the consumer's to be misled.  The court need not resolve whether that is the case, however.  This, of course, is not a reason to strike Maronick's declaration under *Daubert*.  Indeed, it is not even a reason to deny plaintiffs' motion for class certification.  "On a motion for class certification, it is not necessary that expert testimony resolve factual disputes going to the merits of plaintiff[s'] claim; instead, the testimony must be relevant in assessing 'whether there was a common pattern and practice that could affect the class as a whole.'"  *In re ConAgra Foods, Inc.* ("*ConAgra I*"), 302 F.R.D. 537, 549 (C.D. Cal. 2014) (quoting *Ellis*, 657 F.3d at 983).  In this case, the survey evidence tends to show, at a minimum, that respondents understood that NJOY's advertisements conveyed the message that its e-cigarettes were safe or safer than traditional tobacco cigarettes.  Specifically, 50% of respondents who saw the "Resolution Solution" advertisement said that NJOY e-cigarettes were either "safe for your health," "safer for your health than traditional tobacco cigarettes," or both "safe" and "safer for your

---

[133]Declaration of Kent Van Liere ("Van Liere Decl."), Docket No. 130-7 (June 22, 2015), ¶ 19 ("Interviews were conducted by 3Q Global, a well-known, well-respected data collection firm that I have worked with in the past").

[134]Maronick Decl., ¶ 21.

health."[135]  Similarly, 56.7% said the "Try Something New in Bed" advertisement suggested that NJOY e-cigarettes were either "safe for your health," "safer for your health," or both "safe" and "safer for your health."[136]  The survey need not do more.  Cf. *ConAgra II*, 2015 WL 1062756 at *63 ("None of the three surveys plaintiffs cite directly links consumers' understanding of the '100% Natural' label to the specific issue raised in this case—i.e., whether consumers believe the label means the product contains no genetically modified organisms or GMO ingredients.  Nonetheless, the surveys tend to show that, however they interpret it, consumers find the '100% Natural' claim material to their purchasing decisions").

For these reasons, the court denies NJOY's motion to strike Maronick's declaration.[137]

## 2.    Plaintiffs' Objection to NJOY's Expert Carol Scott

Plaintiffs filed an objection to the declaration of Carol Scott, NJOY's rebuttal economic damages expert.[138]  They argue that Scott is not qualified as an economic damages expert and that  her opinions lack foundation.[139]

The court does not agree that Scott is not qualified to serve as an expert in this case.  "A witness can qualify as an expert through practical experience in a particular field, not just through academic training."  *Rogers v. Raymark Industries, Inc.*, 922 F.2d 1426, 1429 (9th Cir. 1991) (citation omitted); see also FED. R. EVID. 702, Advisory Committee Notes (2000) ("Nothing in this amendment is intended to suggest that experience alone – or experience in conjunction with other knowledge, skill, training or education – may not provide a sufficient foundation for expert testimony. . . .  In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony").  Scott is an Emeritus Professor of Marketing at the Anderson Graduate School of Management at the University of California, Los Angeles, and holds a Ph.D. in marketing from

---

[135]Maronick Decl., ¶ 13.

[136]*Id*.  See also *id*., Table 3 (at 14).

[137]At the hearing, NJOY did not raise the issue of Maronick's declaration.

[138]Objection to Carol Scott Declaration, Docket No. 162 (July 10, 2015).

[139]*Id*. at 1-2.

Northwestern University, a Master of Science in Management degree from Norhwestern University, and a Bachelor of Science in Business and History Education degree from the University of Texas.[140]  She has served as a consultant and testifying expert in numerous cases over the past 27 years, and is a founding partner of Crossfield Associates, LLC, a litigation consulting company.[141]

Plaintiffs assert broadly that because Scott is not an "economics expert" she is barred from testifying about economic damages.  Scott, however, does not act as an "economics expert" – at least not in the sense that Harris does.  She offers opinions concerning Harris' conjoint analysis, but does not offer an alternative damages calculation methodology.  She simply analyzes Harris's conjoint analysis from a marketing and business perspective, and concludes that it isolates the perceived value of NJOY's representations, rather than actual price premium consumers paid due to the representations.  As a result, she asserts, it does not capture the measure of class members' damages.[142]  Scott asserts that she received "specific and extensive training in research design and analysis," as well as "training in research methodologies, including surveys and experiments, . . . as part of [her] doctoral education at Northwestern University."  As a result of this training, she opines that Harris's conjoint model "measures perceived value, [which] cannot accurately or reliably measure what consumers actually paid, and it cannot be used as a source of data on the prices of alternative products that were considered," because it does "not use any real world market data and[ thus is not designed to] reflect the real world choices of consumers and their economic consequences."[143]

Scott's education and academic experience qualify her an expert in market research, and her

---

[140]Scott Decl., ¶ 1.

[141]*Id.*, ¶ 2.

[142]*Id.*, ¶ 60 ("Conjoint analysis, which measures perceived value, cannot accurately or reliably measure what consumers actually paid, and it cannot be used as a source of data on the prices of alternative products that were considered, and it cannot be used to measure class members' willingness to pay at the time they made their purchases during the class period.  It can be used to estimate willingness to pay for an attribute as of the time of the study, but it cannot tell us what prices consumers actually paid for the product, and cannot tell us if their willingness to pay has varied or remained constant over the class period").

[143]*Id.*, ¶¶ 60-61.

expertise qualifies her to testify regarding the relationship of perceived value to actual price premium paid. NJOY has thus adequately demonstrated that Dr. Scott is an expert in the matters about which she opines in her expert declaration. Cf. *United States v. Pritchard*, 993 F.Supp.2d 1203, 1209 (C.D. Cal. 2014) ("The Court finds that Ms. Putinier's education and training, specialized knowledge of DNA evidence, and experience as a forensic analyst for over thirteen years, taken together, render her well qualified to provide expert testimony on population frequency statistics"). Plaintiffs' attempt to disqualify her under *Daubert* is thus unavailing, and their objection is overruled.

Plaintiffs also assert that certain of Scott's statements lack foundation. Since a motion for class certification is a preliminary procedure, courts do not require strict adherence to the Federal Rules of Civil Procedure or the Federal Rules of Evidence. See *Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 178 (1974) (the class certification procedure "is not accompanied by traditional rules and procedures applicable to civil trials"). At the class certification stage, "the court makes no findings of fact and announces no ultimate conclusions on [p]laintiffs' claims." *Alonzo v. Maximus, Inc.,* 275 F.R.D. 513, 519 (C.D. Cal. 2011) (quoting *Mazza v. Am. Honda Motor Co.,* 254 F.R.D. 610, 616 (C.D. Cal. 2008)). As a result, it can consider inadmissible evidence in deciding whether it is appropriate to certify a class. *Keilholtz v. Lennox Hearth Prods., Inc.,* 268 F.R.D. 330, 337 n. 3 (N.D. Cal. 2010) ("On a motion for class certification, the Court may consider evidence that may not be admissible at trial"); see also *Waine–Golston v. Time Warner Entertainment–Advance/New House P'ship*, No. CV 11-1057–GPB (RBB), 2012 WL 6591610, *9 (S.D. Cal. Dec. 18, 2012) (overruling objections to evidence because "the Court may consider inadmissible evidence at the class certification stage"); *Alonzo*, 275 F.R.D. at 519 ("The court need not address the ultimate admissibility of the parties' proffered exhibits, documents and testimony at this stage, and may consider them where necessary for resolution of the [Motion for Class Certification]" (alteration original)). Because the court need not adhere strictly to the Federal Rules of Evidence in deciding whether to certify a class, it overrules plaintiffs' evidentiary objections to Scott's declaration.

Accordingly, all of plaintiffs objections to Scott's declaration are overruled.[144]

---

[144]Plaintiffs did not address Scott's declaration at the hearing.

B.     **Plaintiffs' Motion for Class Certification**

1.     **Legal Standard Governing Class Certification**

A district court may certify a class only if:

"(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." FED.R.CIV.PROC. 23(a).

In addition, a district court must also find that at least one of the several conditions set forth in Rule 23(b) is met.  "Rule 23(b)(1) allows a class to be maintained where 'prosecuting separate actions by or against individual class members would create a risk of' either '(A) inconsistent or varying adjudications,' or '(B) adjudications . . . that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede[ ] their ability to protect their interests.'" *Dukes*, 131 S. Ct. at 2549 n. 2.

Rule 23(b)(2) allows class treatment when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED.R.CIV.PROC. 23(b)(2).  The Supreme Court has not yet decided whether this rule "applies only to requests for . . . injunctive or declaratory relief and does not authorize the class certification of monetary claims at all." *Dukes*, 131 S. Ct. at 2557.  It has concluded, however, "that, at a minimum, claims for individualized relief . . . do not satisfy the Rule." *Id.*  Thus, Rule 23(b)(2) "does not authorize class certification when each class member would be entitled to an individualized award of monetary damages." *Id.*

"Rule 23(b)(3) states that a class may be maintained where 'questions of law or fact common to class members predominate over any questions affecting only individual members,' and a class action would be 'superior to other available methods for fairly and efficiently adjudicating the controversy.'" *Id.* at 2549 n. 2.

"Rule 23 does not set forth a mere pleading standard.  A party seeking class certification must affirmatively demonstrate his compliance with the Rule – that is, he must be prepared to prove that there

are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Id.* at 2551.  Thus, "[t]he party seeking certification bears the burden of showing that each of the four requirements of Rule 23(a) and at least one requirement of Rule 23(b) have been met." *Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180, 1186 (9th Cir.), amended, 273 F.3d 1266 (9th Cir. 2001)); see also *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).  A class can be certified only if the court "is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 160-61 (1982).  As the Supreme Court has noted, "[f]requently . . . 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim." *Dukes*, 131 S. Ct. at 2551.

Plaintiffs seeks to certify two statewide classes as follows:

"All persons, exclusive of [NJOY] and its employees, who purchased in or from California [or Florida] one or more NJOY E-Cigarettes sold by [NJOY] during the Class Period.[145]

As pled, the Class Period for the California class runs from January 17, 2010 to the date of notice,[146] while the Class Period for the Florida class runs from July 9, 2010 to the date of notice.[147]

### 2.    Whether the Proposed Class Should Be Certified

#### a.    Standing

NJOY first argues that the named plaintiffs lack standing under the CLRA, UCL, and FDUTPA.[148]  Before turning to that question, the court describes briefly the scope of the claims plaintiffs assert.  The fourth amended complaint alleges a claim based on false and/or misleading advertising, which allegedly conveyed what plaintiffs denominate a "safety message," i.e., that NJOY e-cigarettes were "safe or safer" than and/or a better alternative to traditional tobacco cigarettes.  Plaintiffs also

---

[145]Certification Motion at 7.

[146]FAC, ¶ 114.

[147]*Id.*, ¶ 115.

[148]Certification Opposition at 15.

assert an omission-based claim based on the product packaging.[149]   This claim has two distinct components.  Plaintiffs allege first that NJOY's failure to include certain harmful ingredients on the label of NJOY e-cigarettes – namely,  propylene glycol and glycerin – was misleading because a reasonable consumer would want to know that NJOY e-cigarettes contained propylene glycol and glycerin before purchasing them.[150]   They also allege that, even when these ingredients are disclosed, the packaging is misleading because it fails to warn of the harmful effects of inhaling such ingredients.[151]  The court must assess whether each of the two named plaintiffs has standing to assert each of these claims.

### (1) Halbertstam

"A plaintiff suffers an injury in fact for purposes of standing under the UCL when he or she has: (1) expended money due to the defendant's acts of unfair competition; (2) lost money or property; or (3) been denied money to which he or she has a cognizable claim." *Marilao v. McDonald's Corp.*, 632 F.Supp.2d 1008, 1012 (S.D. Cal. 2009) (citing *Hall v. Time, Inc.*, 158 Cal.App.4th 847, 854–55 (2008)). "'This statutory limitation requires that a plaintiff show he has suffered losses capable of restitution,' as restitution and an injunction are the only remedies available for violation of the UCL." *Hernandez v. Select Portfolio, Inc.*, No. CV 15-01896 MMM (AJWx), 2015 WL 3914741, *16 (C.D. Cal. June 25, 2015) (quoting *Small v. Mortgage Electronic Registration Systems, Inc.,* Nos. 09–cv–0458, 2:10–cv–0342, 2010 WL 3719314, *12 (E.D.Cal. Sept.16, 2010) (internal citations omitted)). "Ordinarily when we say someone has 'lost' money we mean that he has parted, deliberately or

---

[149]FAC, ¶ 64.

[150]*Id*., ¶ 62 ("by omitting the ingredients from the labels, Defendant denied consumers at the point of sale the opportunity to decide for themselves whether the chemicals used are substances they are willing to risk inhaling.  For example, by omitting the ingredients, Defendant hid the fact that NJOY E-Cigarettes contain propylene glycol, a product found to cause throat irritation and induce coughing, and thus no longer used by certain of NJOY's competitors in their e-cigarettes.").

[151]*Id*., ¶ 63 ("By warning of certain risks relating to nicotine, and the risks that may arise if the concentrated contents of the cartridge are swallowed without being vaporized, this packaging implied that those are the only significant health-related risks related to NJOY E-Cigarettes.  This is deceptive and misleading, as the package omitted reference to the other carcinogens, toxins and impurities, including . . . the potentially harmful effects of propylene glycol").

otherwise, with some identifiable sum formerly belonging to him or subject to his control; it has passed out of his hands by some means, such as being spent or mislaid." *Silvaco Data Systems v. Intel Corp.*, 184 Cal.App.4th 210, 244 (2010).

In *Meyer v. Sprint Spectrum L.P.*, 45 Cal.4th 634, 644-45 (2009), "the California Supreme Court made clear that the CLRA's 'any damage' requirement is a capacious one that includes any pecuniary damage as well as opportunity costs and transaction costs that result when a consumer is misled by deceptive marketing practices.  Because the 'any damage' standard includes even minor pecuniary damage, we conclude that any plaintiff who has standing under the UCL's and FAL's 'lost money or property' requirement will, *a fortiori,* have suffered 'any damage' for purposes of establishing CLRA standing." *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1108 (9th Cir. 2013) (quoting *Meyer*); *Klein v. Chevron U.S.A., Inc.*, 202 Cal.App.4th 1342, 1375 (2012) ("[A]t the pleading stage, a plaintiff asserting a UCL or CLRA claim 'satisfies its burden of demonstrating standing by alleging an economic injury'" (citation omitted)).

NJOY asserts Halberstam testified that he did not suffer an injury in fact as a result of his use of an NJOY e-cigarette.  As respects his claim that NJOY's advertising conveyed a "safety message," Halbertstam stated that he saw NJOY's "Resolution Solution" and "Try Something New in Bed" advertisements, and specifically remembered the "Cigarettes, You've Met Your Match" slogan in 2012.[152]  He testified that he believed the advertisements conveyed the message that NJOY e-cigarettes were "a better alternative to cigarettes," i.e., "that [they] would be safer because . . . you don't have the smoke."[153]  Having seen the advertisements, he "decided to purchase a cigarette and an e-cigarette and

---

[152]Declaration of Janine Pollack in Support of Plaintiffs' Reply ("Pollack Reply Decl."), Docket No. 149-3 (July 6, 2015), Exh. H ("Halberstam Depo.") at 50:5-13 ("Q. And you have interrogatory answers that reflect the phrase, 'Cigarettes, You've Met Your Match.' Is that something that you remembered from seeing it in 2012? A. Yes. Q. And 'Try Something New in Bed,' is that something you remember seeing –  A. Yes.  Q. – in 2012?  A. Yes").

[153]*Id*. at 53:7-15.  See also *id*. at 54:1-10 ("Q. So when you said that you thought it would be safer because you don't have the smoke, what -- what do you mean by safer?  A. Well, when you say – like traditional cigarettes, not – it harms other people by – with the secondhand smoke, so obviously smoke is a big thing there.  So if you're eliminating that, I think – you would think that you would be eliminating most of the unsafe things about – about a cigarette").

the brand that stood out . . . with advertising . . . was NJOY."[154]  He contends he was deceived by the advertising and by omissions on the product packaging;[155] that he would not have purchased the products had he known the ingredients and/or what the ingredients would do to him;[156] and that he, and everyone else who was misled by NJOY, deserves a refund.[157]  Stated differently, Halberstam saw NJOY's advertisements; interpreted them as communicating that NJOY e-cigarettes were safer than traditional cigarettes; relied on those advertisements in making his purchase; and wishes to receive restitutionary damages as a result of being misled.  This is sufficient to allege standing under the CLRA, UCL, and FDUTPA.  See *ConAgra I*, 302 F.R.D. at 563 ("Plaintiffs contend they were damaged because ConAgra misleadingly labeled the products '100% Natural,' which 'caus[ed] them to pay higher market prices for those Wesson Oils than [they] would have otherwise paid . . . without that claim'").

At the hearing, NJOY argued that the court's conclusion was incorrect.  It asserted that Halbertstam lacks standing because he admitted that he did not rely on NJOY's advertisements in making his purchasing decision and that the advertisements were not even in his mind when he decided to buy an NJOY e-cigarette.  NJOY relied on the following testimony:

> "A. I was looking for an e-cig, and the brand that stood out was NJOY.  I wasn't thinking about – I mean, the advertisements, I obviously seen the advertisements, and that probably played an effect, but it wasn't on my conscience when I bought it, like –

---

[154]*Id*. at 26:18-21.  NJOY asserts that Halberstam purchased NJOY e-cigarettes not because of the advertising, but because of the NJOY brand name.  Halberstam did not say this at his deposition, however.  His reference to NJOY being the brand that stood out was inextricably linked to "the advertisements[ he had] obviously seen," which "played an effect" on his decision.  (*Id*. at 43:13-18.)

[155]*Id*. at 103:23-104:1 ("Q. When your brother told you that there were additives that were not disclosed in the warning label, did you feel deceived at that moment? A. Yes"); *id*. at 107:15-17 ("Q. So you were deceived by the packaging and anything else? A. The advertising").

[156]*Id*. at 79:18-25 ("Q. So if you had known everything that you say was not disclosed to you by NJOY, would you still have purchased an NJOY electronic cigarette? . . . A. If everything was disclosed to me . . . and made aware to me that it could be doing more  harm and, in effect, it could be, you know, not safer than traditional cigarettes, I probably wouldn't have"); *id*. at 81:7-9 ("It's not just knowing the ingredients.  It's probably knowing what the ingredients would do to me").

[157]*Id*. at 86:22-25 ("I wasn't the only one that suffered – suffered that – the false advertising.  Everybody who bought an NJOY is entitled to a refund.  It's not just me").

1    Q. So the only thing in your consciousness when you bought it was NJOY?

2    A. NJOY, like that's the Number 1 brand."[158]

3    Plaintiffs countered that Halberstam states in this passage that the advertisements "probably

4    played an effect."  Although he also states that he was not consciously thinking about the advertisements

5    at the moment he made the purchase, he reports that the NJOY advertisement he saw conveyed the

6    message that NJOY e-cigarettes were "a better alternative to cigarettes," i.e., "that [they] would be safer

7    because . . . you don't have the smoke."[159]  This portion of Halbertstam's testimony suggests that the

8    only reason he even purchased an e-cigarette was because of NJOY's advertising.  Moreover, the

9    passage NJOY cites clearly demonstrates that its advertising campaign had a significant impact on

10   Halberstam.  Halberstam, for example, thought that NJOY was the "Number 1 brand."  NJOY's expert,

11   Carol Scott, suggests that the "dominant brands in the marketplace" are in fact Blu, MarkTen, and Logic

12   e-cigarettes.[160]  From these facts an inference arises that Halbertstam was drawn to NJOY e-cigarettes

13   because he saw an NJOY advertisement, understood that it conveyed an implied safety message, and

14   elected to purchase an NJOY e-cigarette.  This suffices to confer standing.

15   NJOY also asserted in its opposition that Halberstam lacks standing to assert an omissions claim

16   based on product packaging because, although he signed a retainer agreement related to this case in

17   November 2013, he continued to purchase NJOY e-cigarettes until sometime in December 2013.  The

18   gist of NJOY's argument is that Halberstam could not have relied on the product packaging, because

19   he knew of the additives in the e-cigarettes after November 2013 and continued to buy e-cigarettes.[161]

20   Halbertsam, however, admitted only that he knew the e-cigarettes contained additives when he signed

---

[158]Halberstam Depo. at 43:4-21.

[159]Id. at 53:7-15.  See also id. at 54:1-10 ("Q. So when you said that you thought it would be safer because you don't have the smoke, what -- what do you mean by safer?  A. Well, when you say – like traditional cigarettes, not – it harms other people by – with the secondhand smoke, so obviously smoke is a big thing there.  So if you're eliminating that, I think – you would think that you would be eliminating most of the unsafe things about – about a cigarette").

[160]Scott Decl., ¶ 62.

[161]Certification Opposition at 2, 16.

the retainer agreement; he asserts he did not know "specifically" what the additives were, but only "that there [we]re additives."[162]  He contends he first heard about "about propylene glycol and glycerine," two purportedly dangerous and undisclosed additives in the e-cigarette solution only "once the [c]omplaint was written up."[163]  In any event, the fact Halberstam continued to purchase the product "do[es] not compel a conclusion that he ha[s] not suffered the requisite injury"  to confer standing.  *ConAgra II*, 2015 WL 1062756 at *21 ("As with the plaintiffs' subsequent purchases of products containing GMOs, the fact that the named plaintiffs 'might consider' or 'will consider' purchasing Wesson Oil products in the future, even if they contain GMOs, does not deprive them of Article III standing to assert the claims they plead in their second amended complaint.  Such statements are properly considered in assessing the 'materiality' of the alleged misrepresentation, but do not compel a conclusion that the named plaintiffs have not suffered the requisite injury in fact").[164]

This does not necessarily mean that Halberstam has standing to assert an omissions claim, however.  During his deposition, Halberstam conceded that he would have purchased NJOY e-cigarette even had the packaging disclosed that it contained propylene glycol and glycerin.

"Q. So even if those words [(proplyene gylcol and glycerin)] had been disclosed on the packaging, you would have bought the NJOY cigarette in September of 2013; correct?

. . .

A. Correct."[165]

---

[162]Halberstam Depo. at 100:17-18.

[163]*Id*. at 104:9-12.

[164]NJOY contends, in a footnote, that Halbertstam lacks standing to bring a UCL or CLRA claim because he "resided in New York when he allegedly saw the ad[vertisement] on which he bases his claim."  (Certification Opposition at 15 n. 17.)  CLRA and UCL claims by non-California residents cannot be based on "activity occurring in other states."  See *Wilson v. Frito-Lay N. Am., Inc*., 961 F.Supp.2d 1134, 1147-48 (N.D. Cal. 2013).  Here, however, Halberstam *is* a California resident.  (FAC, ¶ 14.)  Moreover, he claims that he saw NJOY advertisements in both California and New York.  (Halberstam Depo. at 39:1-2 ("I probably seen the advertisements both in New York and California").)  The fact that he may have seen advertisements in New York, therefore, does not compel the conclusion that he lacks standing.

[165]Halberstam Depo. at 74:23-752

Halberstam went on to explain that "if the[ ingredients had been] disclosed . . . in sort of like a warning, [he] probably would have paid more attention to it and . . . found out more about it."[166] NJOY's counsel pressed Halberstam on this response, and he stated that if the packaging had contained a Surgeon General-type warning – like that used to disclose the risks of nicotine – he "probably would have . . . looked into" the health risks associated with the ingredients.[167]   To have UCL and CLRA standing, Halberstam must have purchased a product he would not otherwise have purchased, or paid a price premium for the product, in reliance on NJOY's misrepresentations.   See *Manchouck v. Mondelez Int'l Inc.*, No. 13–2148, 2013 WL 5400285, *2 (N.D. Cal. Sept. 26, 2013) (finding plaintiff had both constitutional and statutory standing where the complaint alleged that "plaintiff paid a 'price premium' because the product claimed to be 'made with real fruit,'" and that "[p]laintiff would not have purchased the two products at that price point absent the alleged misstatements"); *Jones v. ConAgra Foods, Inc.*, 912 F.Supp.2d 889, 901 (N.D. Cal. 2012) (allegations "that plaintiffs would not have purchased a product if the product had been labeled accurately [were] sufficient to establish injury under California's consumer laws").

Because Halberstam admitted that he would have purchased NJOY e-cigarettes even if the packaging had disclosed that it contained propylene glycol and glycerin, he has conceded that he did not suffer injury in fact due to the alleged omission.  *Turcios v. Carma Labs., Inc.*, 296 F.R.D. 638, 644 (C.D. Cal. 2014) (concluding that plaintiff lacked UCL and CLRA standing where he "ha[d] not shown that he relied on any allegedly deceptive practices when making his Carmex purchases"); *Missud v. Oakland Coliseum Joint Venture*, No. CV 12-02967 JCS, 2013 WL 3286193, *20 (N.D. Cal. June 27, 2013) ("Plaintiffs still do not have standing to assert a UCL claim on a theory of misleading advertising because Plaintiffs still have not alleged that they purchased their tickets, or otherwise suffered economic injury, in reliance on any of the unspecified misleading advertising").[168]   Halberstam therefore lacks

---

[166]*Id.* at 75:2-5.

[167]*Id.* at 75:7-11.

[168]He lacks Article III standing to bring an omissions claim on this theory for the same reason. See *Wilson v. Frito Lay N. Am., Inc.*, 961 F.Supp.2d 1134, 1140 (N.D. Cal. 2013) ("Plaintiffs in a case

standing to assert an omissions claim based on NJOY's failure to disclose the fact that proplyene gylcol and glycerin were among the ingredients in its e-cigarette product.  He does, however, have standing to assert an omissions claim based on NJOY's failure to warn of the risks associated with these ingredients, given that he stated he would have investigated further had the packaging included a Surgeon General-type warning concerning the ingredients and inhalation thereof.

### (2)   Thomas

NJOY also asserts that Thomas lacks standing to bring claims under the FDUTPA.  Florida "[c]ourts have interpreted the [FDUTPA] generously, but not consistently.  One line of cases – the more conservative view – extends FDUTPA protection only to persons who were deceived when buying or selling goods and services." *Democratic Republic of the Congo v. Air Capital Grp., LLC*, __ F.3d __, 2015 WL 3619452, *6 (11th Cir. June 11, 2015); cf. *Baptist Hosp., Inc. v. Baker*, 84 So.3d 1200, 1205 (Fla. App. 2012) ("Under these circumstances, it is clear that Demello did not suffer any actual damages as a result of the imposition or payment of the lien and, therefore, he lacks standing to represent the members of Class II in their claim for damages against BHI.").  "Another line of cases, the permissive view, extends FDUTPA protection to any person injured by a deceptive or unfair practice, regardless of whether she sustained the injury in a sale or purchase." *Democratic Republic of the Congo*, __ F.3d __, 2015 WL 3619452 at *6.  The court "need not referee this interpretive tussle," however, because Thomas satisfies even the more rigorous standard.  *Id*.

First, NJOY notes that the complaint does not allege that Thomas saw any NJOY advertisements, and that, because she cannot bring claims based on advertisements she did not see, she cannot assert a FDUTPA claim concerning NJOY advertisements.  In its prior order dismissing the third amended complaint, the court stated that Thomas' claims could not be based on advertisements.[169]  This is

---

like this one can show Article III  standing by alleging that they purchased a product they otherwise would not have purchased, or that they spent too much on such a product, in reliance on a defendant's representations in ads or on labels.")

[169]Order at 15 n. 77.

1   because, "in order for the consumer to be entitled to any relief under FDUTPA, the consumer must not

2   only plead and prove that the conduct complained of was unfair and deceptive but the consumer must

3   also plead and prove that he or she was aggrieved by the unfair and deceptive act." See *Macias v. HBC*

4   *of Florida, Inc.*, 694 So.2d 88, 90 (Fla. App. 1997); see also *Natural Answers, Inc. v. SmithKline*

5   *Beecham Corp.*, 529 F.3d 1325, 1333 (11th Cir. 2008) ("To bring a claim under [the FDUTPA], the

6   plaintiff must have been aggrieved by the alleged unfair and deceptive act"). Thus, where a plaintiff has

7   not seen or heard an allegedly deceptive advertisement, she cannot challenge it under the FDUTPA. See

8   *Smoothie King Franchises, Inc. v. Southside Smoothie & Nutrition Ctr., Inc.*, No. CIV.A.11-02002, 2012

9   WL 630010, *5 (E.D. La. Feb. 27, 2012) ("Only a party who is aggrieved by the alleged unfair and

10  deceptive practice has standing to assert a violation of the statute. Here, Defendants do not allege that

11  they were the parties deceived by Smoothie King's allegedly unlawful advertising practices. Instead,

12  they assert only that their customers are 'consumers' as defined under the act and that their customers

13  were deceived"); *Hall v. Bristol Myers Squibb Co.*, No. CV 06-5203FLW, 2009 WL 5206144, *9

14  (D.N.J. Dec. 30, 2009) (dismissing a FDUTPA claim for failure to allege causation because "[p]laintiffs

15  fail to identify any specific advertisements Plaintiff Hall and Decedent viewed, how they were misled

16  by these advertisements, how these advertisements affected their prescriptions for Plavix and how these

17  advertisements caused any of their injuries. In other words, both of the Amended Complaints fail to

18  identify which, if any, of the promotional or marketing materials were received, viewed or relied upon

19  by Plaintiff Hall and Decedent, and if they were, when these materials were viewed and how they were

20  relied upon. More simply stated, Plaintiffs have failed to allege any specific facts establishing a

21  connection between the alleged conduct of Defendants and the alleged injury claimed"). Plaintiffs do

22  not dispute this. They contend, however, that she nonetheless has standing to bring an omissions claim

23  based on the product packaging.

24          NJOY asserts that Thomas also lacks standing to bring a product packaging claim because she

25  admitted that the product packing does not contain any representations that e-cigarettes are safer than

26  traditional cigarettes. This argument lacks merit. The basis of Thomas's claim is that the packaging

27  omits information that must necessarily be disclosed to ensure that a reasonable consumer is not misled.

28  She contends that she purchased an NJOY e-cigarette after having used another brand of e-cigarettes

that purportedly gave her headaches.  She states the she "read the label" on the packaging due to the fact the prior brand had given her headaches.  She observed that the label reflected that the product "only had nicotine in it," and she thus decided "okay, maybe the other one had other stuff in it I didn't know about."  She concluded that the NJOY e-cigarette would "be better," i.e., safer for her, "and that's why [she] bought it."[170]  Thomas asserts that she would not have purchased the NJOY e-cigarette had the ingredients been listed on the packaging, i.e., that she was "injured in a market transaction between the parties."  See *Air Capital Group, LLC*, __ F.3d __, 2015 WL 3619452 at *7 ("Even if we adopted the former view – that plaintiffs have FDUTPA standing only if they are injured in a purchase or sale – the DRC can still sue"); *Kertesz v. Net Transactions, Ltd.*, 635 F.Supp.2d 1339, 1348-50 (S.D. Fla. 2009) (applying the restrictive view of standing under FDUTPA, and requiring injury resulting from a market transaction between the parties).  Nothing more is required to confer standing.[171]

NJOY disputed this at the hearing.  It argued that Thomas "was not telling the truth"  because her testimony was logically inconsistent and not credible.  Essentially, it asserted that because the package states the product contains only 1.8% nicotine, it was unreasonable for Thomas to have concluded that the only ingredient in the e-cigarette was nicotine.  The court does not understand Thomas to mean that she believed the *only* thing in the e-cigarette was nicotine.  Given the totality of her deposition testimony and the context of the question, she appears to have meant that she did not

_____

[170]Thomas Depo. at 25:3-20.

[171]NJOY argues, in a footnote, that Article III standing is lacking for the same reasons statutory standing is lacking.  It is well settled that "the irreducible constitutional minimum of standing contains three elements.  First, the plaintiff must have suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.  Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.  Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  As respects a "concrete and particularized" injury under *Lujan*, the "injury here meets both of those requirements."  See *Stearns v. Ticketmaster Corp*., 655 F.3d 1013, 1021 (9th Cir. 2011).  "Each alleged class member was relieved of money in the transactions.  Moreover, it can hardly be said that the loss is not fairly traceable to the action of [NJOY] within the meaning of California substantive law."  *Id.*  Finally, nothing prohibits the court from granting restitution, i.e., redressing plaintiffs' alleged injury.  Plaintiffs therefore have Article III standing.  NJOY's argument to the contrary is unpersuasive.

believe the product contained any other ingredients that might cause headaches; this, of course, was the reason she was switching from one brand of e-cigarettes to another. It is undisputed that the NJOY label fails to identify any ingredient other than nicotine, including glycerin and propylene glycol. Because the product packaging did not list "other ingredients" that might pose health risks, Thomas purchased it. The omission therefore caused her to believe that the e-cigarette was safer for her than others.[172] Consequently, she was "injured in a market transaction between the parties," which is sufficient to confer standing under the FDUTPA. See *Air Capital Group, LLC*, 2015 WL 3619452 at *7.

### b.   Rule 23(a) Requirements

#### (1)   Whether Plaintiffs Have Proposed an Ascertainable Class

Although not specifically mentioned in Rule 23, plaintiffs must, in addition to showing numerosity, commonality, typicality and adequacy, demonstrate that the members of the class are ascertainable. See, e.g., *Lukovsky v. San Francisco*, No. C 05-00389 WHA, 2006 WL 140574, *2 (N.D. Cal. Jan. 17, 2006) ("'Although there is no explicit requirement concerning the class definition in FRCP 23, courts have held that the class must be adequately defined and clearly ascertainable before a class action may proceed,'" quoting *Schwartz v. Upper Deck Co.*, 183 F.R.D. 672, 679-80 (S.D. Cal. 1999)); *Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*, 209 F.R.D. 159, 163 (C.D. Cal. 2002) ("Prior to class certification, plaintiffs must first define an ascertainable and identifiable class. Once an ascertainable and identifiable class has been defined, plaintiffs must show that they meet the four requirements of Rule 23(a), and the two requirements of Rule 23(b)(3)" (citation and footnote omitted)); *O'Connor v. Boeing North American, Inc.*, 184 F.R.D. 311, 319 (C.D. Cal. 1998) (holding that a class definition must be "precise, objective and presently ascertainable"); *Bishop v. Saab Automobile A.B.*, No. CV 95-0721 JGD (JRx), 1996 WL 33150020, *4 (C.D. Cal. Feb. 16, 1996) ("To file an action on behalf of a class, the named plaintiffs must be members of the class that they purport to represent at the time the class action is certified. The named plaintiffs must also demonstrate that the class is ascertainable" (citation omitted)).

A class is sufficiently defined and ascertainable if it is "administratively feasible for the court

---

[172]Pollack Reply Decl., Exh. I (Thomas Depo.") at 25:3-20.

1    to determine whether a particular individual is a member." *O'Connor*, 184 F.R.D. at 319; accord

2    *Davoll v. Webb*, 160 F.R.D. 142, 143 (D. Colo. 1995); see also *Buford v. H & R Block, Inc.*, 168

3    F.R.D. 340, 347 (S.D. Ga. 1996) ("[T]he 'description of the class must be sufficiently definite to

4    enable the court to determine if a particular individual is a member of the proposed class,'" quoting

5    *Pottinger v. Miami*, 720 F.Supp. 955, 957 (S.D. Fla. 1989)).

6         Plaintiffs argue that the classes they propose are ascertainable because membership in each is

7    governed by a single objective factor – whether an individual purchased an NJOY e-cigarette during the

8    class period.[173]  They contend the case is similar to *ConAgra II*, and hence that the class is ascertainable.

9    As the court observed in *ConAgra II*, "district courts in this circuit are split as to whether the inability

10    to identify the specific members of a putative class of consumers of low priced products makes the class

11    unascertainable." *ConAgra II*, 2015 WL 1062756 at *23. Compare *In re POM Wonderful LLC*, No. ML

12    10–02199 DDP (RZx), 2014 WL 1225184, *6 (C.D. Cal. Mar. 25, 2014) (observing that "[i]n situations

13    where purported class members purchase an inexpensive product for a variety of reasons, and are

14    unlikely to retain receipts or other transaction records, class actions may present such daunting

15    administrative challenges that class treatment is not feasible," and holding that a class of consumers of

16    a juice product was not ascertainable, particularly where "[n]o bottle, label, or package included any of

17    the alleged misrepresentations"); *Sethavanish v. ZonePerfect Nutrition Co.*, No. 12–2907–SC, 2014 WL

18    580696, *56 (N.D. Cal. Feb. 13, 2014) ("Plaintiff has yet to present any method for determining class

19    membership, let alone an administratively feasible method.  It is unclear how Plaintiff intends to

20    determine who purchased ZonePerfect bars during the proposed class period, or how many ZonePerfect

21    bars each of these putative class members purchased.  It is also unclear how Plaintiff intends to weed

22    out inaccurate or fraudulent claims.  Without more, the Court cannot find that the proposed class is

23    ascertainable") with *Forcellati v. Hyland's, Inc*., No. CV 12–1983–GHK (MRWx), 2014 WL 1410264,

24    *5 (C.D. Cal. Apr. 9, 2014) (rejecting an argument that a putative class of consumers of children's

25    cold/flu products was not ascertainable, and stating that "[g]iven that facilitating small claims is '[t]he

26    policy at the very core of the class action mechanism,' we decline to follow *Carrera [v. Bayer Corp*.,

27

28         [173]Certification Motion at 8-9.

1   727 F.3d 300 (3d Cir. 2013),]" quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997));

2   *McCrary v. Elations Co., LLC*, No. EDCV 13–00242 JGB (OPx), 2014 WL 1779243, *8 (C.D. Cal. Jan.

3   13, 2014) ("*Carrera* eviscerates low purchase price consumer class actions in the Third Circuit.  It

4   appears that pursuant to *Carrera* in any case where the consumer does not have a verifiable record of

5   its purchase, such as a receipt, and the manufacturer or seller does not keep a record of buyers, *Carrera*

6   prohibits certification of the class.  While this may now be the law in the Third Circuit, it is not currently

7   the law in the Ninth Circuit.  In this Circuit, it is enough that the class definition describes 'a set of

8   common characteristics sufficient to allow' a prospective plaintiff to 'identify himself or herself as

9   having a right to recover based on the description.'  As discussed above, the class definition clearly

10  defines the characteristics of a class member by providing a description of the allegedly offending

11  product and the eligible dates of purchase.  A prospective plaintiff would have sufficient information

12  to determine whether he or she was an Elations customer who viewed the specified label during the

13  stated time period,'" quoting *Moreno v. AutoZone, Inc.*, 251 F.R.D. 417, 421 (N.D. Cal. 2008) (citations

14  omitted)).

15      "The court continues to agree with those courts that have found classes, such as those proposed

16  by plaintiffs, ascertainable."  *ConAgra II*, 2015 WL 1062756 at *24.  To hold otherwise "would

17  effectively prohibit class actions involving low priced consumer goods – the very type of claims that

18  would not be filed individually – thereby upending '[t]he policy at the very core of the class action

19  mechanism.'"  *Id.* (quoting *Amchem Prods.*, 521 U.S. at 617).

20      NJOY contends that this is not the end of the ascertainability inquiry, however.  It asserts the

21  case is readily distinguishable from *ConAgra II* because the advertisements are not contained on the

22  product packaging, like the alleged "100% Natural" misrepresentation was in *ConAgra II*.  While

23  Halberstam's advertisement-based claim is arguably distinguishable, the product packaging omission

24  claims are not.  With respect to the advertisement claims, NJOY asserts that plaintiffs' proposed class

25  begins two years before NJOY started advertising; as a result, it contends, many proposed class

26  members could not possibly have relied on NJOY advertisements in purchasing the e-cigarettes during

27  that period.  The court agrees.  The California class – the only class with advertising claims – begins

28

1    January 17, 2010; NJOY did not begin advertising until December 10, 2012, however.[174] Thus, putative

2    class members who purchased an NJOY e-cigarette between January 17, 2010 and December 10, 2012,

3    but did not purchase any after December 10, 2012, cannot possibly have relied on NJOY's

4    advertisements.  The California class is therefore overbroad because it "include[s] members who were

5    never exposed to the alleged misrepresentation." *ConAgra I*, 302 F.R.D. at 568; *Red v. Kraft Foods,*

6    *Inc.*, No. CV 10–1028–GW (AGRx), 2012 WL 8019257, *5 (C.D. Cal. Apr. 12, 2012) (finding a class

7    that included consumers who were not exposed to misleading statements overbroad); *Sevidal v. Target*

8    *Corp.*, 189 Cal.App.4th 905, 926–28 (2010) (finding a class overbroad where a majority of class

9    members were never exposed to the alleged misrepresentations and there was absolutely no likelihood

10   they were deceived by the allegedly false advertising); compare *Algarin v. Maybelline LLC*, 300 F.R.D.

11   444, 455, *7 (S.D. Cal. 2014) ("In the instant case, Plaintiffs have alleged a widespread advertising

12   campaign promoting the alleged misrepresentations as well as uniform labeling for each of the Class

13   Products.  That the proposed class may include purchasers who did not rely on the misrepresentations

14   and/or were satisfied with the products does not render the class 'overbroad' where Maybelline has

15   failed to demonstrate a lack of exposure as to some class members").

16       "However, an over-inclusive class definition need not defeat certification entirely.  Where the

17   court determines that the  class definition is overbroad, the court has the discretion to narrow the class

18   to bring it within the requirements of Rule 23." *National Federation of the Blind v. Target Corp.*, No.

19   CV 06-01802 MHP, 2007 WL 1223755, *3 (N.D. Cal. Apr. 25, 2007) (citing *Gibson v. Local 40*, 543

20   F.2d 1259, 1264 (9th Cir. 1976)); see *Armstrong v. Davis*, 275 F.3d 849, 871 n. 28 (9th Cir. 2001)

21   ("Where appropriate, the district court may redefine the class," citing *Penk v. Oregon State Bd. of*

22   *Higher Educ.*, 816 F.2d 458, 467 (9th Cir. 1987)); *Guevarra v. Progressive Financial Services, Inc.*, No.

23   C-05-3466-VRW, 2006 WL 36123742, *3 (N.D.Cal. Nov. 30, 2006) (denying class certification and

24

25       [174]Declaration of Francesca Vaccari ("Vaccari Decl."), Docket No. 130-2 (June 22, 2015), ¶ 2
26   ("In December 2012, NJOY launched a new product called the NJOY King.  Based on my knowledge,
     NJOY did not do any traditional advertising such as television commercials, print advertisements, radio
27   advertisements, internet advertisements, or billboards prior to the launch of the King in December 2012.
     The OneJoy was out prior to the King, and to my knowledge, NJOY did not do any such advertising for
28   the OneJoy").

49

finding that "[f]or plaintiff to continue her action as a class action, she must redefine her class"). The court therefore narrows the California class period for claims arising out of allegedly false and/or misleading advertisements, such that it begins on December 10, 2012 – the first date on which an NJOY advertisement ran.

NJOY insists that this is insufficient to make the advertisement-based class ascertainable. It asserts it is unclear that all, or even most, class members saw the allegedly misleading advertisements, and thus that the class is not ascertainable. It is true that all of the proposed class members must have seen an advertisement to recover. See *Davis-Miller v. Auto. Club of S. California*, 201 Cal.App.4th 106, 124 (2011) ("[T]he UCL does not authorize an award for injunctive relief and/or restitution on behalf of a consumer who was never exposed in any way to an allegedly wrongful business practice. [A]ctual reliance must be established for an award of damages under the CLRA"); *Cohen v. DIRECTV, Inc.*, 178 Cal.App.4th 966, 979 (2009) (same). This is not an ascertainability issue, however. Rather, it is properly considered in assessing predominance under Rule 23(b)(3). See *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 596 (9th Cir. 2012) ("In the absence of the kind of massive advertising campaign at issue in *Tobacco II,* the relevant class must be defined in such a way as to include only members who were exposed to advertising that is alleged to be materially misleading. The relevant class must also exclude those members who learned of the CMBS's allegedly omitted limitations before they purchased or leased the CMBS system. The district court certified a class that included all persons who purchased or leased an Acura RL with the CMBS between August 2005 and class certification. *This class is overbroad. We vacate the class certification decision on this ground because common questions of fact do not predominate where an individualized case must be made for each member showing reliance*" (emphasis added)).

The inclusion of uninjured class members does not necessarily render a class unascertainable. In *Rodman v. Safeway, Inc*., No. 11–cv–03003–JST, 2014 WL 988992, (N.D. Cal. Mar. 10, 2014), for example, the plaintiff moved to certify a nationwide class of all persons who registered to purchase groceries through Safeway.com, and who purchased groceries that were subject to a price markup. *Id.* at *15. Safeway argued that the class was not ascertainable because it included individuals who, for various reasons, did not have viable claims or who could not prove damages. *Id.* The court disagreed,

noting that such a rule would effectively require a plaintiff to plead a "fail-safe" class. *Id.* See 7A C. Wright, A. Miller, & M. Kane, FEDERAL PRACTICE AND PROCEDURE CIVIL § 1760 (3d ed. 2015) ("Some courts also have considered whether the class definition must exclude anyone who does not have a viable claim.   In effect, this interpretation means that plaintiffs must plead what effectively is a 'fail-safe' class").

Other courts in this circuit have reached similar conclusions, see *Rodman*, 2014 WL 988992 at *15 (collecting cases).   Both the Seventh and Tenth Circuits are also in accord.   See *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009) (the fact that a proposed class "will often include persons who have not been injured by the defendant's conduct . . . does not preclude class certification," but it is also the case that "a class should not be certified if it is apparent that it contains a great many persons who have suffered no injury at the hands of the defendant"); *DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1201 (10th Cir. 2010) ("That a class possibly or even likely includes persons unharmed by a defendant's conduct should not preclude certification").   Although the Ninth Circuit has never explicitly so held, its decisions likewise support the conclusion.

Finally, NJOY argues that proposed omissions classes are overbroad as well.   This is because NJOY disclosed the presence of the allegedly omitted ingredients on its label starting in August 2014.[175] Plaintiffs counter that simply disclosing the presence of propylene glycol and glycerin does not cure NJOY's omission, however, because NJOY did not disclose the risks associated with each of these ingredients, as it did for nicotine.   Plaintiffs plead that, "[b]y warning of certain risks relat[ed] to nicotine, and the risks that may arise if the concentrated contents of the cartridge are swallowed without being vaporized, th[e] packaging implie[s] that th[e]se are the only significant health-related risks [posed by] NJOY [e]-[c]igarettes."[176]   This, they assert, is "deceptive and misleading, in that the package omitted reference to other carcinogens, toxins and impurities, including carcinogenic tobacco-specific

---

[175]Vaccari Decl., ¶ 10 ("Starting in approximately August 2014, NJOY did a complete redesign of its packaging and added the full list of ingredients to its product packaging for the NJOY King. NJOY also introduced several new product lines at that time (NJOY Recharge, Vape Pen, e-liquids, and flavor chambers), all of which included an ingredient list from their inception").

[176]*Id.*, ¶ 63.

nitrosamines found in NJOY [e]-[c]igarettes, and the potentially harmful effects of propylene glycol[and glycerin]. [The package] also did not reference the difference in inhalation behavior between vaping and traditional smoking (described herein) that may cause additional problems for persons who use e-cigarettes, including NJOY [e]-[c]igarettes."[177]  Because plaintiffs' theory is that NJOY's packaging remains misleading, even after disclosure of all ingredients starting in August 2014, the court declines to narrow the class.[178]

### (2)    Numerosity

Before a class can be certified under the Federal Rules of Civil Procedure, the court must determine that it is "so numerous that joinder of all members is impracticable." See FED.R.CIV.PROC. 23(a)(1).  "Impracticability does not mean impossibility, [however,] . . . only . . . difficulty or inconvenience in joining all members of the class."  *Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 913-14 (9th Cir. 1964) (internal quotation marks omitted).  There is no set numerical cutoff used to determine whether a class is sufficiently numerous; courts must examine the specific facts of each case to evaluate whether the requirement has been met. See *General Telephone Co. v. EEOC*, 446 U.S. 318, 329-30 (1980).  "As a general rule, [however,] classes of 20 are too small, classes of 20-40 may or may not be big enough depending on the circumstances of each case, and classes of 40 or more are numerous enough."  *Ikonen v. Hartz Mountain Corp.*, 122 F.R.D. 258, 262 (S.D. Cal. 1988) (citing 3B J. Moore and J. Kennedy, MOORE'S FEDERAL PRACTICE ¶ 23-05[1] (2d ed. 1987)).  Plaintiffs maintain that numerosity is easily satisfied.  They contend that in 2013 alone, NJOY sold millions of units of its NJOY King e-cigarette nationwide.[179]  This, in conjunction with the evidence of mass advertising discussed *infra*, leads the court to conclude that plaintiffs have met their burden of demonstrating that the proposed classes are sufficiently numerous.  NJOY did not dispute this conclusion at the hearing.

---

[177]*Id.*

[178]As discussed *infra*, plaintiffs have adduced no evidence concerning the materiality of NJOY's failure to include a warning concerning propylene glycol and glycerin.  As a result, based on the present record, the court concludes that materiality cannot be shown on a classwide basis.

[179]Certification Motion at 6.

### (3)   Commonality

Commonality requires "questions of law or fact common to the class."  See FED.R.CIV.PROC. 23(a)(2).  The commonality requirement is construed liberally, and the existence of some common legal and factual issues is sufficient.  *Jordan v. County of Los Angeles*, 669 F.2d 1311, 1320 (9th Cir. 1982); accord *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998) ("The commonality preconditions of Rule 23(a)(2) are less rigorous than the companion requirements of Rule 23(b)(3).  Indeed, Rule 23(a)(2) has been construed permissively"); see also, e.g., *Ventura v. New York City Health & Hosps. Corp.*, 125 F.R.D. 595, 600 (S.D.N.Y. 1989) ("Unlike the 'predominance' requirement of Rule 23(b)(3), Rule 23(a)(2) requires only that the class movant show that a common question of law or fact exists; the movant need not show, at this stage, that the common question overwhelms the individual questions of law or fact which may be present within the class").  As the Ninth Circuit has noted: "All questions of fact and law need not be common to satisfy the Rule.  The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies "within the class."  *Hanlon*, 150 F.3d at 1019.

That said, the putative class's "claims must depend upon a common contention – for example, the assertion of discriminatory bias on the part of the same supervisor.  That common contention, moreover, must be of such a nature that it is capable of classwide resolution – which means that the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Dukes*, 131 S. Ct. at 2551.  Although for purposes of Rule 23(a)(2) even a single common question will do, *id.* at 2556, "'[w]hat matters to class certification . . . is not the raising of common 'questions' – even in droves – but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation.  Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.'"  *Id.* at 2551 (citing Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U.L.REV. 97, 132 (2009)).  As the Ninth Circuit recently articulated by way of example, "it is insufficient to merely allege any common question, for example, 'Were Plaintiffs passed over for promotion?'  Instead, they must pose a question that 'will produce a common answer to the crucial question why was I disfavored.'"  *Ellis*, 657 F.3d at 981 (quoting *Dukes*, 131 S. Ct. at 2552).

1    Plaintiffs argue that the commonality requirement is satisfied because all class members were

2    exposed to NJOY's product packaging and because its marketing was national and widespread.  As a

3    result, they maintain, their claims arise from a common core of salient facts and pose a common

4    question: "whether NJOY's misleading implication that NJOY e-cigarettes were safe or safer than

5    cigarettes was false, unfair, deceptive, and/or misleading."[180]  As respects the omission-based claims

6    directed at the product packaging, the court agrees.  There is no question that all class members were

7    exposed to the product packaging; this suffices to show commonality.  See, e.g., *ConAgra I*, 302 F.R.D.

8    at 569 (concluding that commonality was satisfied where "claims pose[d] a common question [as to]

9    whether ConAgra's '100% Natural' marketing and labeling of Wesson Oil products was false, unfair,

10    deceptive, and/or misleading" and "all class members were exposed to the statement"); *Ries v. Arizona*

11    *Beverages USA LLC*, 287 F.R.D. 523, 537 (N.D. Cal. 2012) ("[H]ere, variation among class members

12    in their motivation for purchasing the product, the factual circumstances behind their purchase, or the

13    price that they paid does not defeat the relatively 'minimal' showing required to establish

14    commonality"); *Chavez v. Blue Sky Natural Beverage Co.*, 268 F.R.D. 365, 377 (N.D. Cal. 2010)

15    (holding that the commonality requirement was satisfied by allegations that the defendant beverage

16    supplier's "packaging and marketing materials [were] unlawful, unfair, deceptive or misleading to a

17    reasonable consumer").

18    NJOY asserts in its opposition, however, that the advertising-based claims do not raise common

19    questions.[181]  It contends this is so because there is no evidence that putative class members were

20    actually exposed to its advertisements.  NJOY does not expand on the argument, however, and cites no

21    authority supporting it.  This is likely because the Ninth Circuit has explicitly rejected the suggestion

22    that such concerns are relevant to commonality.  See *Mazza*, 666 F.3d at 589 ("Honda contends that the

23    Plaintiffs did not meet their burden under *Wal–Mart* affirmatively to demonstrate that there is a common

24    question of fact or law that can resolve important issues 'in one stroke.'  Honda argues that the 'crucial

25    question' of '*which* buyers saw or heard *which* advertisements' is not susceptible to common resolution.

---

27    [180]Certification Motion at 6.

28    [181]Certification Opposition at 24.

54

. . . [T]he individualized issues raised go to pre[dominance] under Rule 23(b)(3), not to whether there are common issues under Rule 23(a)(2).  Honda does not challenge the district court's findings that common questions exist as to whether Honda had a duty to disclose or whether the allegedly omitted facts were material and misleading to the public.  We hold that the Plaintiffs satisfied their limited burden under Rule 23(a)(2) to show that there are 'questions of law or fact common to the class'"); *Diacakis v. Comcast Corp.*, No. CV 11-3002 SBA, 2013 WL 1878921, *5 (N.D. Cal. May 3, 2013) ("Comcast contends that commonality is lacking, as there is no evidence that its customers were misled in the same way.  However, 'the individualized issues raised go to pre[dominance] under Rule 23(b)(3), not to whether there are common issues under Rule 23(a)(2).'  The Court therefore finds that Plaintiff has satisfied his 'limited burden' of showing commonality under Rule 23(a)(2).").

The common question is whether NJOY's advertisements and product packaging were misleading to a reasonable consumer.  As the Ninth Circuit has made clear, concerns as to whether absent class members saw the advertisements are relevant in assessing predominance "under Rule 23(b)(3), not . . . whether there are common issues under Rule 23(a)(2)." *Mazza*, 666 F.3d at 589.[182] NJOY did not dispute this conclusion at the hearing.  Accordingly, the court finds the commonality requirement satisfied.

### (4)    Typicality

Typicality requires a determination as to whether the named plaintiff's claims are typical of those of the class members he or she seeks to represent.  See FED.R.CIV.PROC. 23(a)(3).  "[R]epresentative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020; see also *Schwartz v. Harp*, 108 F.R.D. 279, 282 (C.D. Cal. 1985) ("A plaintiff's claim meets this requirement if it arises from the same event or

---

[182]NJOY also asserts that the advertisements were "perceived in multiple ways." (*Id.*)  Whether or not this is true, it does not defeat commonality.  See *Ries*, 287 F.R.D. at 537 ("[H]ere, variation among class members in their motivation for purchasing the product, the factual circumstances behind their purchase, or the price that they paid does not defeat the relatively 'minimal' showing required to establish commonality"); *Chavez*, 268 F.R.D. at 377  (holding that the commonality requirement was satisfied by allegations that the defendant beverage supplier's 'packaging and marketing materials [were] unlawful, unfair, deceptive or misleading to a reasonable consumer").

course of conduct that gives rise to claims of other class members and the claims are based on the same legal theory").

"The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon*, 976 F.2d at 508 (citation and internal quotation marks omitted). Typicality, like commonality, is a "permissive standard[ ]." *Hanlon*, 150 F.3d at 1020. Indeed, in practice, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." *Falcon*, 457 U.S. at 157-58 n. 13. See also *Dukes*, 131 S. Ct. at 2551 n. 5 ("We have previously stated in this context that '[t]he commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence. Those requirements therefore also tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest,'" citing *Falcon*, 457 U.S. at 158 n. 13).

Typicality may be lacking "if 'there is a danger that absent class members will suffer [because] their representative is preoccupied with defenses unique to it.'" *Hanon*, 976 F.2d at 508 (quoting *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner, & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990)); see also *J.H. Cohn & Co. v. Am. Appraisal Assoc., Inc.*, 628 F.2d 994, 999 (7th Cir. 1980) ("[E]ven an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality of the class as well as bring into question the adequacy of the named plaintiff's representation"). To be typical, a class representative need not prove that she is immune from any possible defense, or that her claim will fail only if every other class member's claim also fails. Instead, she must establish that she is not subject to a defense that is not "typical of the defenses which may be raised against other members of the proposed class." *Id.*; see also *Ellis*, 657 F.3d at 984.

Plaintiffs argue that the typicality requirement is satisfied "because the[ir claims] are based on the same deceptive conduct by NJOY that harmed [c]lass members in the same way. All [c]lass members were exposed to the package and/or NJOY's media advertising that conveyed the same [s]afety

1   [m]essage."[183]  Thus, they maintain that their claims are "reasonably co-extensive" with those of the

2   putative class, and typicality is satisfied.  NJOY disputes this, and argues that both named plaintiffs'

3   claims are atypical.

4                                          **(a)      Halberstam**

5           NJOY argues that Halbertstam's claims are not typical because he only viewed the "Resolution

6   Solution" advertisement.  This advertisement, it contends, was the least likely to communicate a safety

7   message, even in the eyes of plaintiffs' experts.  NJOY's argument misconstrues Maronick's survey

8   data, however.   NJOY's argument is based solely on the fact that only 4.7% of respondents in

9   Maronick's survey said in their answer to the initial open-ended question that the advertisement said or

10  suggested NJOY was "safe" or "safer" or "better for health" or "risk free."[184]  Maronick found, however,

11  that 50% of respondents that saw the "Resolution Solution" advertisement believed that it conveyed the

12  message that NJOY e-cigarettes were either "safe for your health," "safer for your health than traditional

13  tobacco cigarettes," or both "safe" and "safer for your health," based on the totality of the questions

14  asked, including the close-ended questions.[185]  Properly understood, there is no suggestion that the

15  "Resolution Solution" advertisement is less likely to mislead than other advertisements, or that

16  Halberstam will be preoccupied with that issue and unable adequately to represent the class. See *Hanon*,

17  976 F.2d at 508.  NJOY makes the related argument that all of the advertisements in question  were not

18  sufficiently similar to warrant a finding of typicality.   Maronick's survey results suggest that "a

19  _____

20           [183]Certification Motion at 7.

21           [184]Maronick Decl., ¶ 30.

22           [185]*Id.*, ¶ 32 ("Importantly, as noted in Table 3, 43% of respondents seeing each of the ads took
23  an implied 'credence' claim that NJOY E-Cigarettes are 'safer for your health than traditional tobacco
    cigarettes' while between one-quarter (24%) and one-third (33%) of respondents across the two NJOY
24  print ads said NJOY E-Cigarettes are 'safe for your health.' Importantly, 12 of the 41 respondents who
    had seen the 'Resolution Solution' ad said or suggested that NJOY E-Cigarettes were 'safe' but not
25  'safer for your health.' Thus, 85 of the 170 respondents (i.e., 73 + 12) seeing the 'Resolution Solution'
    ad (50%) said NJOY E-Cigarettes were either 'safe for your health,' 'safer for your health than
26  traditional tobacco cigarettes' or both 'safe' and 'safer for your health.'  Moreover, among respondents
    seeing the 'Try Something New in Bed' ad, 56.7% of respondents said the ad said or suggested that
27  NJOY E-Cigarettes were either 'safe for your health,' 'safer for your health,' or both 'safe' and 'safer
    for your health than traditional tobacco cigarettes'").

28

significant percentage of consumers [ ] take an implied message from NJOY advertising that the [e]-[c]igarettes are 'safe for your health' and/or 'safer for your health than traditional tobacco cigarettes,' a message important to all such consumers."[186] NJOY's argument that typicality is lacking on this basis is also unavailing.

Second, NJOY contends that Halberstam's claims are atypical because he did not smoke traditional tobacco cigarettes. They do not identify a unique defense that would arise from the fact that Halberstam was not a traditional tobacco smoker prior to trying NJOY's e-cigarettes, however, and the court cannot discern one. The relevant inquiry is whether NJOY used a material misrepresentation concerning the e-cigarettes' overall safety when compared with traditional tobacco cigarettes to market its e-cigarettes. Whether the alleged misrepresentation caused a class member to trying nicotine-based products for the first time, like Halberstam, or to switch from traditional tobacco cigarettes to e-cigarettes, the result is the same – the class member was misled and induced to buy a product he or she otherwise would not have purchased. Halberstam's interests therefore "align[ ] with the interests of the class." *Wolin v. Jaguar Land Rover North America, LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010); see *Astiana v. Kashi Co.*, 291 F.R.D. 493, 503 (S.D. Cal. 2013) ("Moreover, the fact that Plaintiffs may also purchase unhealthy or otherwise artificial foods says nothing about whether they purchased Kashi products specifically because they were supposedly healthy and natural. Plaintiff Larsen and class members share the same interests in determining whether Kashi products were deceptively advertised and labeled").

Whether or not they are "substantially identical," Halberstam's "claims are reasonably co-extensive with those of the absent class members." *Hanlon*, 150 F.3d at 1020. The court therefore concludes that they satisfy the typicality requirement of Rule 23(a)(2).[187]

---

[186]*Id.*, ¶ 44.

[187]NJOY asserts that Halberstam is subject to unique defenses because he suffered no injury as a result of its alleged misconduct (and hence lacks standing), and because he viewed the allegedly misleading advertisements while living in New York. The court has addressed these arguments above.

**(b)     Thomas**

Defendants contend that Thomas is not typical of the class because she did not rely on the product packaging when she purchased NJOY cigarettes and because she purportedly purchased an NJOY e-cigarette to quit smoking traditional cigarettes.  NJOY's arguments lack merit.

Thomas's claims are typical of those of the class because she saw the same label other class members did on the product package – a label that omitted ingredients so as to render the packaging purportedly misleading – and decided to smoke NJOY e-cigarettes as a result.  See *Hanlon*, 150 F.3d at 1020; *Bruno v. Quten Research Inst., LLC*, 280 F.R.D. 524, 534 (C.D. Cal. 2011) (noting that plaintiff saw a different representation than the rest of the class and that "the . . . case [was] distinguishable from those cases on which Plaintiff relies where 'a single misrepresentation . . . was made identically to all potential class members'"); *Schwartz*, 108 F.R.D. at 282 ("A plaintiff's claim meets this requirement if it arises from the same event or course of conduct that gives rise to claims of other class members and the claims are based on the same legal theory").

NJOY asserts Thomas did not rely on the product packaging because she stated in a questionnaire that she bought an NJOY e-cigarette because it was the least expensive.[188]  She also stated, however, that she read the NJOY label, and that had it warned her of the risks associated with the product, she would not have purchased it.[189]  Thus, even assuming that price contributed to her purchase decision, Thomas's deposition testimony confirms that she also relied on the product's label.  Moreover, the court finds no merit in NJOY's argument that Thomas will be subject to a unique defense because she "misread" the representation by using it as a smoking cessation tool.  A class representative's motivation for buying a product does not defeat typicality.  See *Astiana*, 291 F.R.D. at 502 (concluding

---

[188]NJOY's Appendix of Exhibits in Opposition to Class Certification, Docket No. 131 (June 22, 2015), Exh. 13 (Questionnaire) at 1.

[189]Thomas Depo. at 99:7-100:8-14 ("Q. If NJOY's packaging had listed all of the chemicals that the complaint says were not listed and should have been listed, how would you have known whether those chemicals would have caused you concern? . . . A. I would have taken it like – any list of chemicals was what I was trying to avoid.  Any amount of anything that I didn't want to go into my body because I was trying to get away frmo that.  I would have taken it as it would have had an effect on me, the same that regular cigarettes were having.  I would have understood it could be the same as regular cigarettes.").

that "differences in Plaintiffs' perceptions and knowledge about Kashi products, as well as differences in their preferences and reasons for purchasing Kashi products, [did not] render them atypical").[190]

### (5)     Adequacy

The adequacy of representation requirement set forth in Rule 23(a)(4) involves a two-part inquiry: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon*, 150 F.3d at 1020; accord *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003). "Adequate representation depends on, among other factors, an absence of antagonism between representatives and absentees, and a sharing of interest between representatives and absentees." *Ellis*, 657 F.3d at 985. Individuals are not adequate representatives of a class when "it appears that they have abdicated any role in the case beyond that of furnishing their names as plaintiffs." *Helfand v. Cenco, Inc.*, 80 F.R.D. 1, 7 (N.D. Ill. 1977). As respects class counsel, adequacy of representation turns on counsel's competence and the absence of conflicts of interest. *Falcon*, 457 U.S. at 157 n. 13 ("The commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence. Those requirements therefore also often tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest"); *Staton*, 327 F.3d at 957 ("To determine whether the representation meets [Rule 23(a)(4)'s] standard, we ask two questions: (1) Do the representative plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the representative plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" citing *Molski v. Gleich*, 318 F.3d 937, 955 (9th Cir. 2003) (in turn quoting *Crawford v. Honig*, 37 F.3d 485, 487 (9th Cir. 1995)); *Hanlon*, 150 F.3d at 1020.

Plaintiffs contend that the class representatives and class counsel are adequate. They assert that

---

[190]Although NJOY disputed whether the class representatives were typical in its opposition, it did not challenge the court's finding that typicality was satisfied at the hearing.

1  the interests of plaintiffs and the absent class members are fully aligned; they all seek to recover

2  damages based on NJOY's false and/or deceptive marketing of its e-cigarettes.[191]  Counsel asserts that

3  the named plaintiffs have been actively participating in the case, and are diligently representing the

4  interests of the class as a whole.[192]  Plaintiffs note that they have retained the law firms of Wolf

5  Haldenstein Adler Freeman & Herz LLP, Levi & Korsinsky LLP, and The Westerman Law Corporation

6  as interim lead counsel.  Each firm has significant experience prosecuting large consumer fraud class

7  actions.  The court has no doubts that they are equipped to represent the class adequately.[193]  NJOY,

8  moreover, does not dispute that the class representatives and class counsel are adequate.  See *Keegan*

9  *v. Am. Honda Motor Co.*, 284 F.R.D. 504, 526 (C.D. Cal. 2012) ("The class representatives have been

10  engaged participants in this litigation, submitting declarations in support of plaintiffs' motions and

11  making themselves available for deposition testimony.  Defendant raises no questions about their

12  credibility, and no evidence of a conflict of interest between plaintiffs and members of the putative class.

13   In addition, class counsel has submitted evidence of their qualifications to represent the class, and their

14  experience litigating similarly complex class actions.  The court finds this evidence sufficient, and

15  deems the adequacy requirement satisfied").  Accordingly, the court finds that named plaintiffs and class

16  counsel satisfy Rule 23(a)(4)'s adequacy requirement.

---

17  [191]Certification Motion at 7.

19  [192]*Id.* at 7.  See also Pollack Decl. ¶ 3 ("Defendant has served notices of deposition on each of the proposed class representatives in this litigation, and each is scheduled to sit for deposition prior to the hearing on this motion").

21  [193]Declaration of Janine Pollack in Support of Appointment of Interim Class Counsel, Docket No. 36-1 (Apr. 2, 2014), ¶ 3 ("Wolf Haldenstein, proposed as Interim Co-Class Counsel here, is a highly experienced class action firm, having represented plaintiffs in numerous nationwide class actions, including consumer class actions, and other complex, large-scale litigations throughout the United States. The firm has offices in San Diego, New York and Chicago, with more than 70 attorneys, including 38 in its Class Action Litigation Group"); *id.*, ¶ 6 ("Westerman Law Corp. is also proposed as Interim Co-Class Counsel.  Jeff S. Westerman, of Westerman Law Corp., has an extensive background in the leadership of complex investor, consumer, and antitrust class actions, including in the Central District of California"); *id.*, ¶ 7 ("Levi & Korsinsky, also proposed as Interim Co-Class Counsel, similarly is experienced in the prosecution of class actions.  Eduard Korsinsky, of Levi & Korsinsky, has represented clients in securities, derivative, consumer, and other complex commercial cases for almost two decades. He has recovered hundreds of millions of dollars for aggrieved shareholders and consumers").

1  
2  
3

### c.   Rule 23(b)(3)

Having concluded that plaintiffs have satisfied Rule 23(a)'s prerequisites, the court turns to Rule 23(b)(3)'s requirements.[194]

### (1)   Whether Common Issues Predominate

4

5  Certifying a class under Rule 23(b)(3) requires "that the questions of law or fact common to the

6  members of the class predominate over any questions affecting only individual members, and that a class

7  action is superior to other available methods for the fair and efficient adjudication of the controversy."

8  FED.R.CIV.PROC. 23(b)(3); see *Poulos v. Caesars World, Inc.*, 379 F.3d 654, 664 (9th Cir. 2004).  The

9  predominance requirement is "far more demanding" than the commonality requirement of Rule 23(a).

10  *Amchem Products*, 521 U.S. at 623-24.  If common questions "present a significant aspect of the case

11  and they can be resolved for all members of the class in a single adjudication," then "there is clear

12  justification for handling the dispute on a representative rather than on an individual basis," and the

13  predominance test is satisfied.  *Hanlon*, 150 F.3d at 1022.  "'[I]f the main issues in a case require the

14  separate adjudication of each class member's individual claim or defense, [however,] a Rule 23(b)(3)

15  action would be inappropriate.'"  *Zinser*, 253 F.3d at 1190 (quoting 7A C. Wright, A. Miller & M. Kane,

16  FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 1778, at 535-39 (1986)).  This is because, *inter alia*,

17  "the economy and efficiency of class action treatment are lost and the need for judicial supervision and

18  the risk of confusion are magnified."  *Id.*

19  Plaintiffs seek to certify a California class alleging violations of California's UCL and

20  CLRA, as well as a Florida class alleging violations of the FDUTPA.  NJOY argues that individual

21  issues predominate because each class member will be required to show causation and damages, as its

22  advertisements and product label did not contain material misrepresentations or omissions, and plaintiffs

23  do not link their damages methodology to their theory of recovery, as required by *Comcast*.  The court

24  addresses each contention in turn.

25  
26  
27  
28

[194]Plaintiffs move to certify only a Rule 23(b)(3) damages class; they do not seek to certify an injunctive/declaratory relief class under Rule 23(b)(2).

(a)    **Whether Reliance and Causation Can Be Shown on a Classwide Basis**

(1)    **California Claims**

Courts generally consider claims under the UCL and CLRA in tandem.  See *Forcellati*, 2014 WL 1410264 at *4 ("For purposes of class certification, the UCL, FAL, and CLRA are materially indistiguishable," citing *Delarosa v. Boiron, Inc.*, 275 F.R.D. 582, 589 n. 3 (C.D. Cal. 2011); *Bruno v. Quten Research Inst., LLC*, 280 F.R.D. 524, 534 (C.D. Cal. 2011)).  Both statutes allow plaintiffs to establish materiality and reliance (i.e., causation and injury) by showing that a reasonable person would have considered the defendant's representation material.  *Forcellati*, 2014 WL 1410264 at *9 (citing *Bruno*, 280 F.R.D. at 534); see also *In re Tobacco II Cases*, 46 Cal.4th 298, 327 (2009); *In re Steroid Hormone Prod. Cases*, 181 Cal.App.4th 145, 157 (2010).

Thus, a California class suing under the state's consumer protection statutes need not show individualized reliance if it can establish the materiality of NJOY's purported safety message and its label omissions to a reasonable consumer.  See *Forcellati*, 2014 WL 1410264 at *9 ("As such, whether or not Defendants' claims are misleading is an objective, classwide inquiry for purposes of the UCL, FAL, and the CLRA.  It is simply a matter of common sense that consumers who purchased Defendants' products did so in reliance on Defendants' claims that the products provided effective relief from cold and flu symptoms," citing *Delarosa*, 275 F.R.D. at 586).

(2)    **Florida Class Claims**

Under the FDUTPA, proof of causation "does not require subjective evidence of reliance, as would be the case with a common law action for fraud."  *Davis v. Powertel, Inc.*, 776 So.2d 971, 974 (Fla. App. 2000).  "This is so because the question is not whether the plaintiff actually relied on the alleged deceptive trade practice, but whether the practice was likely to deceive a consumer acting reasonably in the same circumstances."  *Id.*  See also *Cold Stone Creamery, Inc. v. Lenora Foods I, LLC*, 332 Fed. Appx. 565, 567 (11th Cir. June 3, 2009) (Unpub. Disp.) ("the FDUTPA does not require a plaintiff to prove actual reliance on the alleged conduct"); *Attorney General v. Commerce Commercial Leasing, LLC*, 946 So.2d 1253, 1258 (Fla. App. 2007) ("A deceptive or unfair trade practice constitutes a somewhat unique tortious act because, although it is similar to a claim of fraud, it is different in that,

unlike fraud, a party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue"); *Millennium Communications & Fulfillment, Inc. v. Office of the Attorney General*, 761 So.2d 1256, 1263 (Fla. App. 2000) ("the new standard considers as material only deceptions that are likely to cause injury to a reasonable relying consumer, whereas the old standard reached deceptions that a consumer might have considered important"). Thus, as is the case under the CLRA and UCL, to satisfy the FDUTPA's causation requirement, each plaintiff is required to prove only that the deceptive practice is sufficiently material to deceive an objective reasonable consumer.

### (3)   Conclusion Respecting Causation and Reliance

For the reasons stated, the court concludes that plaintiffs can prove reliance and causation on a classwide basis if they are able to show the representations and omissions were material. The court considers next whether plaintiffs can show that NJOY's alleged misrepresentations and omissions would have been material to a reasonable consumer such that a classwide inference of reliance could arise.

### (b)   Whether Plaintiffs Can Show They Were Exposed to Material Misrepresentations and Omissions on a Classwide Basis

NJOY maintains that the materiality of its purported advertising misrepresentations cannot be proved on a classwide basis because there is no evidence suggesting that members of the putative class were exposed to the same advertisements. NJOY focused primarily on this argument at the hearing. The crux of its argument is that class members were exposed to different advertisements, all conveying a different message, throughout the class period, such that individualized inquiries would be required for each class member. See *Davis–Miller v. Automobile Club of Southern California*, 201 Cal.App.4th 106, 125 (2011) ("An inference of classwide reliance cannot be made where there is no evidence that the allegedly false representations were uniformly made to all members of the proposed class"); *Cohen v. DIRECTV, Inc.*, 178 Cal.App.4th 966, 980 (2009) ("[California law does not] authorize an award . . . on behalf of a consumer who was never exposed in any way to an allegedly wrongful business practice"). NJOY focused extensively on the Ninth Circuit's decision in *Mazza*. There, a split panel

reversed the district court's certification of a nationwide class, which, as here, asserted claims under the UCL and the CLRA.[195] Specifically, the *Mazza* plaintiffs alleged that "Honda misrepresented and concealed material information in connection with the marketing and sale of Acura RL vehicles equipped with the [Collision Mitigation Braking System ("CMBS") ]." *Mazza*, 666 F.3d at 587. The claims were based on a "mass advertising" scheme between November 2005 and sometime in 2006, despite the fact that the class period ran from August 17, 2005 to the date of certification. *Id.* at 586-87. During this time, Honda aired two commercials, one that ran for a week and another that ran for roughly six months. Thereafter, Honda continued to engage in marketing in narrow contexts: in internal videos that dealers had the option to show purchasers at dealerships; in Honda brochures; on its website; and in "some" magazines. *Id.*

In deciding whether reliance could be presumed, the Ninth Circuit discussed the California Supreme Court's decision in *In re Tobacco II Cases*, 46 Cal.4th 298. It explained that *Tobacco II* "reconfirmed that class members do not need to demonstrate individualized reliance, and that Proposition 64 imposes its reliance requirements only on the named plaintiff, not unnamed class members." *Mazza*, 666 F.3d at 595-96 (citing *Tobacco II*, 46 Cal.4th at 324-27). The court noted, however, that "*Tobacco II*'s holding was in the context of a 'decades-long' tobacco advertising campaign where there was little doubt that almost every class member had been exposed to defendants' misleading statements, and defendants were not just denying the truth but representing the opposite." *Id.*

The Ninth Circuit has subsequently explained that, in reversing the district court, it relied on "two crucial facts" about Honda's advertising program – "first, that it 'f[e]ll short of the extensive and longterm fraudulent advertising campaign at issue in *Tobacco II*'"; and second, that '[the] advertising materials d[id] not deny that limitations [to the brake system] exist[ed].'" *Berger v. Home Depot USA,*

---

[195]The complaint also asserted a claim under the False Advertising Law and an unjust enrichment claim under California law. The fact that California law could not be applied to the claims of all class members nationwide was an independent reason the Ninth Circuit concluded that common questions did not predominate. *Mazza*, 666 F.3d at 590 ("We . . . hold that the district court abused its discretion in certifying a class under California law that contained class members who purchased or leased their car in different jurisdictions with materially different consumer protection laws").

1   *Inc.*, 741 F.3d 1061, 1068 (9th Cir. 2014) (quoting *Mazza*, 666 F.3d at 596).  Accordingly, the Ninth

2   Circuit concluded that "[i]n both breadth and content, it was 'unreasonable to presume' that all class

3   members were exposed to Honda's misleading statements, and that without such exposure, consumers

4   were not likely to be deceived."  *Id.* (citations omitted); see also *Mazza*, 666 F.3d at 595 ("it is likely

5   that many class members were never exposed to the allegedly misleading advertisements, insofar as

6   advertising of the challenged system was very limited").

7          Plaintiffs contend that the safety message NJOY communicated was uniform, and that this makes

8   *Mazza* inapposite.  As respects the omissions claims based on product packaging, there is no question

9   that *Mazza* is not controlling and is distinguishable.   The omissions did not occur in the context of a

10  limited advertising campaign that reached only a small subset of the class.   "Rather, the alleged

11  omissions . . . relate to the packaging of [NJOY's e-cigarettes], which has not materially changed over

12  the course of the [shortened c]lass [p]eriod." *Guido v. L'Oreal, USA, Inc*., No. CV 11-1067 CAS (JCx),

13  2013 WL 3353857, *11 (C.D. Cal. July 1, 2013).   Plaintiffs allege that the packaging consistently

14  omitted reference to ingredients such as propylene glycol and glycerin, or consistently failed to disclose

15  health-related risks.  NJOY has adduced no evidence suggesting otherwise.  "Accordingly, the class

16  members – who are defined, *inter alia*, as purchasers and users of [NJOY e-cigarettes] – were

17  necessarily 'exposed' to defendants' alleged misleading packaging of [NJOY e-cigarettes], in contrast

18  to the putative class in *Mazza*." *Id.*  See also *McCrary v. Elations Co., LLC*, No. CV 13-00242 JGB

19  (OPx), 2014 WL 1779243, *13 (C.D. Cal. Jan. 13, 2014) ("Defendant does not argue, nor could it, that

20  its clinical proof claims were of limited scope, since it placed them on the packaging of every unit of

21  Elations sold over an 18–month period.  The factual dissimilarity of *Mazza* renders it inapplicable");

22  *Tait v. BSH Home Appliances Corp*., 289 F.R.D. 466, 482 (C.D. Cal. 2012) ("*Mazza* stands for the

23  unremarkable proposition that it is difficult to certify a class where the class members are not all

24  exposed to the same representations.  This proposition has no relevance to the present case, where

25  Plaintiffs' theory is that Defendant's *omissions* violated the UCL, FAL, and CLRA and that partial

26  representations *on the product itself* are misleading"); *Johns v. Bayer Corp*., 280 F.R.D. 551, 558 n. 5

27  (S.D. Cal. 2012) ("Here, [in] contrast[ to *Mazza*], all class members necessarily saw Bayer's prostate

28  claim, since it appeared prominently on the packaging itself"); compare *Pfizer Inc. v. Superior Court*,

182 Cal.App.4th 622, 631-32 (2010) (concluding that a class of purchasers of Listerine in California during a six-month period could not be certified because "of 34 different Listerine mouthwash bottles, 19 never included any label that made any statement comparing Listerine mouthwash to floss," and "not every bottle shipped between June 2004 and January 2005 bore such a label").

Whether *Mazza* forecloses plaintiffs' misrepresentation claims based on NJOY's advertising campaign is a more difficult question.  NJOY maintains that its advertising was limited in breadth, more so even than the advertising in *Mazza*; thus, it contends that "many class members were never exposed to the allegedly misleading advertisement," and that "an individualized case [will have to] be made for each member showing reliance."  *Mazza*, 666 F.3d at 596.

Plaintiffs counter that NJOY engaged in a massive advertising campaign, and that it is reasonable to presume all members of the class viewed its advertisements.  See *Johnson v. General Mills, Inc*., 275 F.R.D. 282, 288-89 (C.D. Cal. 2011) ("General Mills' argument is unpersuasive that individual issues predominate because purchasers of YoPlus have been exposed to different mixes of packages and advertisements since General Mills has, over time, modified the packaging of YoPlus and the content and emphasis of its marketing materials.  Contrary to General Mills' suggestion, individualized proof of deception and reliance are not necessary for Mr. Johnson to prevail on the class claims.  Again, the common issue that predominates is whether General Mills' packaging and marketing communicated a persistent and material message that YoPlus promotes digestive health," citing *Fitzpatrick v. General Mills, Inc*., 263 F.R.D. 687, 697 (S.D. Fla. 2010) ("Try as it might, General Mills cannot evade the unmistakable fact that the objective – and realization – of its marketing campaign was to present Yo-Plus to Florida consumers as a product that . . . aids in the promotion of digestive health")).

Plaintiffs assert that each of NJOY's advertisements conveyed the safety message; they note that virtually every advertisement NJOY ran contains language such as "finally smokers have a real alternative," "cigarettes you've met your match," and other slogans such as "Resolution Solution" and "Everything you like about cigarettes without the things you don't."[196]  The court addresses materiality *infra*.  Assuming the advertisements were materially misleading, and conveyed a safety message, the

---

[196]Certification Motion Reply at 3-4.

fact that they were worded differently does not preclude a finding that materiality can be proved on a classwide basis. See *In re First Alliance Mortgage Co.*, 471 F.3d 977, 992 (9th Cir. 2006) ("The class action mechanism would be impotent if a defendant could escape much of his potential liability for fraud by simply altering the wording or format of his misrepresentations across the class of victims"); see also *In re Nat'l W. Life Ins. Deferred Annuities Litig.*, 268 F.R.D. 652, 668 (S.D. Cal. 2010) (finding predominance because "a presumption, or at least an inference, of reliance arises whenever there is a showing that a misrepresentation was material, that is, a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question" (internal quotations and citations omitted)); cf. *Mazza*, 666 F.3d at 595 ("[W]e agree with Honda's contention that the misrepresentations at issue here do not justify a presumption of reliance. This is so primarily because it is likely that many class members were never exposed to the allegedly misleading advertisements, insofar as advertising of the challenged system was very limited").

This does not end the inquiry, however. The California Court of Appeal has stressed that an "inference of classwide reliance cannot be made where there is no evidence that the allegedly false representations were uniformly made to *all* members of the proposed class." *Davis-Miller v. Auto. Club of So. California*, 201 Cal.App.4th 106, 125 (2011) (emphasis added); *id*. at 124-25 ("[B]oth [the UCL and the CLRA] require, at a minimum, that the class be exposed to the allegedly false advertising at issue").[197] NJOY's principal contention is that its advertising was not sufficiently pervasive to support a presumption that all members of the class saw the advertisements. Plaintiffs contend the evidence they have proffered, in combination with admissions in NJOY's brief, suggests otherwise. NJOY began to advertise in California upon introducing its King e-cigarette to the market in December 2012.[198] NJOY concedes its records reflect that it ran a total of eight print advertisements for NJOY Kings intermittently

---

[197]The same is true of the FDUTPA claim, as that statute employs substantially the same test for causation and materiality. See *Keegan*, 284 F.R.D. at 541 ("With small differences in wording, all three states [(California, Florida, and New York)] appear to employ the same causation and reliance standard. The touchstone of each state's law is whether a reasonable person would have found the relevant omission misleading"); see also *Makaeff v. Trump Univ., LLC*, No. 10-CV-0940 GPC WVG, 2014 WL 688164, *14 (S.D. Cal. Feb. 21, 2014) (agreeing with *Keegan*).

[198]Vaccari Decl., ¶ 2.

over the course of a year – from December 2012 to December 2013.[199]  The "Resolution Solution"
advertisement ran in editions of *ESPN Magazine*, *Rolling Stone*, and *Sports Illustrated* published on
December 28, 29, and 31, 2012.[200]  Each of these magazines is weekly or biweekly, meaning that the
advertisement ran in the current issue of the magazines for one to two weeks.  NJOY's "Try Something
New in Bed" advertisement ran in *Paper Magazine* in October 2013.  Another version of the "Try
Something New in Bed" advertisement ran in *Fashion Daily*, *New York Magazine*, and *Women's Wear
Daily* in February 2013, and in *Out Magazine* in May 2013.[201]  NJOY's "Most Amazing Thing"
advertisement ran in *Out Magazine* in February 2013, *Paper Magazine* in February and April 2013, and
*USA Today* on December  3 and 17, 2012, and for the month of March 2013.[202]  NJOY's "Start a New
Relationship" advertisement ran in *Paper Magazine* in November 2012, and in *Out Magazine* in
December 2013.[203]  Another version of the same advertisement ran in *ESPN Magazine* in June 2013,
*Fashion Daily* in February 2013, *Paper Magazine* in May and June 2013, *USA Today* in  February and
April 2013, and *Women's Wear Daily* in February 2013.  NJOY's "Lose Your Cigarettes" advertisement
ran in *ESPN Magazine* in October 2013, and its "Size Does Matter" advertisement ran in *Out Magazine*
in October 2013.[204]

At the hearing, NJOY described these publications as "mostly off beat" magazines that a
majority of consumers would not have seen prior to purchasing NJOY e-cigarettes.  While *Out
Magazine*, *Fashion Daily*, *Paper Magazine*, *Women's Wear Daily*, and *New York Magazine* circulate
more narrowly than *Sports Illustrated*, *Rolling Stone*, and *ESPN Magazine*, their audiences are by no
means insignificant.  Nonetheless, NJOY is correct that its print advertising campaign was lasted less

---

[199]*Id.*, ¶ 3.

[200]*Id.*

[201]*Id.*

[202]*Id.*

[203]*Id.*

[204]*Id.*

than one year, and was certainly not as widespread as the campaign at issue in *Tobacco II*.

NJOY also ran a radio advertisement from December 31, 2012 to January 13, 2013, that included a voice-over stating: "Finally smokers have a real alternative" and "Cigarettes you've met your match."[205] Plaintiffs cite similar radio advertisements – one ran on local Los Angeles radio stations from December 10 to December 23, 2012, on ESPN radio from April 15 to June 30, 2013, and again on local Los Angeles stations from June 3 to July 28, 2013. A second ran from February 3 to March 30, 2014, while a third ran from December 26 to 29, 2013.[206]

NJOY's "Amazing" commercial ran on KTLA in Los Angeles from December 3 to December 16, 2012, and again from April 18 to July 21, 2013. It also aired nationally on ESPN/ESPN2 for five day from July 29 to August 4, 2013.[207] Similarly, NJOY's "Friends Don't Let Friends Smoke" television advertisement ran nationally on ESPN2 between December 26, 2013 and January 19, 2014, and on ESPN from February 1 to March 30, 2014.[208]

Plaintiffs note that NJOY made the allegedly false and misleading statements in magazine advertisements for approximately ten months; in television commercials for a total of 193 days (106 of which were solely in Los Angeles); and on the radio for a combined total of 217 days (69 of which were solely in the Los Angeles market). The entire campaign spanned the period from December 10, 2012 to March 30, 2014 – 475 days. Assuming a notice date of August 14, 2015 (today), and taking into account the court's decision to narrow the class period, the California Class Period is 977 days. This is more than twice as long as the entire period during which NJOY advertised. Indeed, any consumer that purchased NJOY e-cigarettes for the first time between March 30, 2014 and today might well never have seen an NJOY advertisement, since none was disseminated during that time period.

Plaintiffs contend the evidence they have proffered of mass media advertising by NJOY

---

[205]Reply Declaration of Janine Pollack ("Pollack Reply Decl."), Docket No. 149-3 (July 6, 2015), ¶ 2; see also *id*., Exh. A.

[206]Certification Reply at 5.

[207]Pollack Reply Decl., Exh. A.

[208]*Id.*

constitutes "substantial evidence that [NJOY] made common misrepresentations to all of the class members." *Makaeff*, 2014 WL 688164, *13 (S.D. Cal. Feb. 21, 2014). Given "the effect of this campaign," plaintiffs contend, "it [is] highly likely that each member of the putative class was exposed to the same misrepresentations." *Id.* For this reason, they assert, their UCL and CLRA claims are not barred by *Mazza*. See *id.* At the hearing and in their reply, plaintiffs argued that the advertising was sufficiently pervasive to distinguish this case from *Mazza*, and make it analogous to *Makaeff*. In *Makaeff*, plaintiffs sought certification of a class of "all individuals who purchased Trump University, LLC ('TU') real estate investing seminars." *Id.* at *2. The operative complaint alleged that "TU and Donald Trump made [numerous] common misrepresentations in invitations, advertisements, and at the [actual] seminar[s]: (1) [that] Trump University was an accredited university; (2) [that] students would be taught by real estate experts, professors and mentors hand selected by Mr. Trump; and (3) [that] students would receive one year of expert support and mentoring." *Id.* Defendants argued that common questions did not predominate because the class was not exposed to uniform misrepresentations. *Id.* at *12. The court agreed with defendants that the "advertising and [defendant's] promotional activities . . . were not part of a massive advertising campaign." *Id.* It disagreed, however, that this required a class not be certified. It noted that the relevant issue was "whether the putative class members were exposed to the same alleged misrepresentations," *id.* at *13, and concluded that "unlike the limited advertising in *Mazza*, there [was] evidence that the TU multi-media promotional campaign was uniform, highly orchestrated, concentrated and focused on its intended audience." *Id.* It also concluded that the nature of the product – real estate investment seminars – made it likely that those who actually purchased the seminars saw the advertisements. *Id.* (the "effect of th[e] campaign [made] it highly likely that each member of the putative class was exposed to the same misrepresentations"). As a result, the court found there was "substantial evidence that class members paid for TU seminars for reasons that track the advertising and promotional information provided in the highly orchestrated campaign," *id.*, and concluded in light of the evidence that it was reasonable to presume all class members had been exposed to the misrepresentations. *Makaeff*, of course, is not binding on the court; the question the court must answer is whether *Mazza* and the California authority on which *Mazza* relies makes it reasonable to presume that all class members saw advertisements containing the implied safety message. In

deciding this issue, the court notes first that the circumstances of this case are markedly different than those in *Makaeff*.  First and most fundamentally, the nature of the product at issue here renders much of *Makaeff*'s reasoning inapposite.  In *Makaeff*, it stood to reason that people decided to attend TU seminars because they had been exposed to TU advertisements; indeed, there is no indication in the opinion that someone could have learned of the seminars in any other way.   *Id*.  Here, by contrast, putative class members could easily have decided to purchase an NJOY e-cigarette for reasons other than having seen or heard an advertisement with the implied safety message.  A purchaser, for example, could simply have seen the e-cigarettes in a gas station or convenience store and decided to buy them.

The decision of other California district courts suggest that NJOY's advertising is not sufficiently substantial or pervasive to give rise to a presumption that all class members were exposed to the advertisements.  In *In re Clorox Consumer Litig*., 301 F.R.D. 436, 445 (N.D. Cal. 2014), for example, the court considered whether a sixteen month television advertising campaign designed to promote Clorox's Fresh Step cat litter was sufficiently pervasive to support an inference that all class members had been exposed to Clorox's allegedly misleading advertisements.  The court explained that in *Tobacco II* "presumptions of exposure and reliance were justified by a 'decades-long campaign of the tobacco industry to conceal the health risks of its product.'"  *Id*. (citing *Tobacco II*, 46 Cal.4th at 327).  It noted, however, that "[s]ince *Tobacco II*, both California state courts and federal courts in the Ninth Circuit – when applying California law – have refused to presume so broadly in other contexts." *Id*.  Quoting the Ninth Circuit's decision in *Mazza*, the court noted that "[i]n the absence of the kind of massive advertising campaign at issue in *Tobacco II,* the relevant class must be defined in such a way as to include only members who were exposed to advertising that is alleged to be materially misleading."  *Id*. (quoting *Mazza,* 666 F.3d at 596).  It concluded that a "sixteen-month television advertising campaign combined with messages in small print on the back of a small minority of Fresh Step packaging d[id] not even approach the 'massive advertising campaign' at issue in *Tobacco II*."  *Id*. It thus held that the

> "proposed class – which include[d] all purchasers of Fresh Step in California over a period of almost four years – [wa]s not defined so as to include only members who were exposed to the allegedly misleading material.  Without any evidence that Clorox

72

included its superiority message on a significant portion of Fresh Step products, or that consumers actually saw it, [p]laintiffs ha[d] no basis for their claim that Clorox presented a uniform message to its customers." *Id*. at 445-46.

In this case, NJOY's advertising spanned an even shorter period than sixteen months.  The case is thus more analogous to *Clorox* than *Makaeff*; the *Makaeff* court did not discuss the duration of the advertising at issue there, and it does not appear that it involved television, print, and radio advertisements such as NJOY used here.  More fundamentally, a review of *Mazza* makes clear that NJOY's advertising was not sufficiently pervasive to give rise to a presumption that all class members viewed advertisements with the implied safety message.  As noted, the marketing campaign at issue in *Mazza* included a television commercial that ran for a week in November 2005 and from February to September 2006.  See 666 F.3d at 586.  This is approximately 180 days, a period roughly equivalent to the 193 days NJOY ran advertisements concerning its e-cigarettes; on 106 of these 193 days, the commercials ran only in Los Angeles.  Honda also ran advertisements in "some magazines" from March to September 2006, four months less than the ten months NJOY advertised its products.  *Id*.  Although NJOY ran print advertisements for four months longer than Honda, and ran radio advertisements for approximately seven months, *Mazza* makes clear that its advertising campaign was simply not the type of long-term, pervasive campaign at issue in *Tobacco II*.  Even if the court assumes, moreover, that the campaign was sufficiently pervasive while it was ongoing, the class includes persons who bought NJOY e-cigarettes during a sixteen month period *after* NJOY had stopped running advertisements.  Plaintiffs do not assert that all (or even most) of the individuals who purchased NJOY e-cigarettes from March 30, 2014 to the present did so after hearing or viewing NJOY advertisements than ran weeks, months, and even years earlier.  As noted, there can be no classwide presumption of reliance under California law where, as here, it is likely that "many class members were never exposed to the allegedly misleading advertisements."  *Mazza*, 666 F.3d at 595; *Cabral v. Supple LLC*, __ Fed. Appx. __, 2015 WL 3855142, *1 (9th Cir. June 23, 2015) (Unpub. Disp.) ("In a case of this nature, one based upon alleged misrepresentations in advertising and the like, it is critical that the misrepresentation in question be made to all of the class members.  The record in this case does not meet that standard; it will not support a determination that all of the class members saw or otherwise received the misrepresentation"); *Clorox*

1  *Consumer Litig.*, 301 F.R.D. at 445-46 (concluding that a sixteen month advertising campaign was

2  insufficient to warrant application of the *Tobacco II* presumption of exposure); *Pfizer Inc.*, 182

3  Cal.App.4th at 632 (*Tobacco II* does not allow "a consumer who was never exposed to an alleged false

4  or misleading advertising . . . campaign" to recover damages under the UCL or CLRA).  As the Ninth

5  Circuit held in *Mazza*, "[i]n the absence of the kind of massive advertising campaign at issue in *Tobacco*

6  *II,* the relevant class must be defined in such a way as to include only members who were exposed to

7  advertising that is alleged to be materially misleading." *Mazza,* 666 F.3d at 596.  Because they have not

8  demonstrated that NJOY's advertising was sufficiently pervasive to warrant a presumption that all

9  members of the class saw advertisements with the implied safety message, they have not shown that

10  materiality can be proved on a classwide basis.  Nor have they defined the class in a manner consistent

11  with *Mazza*.   The court therefore declines to certify the California class to the extent based on

12  misrepresentations in advertising.

13  **(c)      Whether Plaintiffs Have Demonstrated Materiality**

14       NJOY contends finally that plaintiffs have failed to adduce evidence showing that its advertising

15  and omissions were material.[209]   It notes the only evidence of materiality proffered by plaintiffs is

16  Maronick's survey.  NJOY contends that the survey evidence is not probative of materiality because the

17  vast majority of survey respondents were not from California or Florida.[210]  It is unclear why NJOY

18  believes the survey results are not probative because respondents resided in states other than California

19  and Florida.  Materiality is established "if a reasonable man would attach importance to [the] existence

20  or nonexistence [of a fact] in determining his choice of action in the transaction in question."  *Stearns,*

21  655 F.3d at 1022 (quoting *Steroid Hormone Prod. Cases*, 181 Cal.App.4th 145, 155-56 (2010)); *Astiana*,

22  291 F.R.D. at 504 (same); *Latman v. Costa Cruise Lines, N.V.*, 758 So.2d 699 (Fla. App. 2000) (under

23  the FDUTPA, "[i]t is sufficient if the class can establish that a reasonable person would have relied on

24  the representations").

25       Whether a *reasonable consumer* would find NJOY's advertisements and omissions misleading

26  _____

27       [209]Certification Opposition at 26-27.

28       [210]*Id.* at 26.

is not a question that requires survey data solely from California and Florida.  NJOY does not suggest that the materiality of its marketing varied from California to Georgia or Florida to Wisconsin, and the nature of the reasonable person inquiry is such that it did not.[211]

### (1)    Misrepresentations

NJOY also asserts that Maronick's survey is insufficient to establish materiality.  Maronick concludes, however, that (1) "a significant percentage of consumers also take an implied message from NJOY advertising that the [e]-[c]igarettes are 'safe for your health' and/or 'safer for your health than traditional tobacco cigarettes,' a message important to all such consumers"; (2) "NJOY's claims that 'Cigarettes, You've Met Your Match' and that, with NJOY [e]-[c]igarettes, consumers have a 'Real Alternative' conveys, to a substantial percentage of the target market, that NJOY E-Cigarettes are a 'better alternative' to traditional tobacco cigarettes and that they are 'safe' and/or 'safer' than traditional tobacco cigarettes, factors important or very important to virtually all consumers who said the NJOY [e]-[c]igarette ads communicated that the product is 'safe' or 'safer for your health' than traditional tobacco cigarettes"; (3) "when NJOY tells consumers they can 'keep the things they like about smoking, while losing the things they don't,' and when NJOY tells consumers that 'Friends don't let friends smoke,' consumers are taking the claims to mean that, if they smoked NJOY E-Cigarettes, they would be giving up the 'bad or harmful' effects of smoking or keeping their friends from the 'bad or harmful' aspects of smoking, implying that NJOY E-Cigarettes are, therefore, 'safe' or 'safer for their (or their friends') health' than traditional tobacco cigarettes"; and (4) "respondents seeing the NJOY E-Cigarette label would like to know all the ingredients harmful to their health that are in NJOY E-Cigarettes, not just that fact that it has 'nicotine.'"[212]

In particular, with respect to the omissions-based claims, 91% of respondents indicated that it would have been either "Very Important" or "Important" to know that e-cigarettes contained other

---

[211]*Bruce v. Teleflora, LLC*, No. 13 CV 03279 ODW, 2013 WL 6709939, *7 (C.D. Cal. Dec. 18, 2013), the only case cited by NJOY, is not to the contrary.  There, the court did not address materiality under a reasonable person test; it decided whether plaintiffs' damages model was sufficient under *Comcast*.  Whether a reasonable person would find a misrepresentation or omission material is an entirely different question.

[212]Maronick Decl., ¶¶ 44-47.

ingredients than nicotine.  That is sufficient to demonstrate that reasonable persons could find NJOY's omissions on the product label were material.  The same is true of the alleged misstatements in the advertisements.  Some 40.7% of respondents that viewed NJOY's 60 second "Friends don't let friends smoke" advertisement understood that it meant friends do not let friends do things that are "bad for their health"; an additional 17.6% of respondents said the advertisement communicated that NJOY e-cigarettes were "safer," "better for you," or "risk free."[213] Thus, 58.3% of respondents understood that the "Friends don't let friends smoke" advertisement conveyed an implied safety message.

Similarly, 27.5% of respondents perceived NJOY's claim in the "Try Something New in Bed" advertisement that "you can keep the things you like about smoking, while losing the things you don't," to mean that they would be giving up the "harmful or bad" effects of smoking or that by giving up those "things [they didn't] like" they would be smoking a "safe," or "safer" cigarette or one that was "better for their health."[214]  Of respondents viewing the "Cigarettes, You've Met Your Match" claim in the "Resolution Solution" and "Try Something New in Bed" advertisements, 33.7% and 47.6% of respondents, respectively, indicated that the phrase suggested that NJOY's e-cigarettes were an "alternative to/better than cigarettes."[215]  Based on the same advertisements, 22.7% and 27.5% of respondents understood NJOY's statement that "Smokers finally have a real alternative" to mean that NJOY's e-cigarettes were "alternative to/better than cigarettes," while 14.4% and 14% viewed the statement as an indication that NJOY e-cigarettes were "Safe/Safer/Better for Health/Risk Free."[216] Thus, 37.1% and 41.5% of respondents who viewed this advertisement believed it conveyed an overall implied safety message.

There are further statistical examples of materiality, but the court believes these more than suffice to demonstrate that a reasonable consumer could find materiality.  Courts have found a representation material when significantly smaller percentages of consumers than those reflected in the

---

[213]*Id.*, ¶ 38.

[214]*Id.*, ¶ 36.

[215]Id., ¶ 35; *id.*, Table 6.

[216]*Id.*, Table 5.

surveys here.  See *Oshana v. Coca–Cola Co.*, No. 04 C 3596, 2005 WL 1661999, *9 (N.D. Ill. July 13, 2005) ("Coca–Cola provides no authority that a misrepresentation is immaterial if only 24% of consumers would behave differently. . . .  [T]here is sufficient evidence to raise a genuine issue of fact as to whether the alleged misrepresentations are material to a reasonable consumer"); cf. *ConAgra II*, 2015 WL 1062756 at *64 (materiality was satisfied where a "majority" of respondents found that "100% Nature" meant no GMOs).  NJOY cites no case law to the contrary.  The only case it cites, *Algarin v. Maybelline, LLC*, 300 F.R.D. 444 (S.D. Cal. 2014), is inapposite.  There, the allegedly material misrepresentation was Maybelline's claim that its line of makeup had "24 hour staying power."  *Id.* at 450.  The court found the representation was not material because "more purchasers expected the product to last less than 24 hours or had no specific duration expectations" than thought it would last 24 hours.  *Id.* at 457.  Maronick's survey data are not susceptible to such a reading.

NJOY's only attack on the actual results of Maronick's survey evidence is to assert that "less than 5% of the respondents believed NJOY's Resolution Solution ad – the only one Halberstam saw – conveyed the '[s]afety [m]essage' when asked their perception in an open-ended question."[217]  This is true.  In close-ended questions concerning the "Resolution Solution" advertisement, however, 50% of respondents  said NJOY e-cigarettes were either "safe for your health," "safer for your health than traditional tobacco cigarettes" or both "safe" and "safer for your health."[218]  NJOY does not dispute that a showing that half of all respondents found the communications implied a safety message is sufficient to show materiality for purposes of Rule 23(b)(3) certification.  See *Oshana*, 2005 WL 1661999 at *9 (survey evidence that 24% of consumers found advertisement misleading was sufficient).

To the extent NJOY contends close-ended questions are impermissible, the court cannot agree.  Respondents' answers to open-ended questions are recorded verbatim, while respondents select from a set field of responses when answering close-ended questions.  Although open-ended questions are generally considered less likely to undermine reliability, close-ended questions are not inherently suspect, and courts frequently rely on the data obtained from such questions. See, e.g., *PBM Products,*

---

[217]Certification Opposition at 26.

[218]Maronick Decl., ¶ 32.

*LLC v. Mead Johnson Nutrition Co.*, No. 3:09 CV 269, 2010 WL 56072, *12 (E.D. Va. Jan. 4, 2010) (use of close-ended and open-ended questions permissible), aff'd sub nom. *PBM Products, LLC v. Mead Johnson & Co.*, 639 F.3d 111 (4th Cir. 2011); *Healthpoint, Ltd. v. Ethex Corp.*, No. CV 01 CA 646 OG, 2004 WL 6042867, *4 (W.D. Tex. Aug. 5, 2004) ("Although it is true that open-ended questions generally are considered to be less likely to undermine the reliability of a survey, a survey's use of close-ended questions, in and of itself, is not determinative of reliability or admissibility"). Indeed, Maronick contends that the "generally accepted approach to testing for express and implied claims is to follow open-ended questions with closed-ended questions with unbiased response options."[219]  As Shari Seidman Diamond explains in a text upon which both plaintiffs' and NJOY's experts purport to rely, close- and open-ended questions both have their appropriate uses: "[o]pen-ended questions are more appropriate when the survey is attempting to gauge what comes first to a respondent's mind, but closed-ended questions are more suitable for assessing choices between well-identified options or obtaining ratings on a clear set of alternatives." Sheri Diamond, *Reference Guide on Survey Research*, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (3d ed. 2011) at 253. Stated differently, open-ended questions give respondents the opportunity to report not only their initial thoughts, but also any implied messages they took from the statements.[220]  The use of such questions is permissible, and does not undermine plaintiffs' showing of materiality for class certification purposes.

Finally, NJOY asserts that Maronick's survey is contradicted by a survey conducted by its expert, Kent Van Liere.[221]  Van Liere's results are markedly different than Maronick's. Based on his survey results, Van Liere concludes that "[o]nly a net one percent of the NJOY purchasers sample in [his] study indicate[d] that the advertising and product packaging suggests a comparison to traditional cigarettes, . . . that the comparison suggests that e-cigarettes are safer and/or healthier than cigarettes,

---

[219]Maronick Reply Declaration, Docket No. 149-2 (July 6, 2015), ¶ 22.

[220]*Id.*, ¶ 22 ("This gives the respondents the opportunity to report not only the top of mind express claims they saw in the ad but also any implied messages they took from it.").

[221]Certification Opposition at 10.

and that the comparison makes them more likely to purchase the NJOY products."[222]  He asserts that "[t]he results across [his] surveys consistently show that there are relatively small to no differences in the perceptions of respondents between the test conditions and the control conditions where the allegedly misleading material has been removed or altered," which "shows that the allegedly misleading statements or omissions are not causing consumers to form different impressions about NJOY e-cigarettes with regard to health and safety messages or to infer that the NJOY products are healthier or safer than traditional cigarettes."[223]

Van Liere's survey used only open-ended questions.  Respondents were asked to look at the print advertisements or to watch the commercial.  They were then asked a series of open-ended questions, with the advertisement still in front of them.  First, they were asked "what does this commercial/advertisement convey to you?"  Their verbatim responses were recorded. They were then asked "what makes you say that."  Again, their verbatim responses were recorded.  Third, they were asked "If you have an opinion, does the commercial/advertisement convey or not convey any message or messages about e-cigarettes compared to traditional combustible cigarettes?"[224]

Maronick criticizes Van Liere's survey for a number of reasons.  First, he asserts that leaving the print advertisement in front of the respondents makes the questions in the survey a "reading test" where respondents are simply reading what is expressed in the text of the advertisement, as opposed to a "memory test" where they recall what was said or may have been implied.  Since the issue is whether claims such as "cigarettes you've met your match" may *imply* something about a comparison with traditional cigarettes, a reading test is unlikely to elicit responses reflecting implied claims.[225]  Second, he contends Van Liere used leading language because his survey asks "what message or messages would you say the commercial/advertisement *conveys* about e-cigarettes compared to traditional combustible cigarettes?"  According to Maronick, the generally accepted approach "to elicit[ing] consumer

---

[222]Declaration of Kent Van Liere, Docket No. 130-7 (June 22, 2015), ¶ 14.

[223]*Id.*

[224]Van Liere Decl., ¶¶ 25-27.

[225]Maronick Reply Decl., ¶ 19.

perceptions related to express and/or implied claims is to ask 'what does the commercial/ad say or suggest? . . . without any direction[ ] regarding what the interviewer is 'looking for.'"  Thus, by using the word "convey" and asking respondents to address "e-cigarettes compared to traditional combustible cigarettes," "Van Liere [purportedly] created a leading question that almost guarantee[d] that the resulting responses [would be] related to express claims."[226] Third, Maronick contends that because Van Liere used only open-ended questions, "[c]learly this biase[d] the results and render[ed] the resulting data of questionable validity and reliability relative to the issues in this litigation, namely whether a reasonable consumer would understand that a health and/or safety message was implied."  This, Maronick states, is because closed-ended questions give "respondents the opportunity to report not only the top of mind express claims they saw in the ad[vertisement] but also any implied messages they took from it.[227]

Most fundamentally, Maronick contends that Van Liere did not "code all the responses" to the questions that were asked.  He asserts that "by selectively coding only those respondents who gave a specific 'health' or 'safe/safer' message, Van Liere mischaracterized and underrepresented the extent to which health-related messages were conveyed by the two print advertisements.  In fact, despite the fact that he asked respondents how NJOY e-cigarettes 'compare to traditional combustible cigarettes,' he coded only those responses that [were] health and safety responses and conveniently report[ed] that few respondents took a health or safety message from the ad[vertisement]."[228] Maronick asserts that, taking into account all "the coded verbatim responses for the two test print ads (i.e., Resolution Solution and Try Something New in Bed), 12.1% of respondents gave a health-related response to what the ad conveyed, while 26.2% across the two ads said the ads conveyed that the way NJOY e[-]cigarettes 'compares to traditional cigarettes' is that NJOYs are an "alternative to tobacco cigarettes" and/or can be used to help quit smoking, i.e., in a way that may be interpreted as a health claim."[229] As interpreted

---

[226]*Id.*, ¶ 20.

[227]Id., ¶ 22.

[228]*Id.*, ¶ 21.

[229]*Id.*

by Maronick, 26.2% of respondents in Van Liere's survey thought that the advertisements conveyed the message that NJOY e-cigarettes are alternative to/better than cigarettes, while 12.1% thought that they were safe/safer, healthy/healthier/better for you, or that they had no harmful effects.[230]  In combination, therefore, Maronick asserts that 38.3% of Van Liere's respondents took an implied safety message from the advertisement, notwithstanding his criticisms of the methodology as a whole.

"Although [the Supreme Court] ha[s] cautioned that a court's class-certification analysis must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim,' Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage.  Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194-95 (2013).  Although Van Liere contends otherwise, Maronick's survey results, combined with his critique of Van Liere's survey methodology, and his interpretation of Van Liere's survey results when all coded responses are taken into account, are sufficient to persuade the court that the materiality of NJOY's safety message can be demonstrated by common survey proof.  See *Wolph v. Acer Am. Corp.*, 272 F.R.D. 477, 487 (N.D. Cal. 2011) ("In order to determine whether common issues predominate, the Court neither decides the merits of the parties' claims or defenses nor does it decide 'whether the plaintiffs are likely to prevail on their claims.  Rather, the Court must determine whether plaintiffs have shown that there are plausible classwide methods of proof available to prove their claims,'" citing *Negrete v. Allianz Life Ins. Co.*, 238 F.R.D. 482, 489 (C.D. Cal. 2006)); cf. *ConAgra II*, 2015 WL 1062756 at *63-64 (finding that plaintiffs had "submitted substantial evidence demonstrating that the materiality of ConAgra's misrepresentation can be established by common survey proof").

### (2)     Omissions

NJOY also argued, most clearly at the hearing, that plaintiffs never tested the product packaging to determine whether it conveyed a safety message, and hence that there is no evidence to support a finding of materiality with respect to the omissions claim.  NJOY, however, appears to misinterpret

---

[230]*Id.*, Table 2.

plaintiffs' omission theory.  Plaintiffs do not contend that the product packaging conveys the safety message.  Thomas contends that the label omits information a reasonable consumer would deem important, i.e., that the product contains propylene glycol and glycerin.  Halberstam admitted at his deposition that even if the product listed propylene glycol and glycerin on the label, this would not have deterred him from buying NJOY e-cigarettes; stated differently, merely identifying the ingredients was immaterial to him.  Rather, Halbertstam asserts that even with these ingredients disclosed, the packaging is misleading because it omits material information concerning the risks associated with them.[231]

In support of Thomas' omissions claim, plaintiffs have adduced evidence suggesting that the failure to disclose ingredients that may pose a health risk – as plaintiffs contend propylene glycol and glycerin do – is material to consumers.  In the methodology section of his declaration, Maronick states that respondents were "randomly assigned to see images of the front and back labels of an NJOY King[ e]-[c]igarette package."[232]  Once they viewed the packaging, respondents were asked if the label said or suggested anything about the ingredients in NJOY e-cigarettes; 78% answered affirmatively.[233]  All respondents who believed the label said or suggested something about the ingredients in NJOY e-cigarettes were then asked this question: "If there were health risks associated with the ingredients in NJOY [e]-[c]igarettes, other than those listed on the NJOY [e]-[c]igarettes package, how important, if at all, would it be to you that those ingredients also be listed on the NJOY package?"[234]  Ninety-one percent indicated that "it would be either 'Very Important' or 'Important' that other ingredients associated with health risks be listed on the NJOY E-Cigarettes package."[235]  This evidence suffices to demonstrate that a reasonable consumer would find the failure to disclose certain ingredients that pose health risks from the product label a material omission.

---

[231]Halberstam Depo. at 75:2-5 (stating "if the[ ingredients had been] disclosed . . . in sort of like a warning, [he] probably would have paid more attention to it and . . . found out more about it.").

[232]Maronick Decl., ¶ 42.

[233]*Id*.  See also *id*., Table 12.

[234]*Id*., ¶ 43.

[235]*Id*.  See also *id*., Table 14.

NJOY's expert, Van Liere, has proffered no evidence or opinions that rebut Maronick's survey evidence.  Rather, consistent with NJOY's mistaken understanding of plaintiffs' omission claim, Van Liere tested whether the product packaging conveyed an implied safety message.[236]  Van Liere did not ask respondents questions relevant in assessing the materiality of information omitted from the packaging.  His survey results are thus not probative of the materiality of NJOY's alleged omissions.  Moreover, Van Liere's survey respondents viewed the NJOY packaging side by side with NJOY's advertisements.  There is no evidence that consumers encountered NJOY's television commercials or radio and magazine advertisements at the same time they viewed the product packaging.  This too renders Van Liere's survey results regarding the materiality of omissions suspect.  Consequently, no evidence rebuts Maronick's survey data, which is sufficient to show materiality with respect to Thomas' omissions claim.

As noted, Halberstam contends that even after NJOY disclosed ingredients posing a safety risk on the product packaging, it continued to omit material information by failing to warn of risks associated with the inhalation of propylene glycol or glycerin.  Plaintiffs have adduced no evidence supporting this omissions claim.[237]  Maronick did not ask respondents whether a warning concerning the inclusion of propylene glycol or glycerin was material; aside from Halberstam's assertion that he "probably would have paid more attention to [the label]" if it had a Surgeon General-type warning similar to that required for nicotine, there is no evidence of the materiality of this omission.  On the present record, therefore, the court cannot conclude that failing to disclose the risks of propylene glycol and glycerin on the product packaging was a material omission.

Consequently, the court concludes that plaintiffs have failed to show that they can prove on a classwide basis that NJOY's failure to warn of the risks of propylene glycol and glycerin on the product packaging was a material omission.  Because this is the only omissions claim Halberstam asserts on behalf of the California class, the court cannot certify a California omissions claim.  By contrast, plaintiffs have adduced sufficient evidence demonstrating that the materiality of NJOY's failure to

---

[236]Van Liere Decl., ¶ 26.

[237]FAC, ¶ 63.

1   disclose propylene glycol and glycerin on the product packaging can be decided on a classwide basis;

2   this prerequisite to certification of a Florida class is therefore satisfied.  Finally, plaintiffs have not

3   adduced evidence showing that NJOY's advertising campaign was so pervasive that it gives rise to a

4   presumption that all class members were exposed to NJOY's allegedly misleading advertisements.

5   Consequently, plaintiffs have shown that materiality can be proved on a classwide basis only by the

6   Florida class, which alleges that NJOY's failure to disclose that its e-cigarettes contained propylene

7   glycol and glycerin made its packaging misleading.

8   **(d)      Whether Damages Can be Proved on a Classwide Basis**

9   Rule 23(b)(3) is satisfied only if plaintiffs can show that "damages are capable of measurement

10  on a classwide basis." *Comcast*, 133 S. Ct. at 1433.  In *Comcast*, the Supreme Court held that plaintiffs'

11  method of proving damages must be tied to their theory of liability.  See *id.* ("If respondents prevail on

12  their claims, they would be entitled only to damages resulting from reduced overbuilder competition,

13  since that is the only theory of antitrust impact accepted for class-action treatment by the District Court.

14  It follows that a model purporting to serve as evidence of damages in this class action must measure *only*

15  *those damages attributable to that theory*.  If the model does not even attempt to do that, it cannot

16  possibly establish that damages are susceptible of measurement across the entire class for purposes of

17  Rule 23(b)(3)" (emphasis added)).

18  NJOY asserts that Harris's damages calculation methodology fails under *Comcast* because  it

19  does not measure the damages recoverable on plaintiffs' legal theory.  The UCL, CLRA, and FDUTPA

20  "authorize a trial court to grant restitution to private litigants asserting claims under those statutes."

21  *Colgan v. Leatherman Tool Group, Inc.*, 135 Cal.App.4th 663, 694 (2006); *Rollins, Inc. v. Heller*, 454

22  So.2d 580, 585 (Fla. App. 1984) ("[T]he measure of actual damages is the difference in the market value

23  of the product or service in the condition in which it was delivered according to the contract of the

24  parties").  Restitutionary relief is an equitable remedy, and its purpose is "to restore the status quo by

25  returning to the plaintiff funds in which he or she has an ownership interest."  *Korea Supply Co. v.*

26  *Lockheed Martin Corp.*, 29 Cal.4th 1134, 1149 (2003).  "The proper measure of restitution in a

27  mislabeling case is the amount necessary to compensate the purchaser for the difference between a

28  product as labeled and the product as received."  *Werdebaugh v. Blue Diamond Growers*, No.

1  12-CV-2724-LHK, 2014 WL 2191901, *22 (N.D. Cal. May 23, 2014) (citing *Colgan,* 135 Cal.App. 4th

2  at 700 (rejecting a restitutionary award for products "Made in U.S.A." where the expert "did not attempt

3  to quantify either the dollar value of the consumer impact or the advantage realized by [the

4  defendant]")).  This calculation contemplates the production of evidence that attaches a dollar value to

5  the "consumer impact or advantage" caused by the unlawful business practices.  *Id.*  "Restitution can

6  then be determined by taking the difference between the market price actually paid by consumers and

7  the true market price that reflects the impact of the unlawful, unfair, fraudulent business practices."

8  *Id.*  Accordingly, plaintiffs must present evidence of a damages methodology that can determine the

9  price premium attributable to NJOY's use of the misleading advertisements and product labeling

10 omissions.

11      Plaintiffs' expert, Jeffrey Harris, proposes to calculate damages using either conjoint or direct

12 method analysis.  "Conjoint analysis is a statistical technique capable of using survey data to determine

13 how consumers value a product's individual attributes – often called the market's willingness to pay."

14 *Saavedra*, 2014 WL 7338930 at *4.  As Harris explains, "[i]n conjoint analysis, survey respondents are

15 asked to make a series of choices between different combinations of product attributes. . . .  Combining

16 the responses to all of the choice sets, the analyst can then use established statistical methods to estimate

17 the separate value (or part-worth) that consumers attach to each product attribute."[238]  "With respect to

18 the price attribute, the alternative levels can be expressed either in dollar units or in percentage terms."[239]

19 Harris contends that using a percentage makes more sense, given that the purchase price of NJOY e-

20 cigarettes varied from year to year.  Thus, once the price premium for the safety messages is isolated,

21 the resulting price premium attributable to the safety claim can be computed as a percentage of the

22 purchase price – i.e., the safety message was "worth" X% of the purchase price.[240]

23      Harris's conjoint analysis does not satisfy *Comcast*.  His conjoint methodology could quantify

24 the relative value a class of consumers ascribed to the safety message, but it does not permit the court

25 _____

26      [238]Harris Decl., ¶ 45.

27      [239]*Id.*, ¶ 52.

28      [240]*Id.*

to turn the "relative valuation . . . into an absolute valuation to be awarded as damages." *Saavedra*, 2014 WL 7338930 at *4.  "The ultimate price of a product is a combination of market demand and market supply." *Apple, Inc.*, 2014 WL 976898 at *11.  Harris's model looks only "to the demand side of the market equation," converting what is properly "an objective evaluation of relative fair market values [in]to a seemingly subjective inquiry of what an average consumer wants."  *Saavedra*, 2014 WL 7338930 at *4.

Harris's direct method fares no better.  It too focuses solely on the consumer's subjective valuation.  "In the direct method, representative members of the class are directly asked what they would be willing to pay for additional safety."[241]  Harris states: "The price premium attributable to the [NJOY's] safety claim [can] then be computed as the average discount among all respondents. Since the direct method survey would likewise include class members from both California and Florida, one would be able to compute the price premium attributable to the Defendant's safety claim separately for each state."[242]  Harris notes that he used a similar theory to calculate damages in a case alleging that light cigarettes were falsely represented to be safer than traditional cigarettes.[243]  Indeed, in a light cigarette case that made its way to the Second Circuit, Harris proffered what was there termed the "loss of value theory" that appears to be indistinguishable from the "direct method" analysis he proffers here.  There, as here, respondents were asked to conceptualize a healthy version of the allegedly unhealthy product, and then "to imagine what [they] might have paid for such a thing."  *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 229 (2d Cir. 2008), abrogated on other grounds by *Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639 (2008).  The Second Circuit rejected the theory as "pure speculation."

> "Dr. Jeffrey Harris, proponent of the loss of value theory, asked survey respondents to 'make binary comparisons between a 'genuine' light cigarette that reduced risk . . . and a 'misrepresented' light cigarette that was no less harmful than conventional cigarettes.'  He concluded that 'virtually all respondents reported a non-zero loss in value.'  While

[241]*Id.*, ¶ 54.

[242]*Id.*, ¶ 59.

[243]*Id.*, ¶ 54.

86

1    the district court is quite correct that 'damages need not [usually] be demonstrated with

2    precision,' plaintiffs' theory is pure speculation." *Id.*

3        Harris does not dispute that both his conjoint and direct method analyses provide only a model

4    for testing what a consumer is willing to pay, without considering other factors in a functioning

5    marketplace.[244]  His method therefore does not address the fair *market* value of NJOY's e-cigarettes

6    absent the misrepresentations and omissions.  See, e.g., *Apple, Inc.*, 2014 WL 976898 at *11 ("As a

7    result, the survey leaves the Court with no way to compare Dr. Hauser's willingness to pay metrics –

8    which relate only to demand for the patented feature – to the market price of the infringing devices,

9    which reflects the real-world interaction of supply and demand for infringing and noninfringing

10   devices").   Harris's methodology completely ignores the price for which NJOY is willing to sell its

11   products, what other e-cigarette manufacturers say about their products, and the prices at which those

12   entities are willing to sell their products.  This does not suffice under *Comcast*.  "The [c]ourt has found

13   no case holding that a consumer may recover based on consumers' willingness to pay irrespective of

14   what would happen in a functioning market (i.e. what could be called sellers' willingness to sell)."

15   *Saavedra*, 2014 WL 7338930 at *4.

16       In their opposition, plaintiffs attempt to distinguish *Saavedra*, asserting that it is a "benefit-of-

17   the-bargain" case.  They contend their damages theory is restitutionary in nature, and hence the case is

18   distinguishable.  The court finds this argument unpersuasive, as the theory of liability and damages

19   methodology in *Saavedra* were both remarkably similar to those at issue here.  The named plaintiffs in

20   *Saavedra* sought to certify, *inter alia*, a California UCL and CLRA class.  *Id.* at *2.  Plaintiffs alleged

21   that Eli Lilly misrepresented the risk of experiencing withdrawal symptoms from its prescription

22   antidepressant Cymbalta.  The drug's warning label indicated that withdrawal occurred "at a rate greater

23   than or equal to 1% and at a significantly higher rate in duloxetine [(Cymbalta's chemical name)]-treated

24   patients compared to those discontinuing from placebo."   *Id.* at *1.  Plaintiffs argued that the risk of

25   withdrawal was "in fact approximately 44%."  *Id.*  Addressing whether individual issues predominated,

26

---

27   [244]*Id.*, ¶ 23 ("Economists have used the concept of willingness to pay to measure the price

28   premium that consumers would be willing to pay for improved products or product attributes").  See also *id.*, ¶¶ 25-28, 55-60 (discussing willingness to pay).

1   the court noted that the named plaintiffs, like plaintiffs here, argued that class members were harmed

2   because they purchased a product that was represented as having a certain attribute, i.e., a roughly 1%

3   risk of withdrawal side effects, but that in fact had a different attribute altogether, i.e., an approximately

4   44% risk of withdrawal side effects.  *Id*.  To calculate damages, plaintiffs proposed using conjoint

5   analysis to identify the "benefit that consumers believe[d] they w[ould] obtain by using or owning [the]

6   product," i.e., isolating the relative value consumers placed on "a drug with a withdrawal risk of 'greater

7   than or equal to 1%' compared to a drug whose risk is 'at least 44%.'"  *Id*. at *4.  Plaintiffs' expert

8   proposed to take the relative value ascertained by conjoint analysis and develop a "refund ratio," which

9   he would then apply to each class member's out-of-pocket costs to determine damages.  *Id*.  ("Thus, if

10  the value of a drug with a 1% withdrawal risk is 30% higher than a drug with a 44% withdrawal risk,

11  then a class member's damages would be equal to 30% of her out-of-pocket costs").  Harris proposes

12  to use precisely this methodology here.[245]

13      The *Saavedra* court found the methodology insufficient under *Comcast*, because it offered no

14  way to "turn the relative valuation ascertained via conjoint analysis into an absolute valuation to be

15  awarded as damages."  *Id*.  It found plaintiffs' damages methodology highly flawed given that it ignored

16  the supply side of the market equation.  *Id*. at *5.  ("By looking only to consumer demand while ignoring

17  supply, [plaintiffs'] method of computing damages converts the lost-expectation theory from an

18  objective evaluation of relative fair market values to a seemingly subjective inquiry of what an average

19  consumer wants").

20      Plaintiffs contend that, notwithstanding *Saavedra*, courts have permitted classes to calculate

21  damages using conjoint analysis only.  They contend this case is most analogous to *Guido*, a case that

22  involved alleged omissions concerning the flammability of L'Oreal hairstyling serum.  There, the court

23  concluded that calculating damages using conjoint analysis only satisfied *Comcast*.  See 2014 WL

24  6603730 at *5.  Plaintiffs are correct that *Guido* approved use of a conjoint analysis only to calculate

25

26      [245]*Id*., ¶ 61 ("The price premium attributable to the Defendant's safety claim would then be computed as the average discount among all respondents.  Since the direct method survey would

27  likewise include class members from both California and Florida, one would be able to compute the price premium attributable to the Defendant's safety claim separately for each state").

28

the price premium attributable to product-related misrepresentations.  L'Oreal, however, did not raise

concerns regarding market supply, and the court did not address whether market supply factors must be

taken into consideration.  Because the issue was not directly before the court, *Guido* does not persuade

the court that market factors can be ignored in determining the price premium attributable to product

misrepresentations or omissions.  The conjoint analysis in *Guido*, moreover, considered many more

factors than Harris proposes to do here.  First, the *Guido* expert stated that his conjoint analysis would

take market factors into account in isolating part worth, e.g., different brands of hair serums.[246]  Harris

does not employ a similar methodology.  The *Guido* expert proposed to use the data captured to

construct a regression model that captured the part worth of the feature at issue.  He also proposed to

account for "[a]ll other factors influencing value" by employing a stochastic component that could

ultimately be integrated out of the overall price function; when this was done, he asserted, one was left

with the price premium attributable to the alleged misrepresentation.[247]  Harris's declaration states only

that he will isolate a consumer's subjective willingness to pay for a product in the absence of misleading

omissions or misrepresentations.  He proposes to do this by asking respondents a series of questions

concerning their subjective valuation of products with and without the alleged misrepresentations and

omissions.  Unlike the expert's in Guido, therefore, his method is entirely subjective and lacks any

market-based component.  The court therefore find the case unpersuasive.

Finally, plaintiffs' attempt to analogize this case to *ConAgra II* is unavailing.  In *ConAgra II*,

the court found that the use of conjoint analysis *in conjunction with* a proposed hedonic regression that

accounted for "supply and market factors," was sufficient to permit certification under *Comcast*.

ConAgra raised the same concerns that NJOY raises; it was only because the *ConAgra II* plaintiffs

proposed to use a "hybrid damages methodology" whereby a conjoint analysis was used in addition to

a hedonic regression that the court was able to certify a class.  See *ConAgra II*, 2015 WL 1062756 at

*69 ("To the extent ConAgra faults Howlett for failing to consider supply factors in measuring the

---

[246]Expert Report of Sanjog Misra, Case No. CV 11-01067-CAS-JCx, Docket No. 128 (Jan. 8, 2014), ¶¶ 21-22.

[247]*Id.*, ¶ 22.

1   'relative importance' of product attributes to consumers, and using a specific attribute's relative

2   importance to calculate the price premium attributable to it, as Weir notes, and as the court discusses

3   elsewhere in this order, the proposed hedonic regression accounts for the supply and market factors

4   Ugone identifies.  For all of these reasons, the court finds Ugone's first criticism of Howlett's proposed

5   conjoint analysis unpersuasive"); accord *Apple, Inc*., 2014 WL 976898 at *11 (rejecting a damages

6   model that failed to provide a way to compare "willingness to pay metrics—which relate only to demand

7   for the patented feature—to the market price of the infringing devices, which reflects the real-world

8   interaction of supply and demand for infringing and noninfringing devices").

9          In sum, damages under the UCL, CLRA, and FDUTPA are determined by taking "the difference

10   between *the market price actually paid* by consumers and the *true market price* that reflects the impact

11   of the unlawful, unfair, or fraudulent business practices." See *Werdebaugh*, 2014 WL 2191901 at *22;

12   *Rollins*, 454 So.2d at 585 ("[T]he measure of actual damages is the difference in *the market value of the*

13   *product* or service in the condition in which it was delivered according to the contract of the parties").

14   In this case, as in *Saavedra* and *Apple*, the proffered damages methodology is divorced from the

15   marketplace.  A consumer's subjective valuation of the purported safety message, measured by their

16   relative willingness to pay for products with or without the message, is not an accurate indicator of

17   restitutionary damages, because it does not permit the court to calculate the *true market price* of NJOY

18   e-cigarettes absent the purported misrepresentations.  Plaintiffs' damages methodology is therefore

19   deficient under *Comcast*.

20                    **(e)      Conclusion Regarding Predominance**

21          For the reasons stated, the court concludes that plaintiffs have not shown that common questions

22   predominate over individualized questions.  It therefore finds that certification of the putative classes

23   under Rule 23(b)(3) is inappropriate.

24                    **(2)      Superiority**

25          The second requirement imposed by Rule 23(b)(3) is that a class action be superior to other

26   methods of resolving class members' claims.  "Under Rule 23(b)(3), the court must evaluate whether

27   a class action is superior by examining four factors: (1) the interest of each class member in individually

28   controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation

concerning the controversy already commenced by or against the class; (3) the desirability of concentrating the litigation of the claims in a particular forum; and (4) the difficulties likely to be encountered in the management of a class action." *Edward v. City of Long Beach*, 467 F.Supp.2d 986, 992 (C.D. Cal. 2006) (quoting *Leuthold v. Destination Am., Inc.*, 224 F.R.D. 462, 469 (N.D. Cal. 2004)).

"Where damages suffered by each putative class member are not large, th[e first] factor weighs in favor of certifying a class action." *Zinser*, 253 F.3d at 1190. Given the relatively low average price of an NJOY e-cigarette, the price premium attributable to consumers' belief that NJOY e-cigarettes are safe or safer than traditional tobacco cigarettes will, if calculable, be small. Thus, even if an individual purchased NJOY e-cigarettes on a regular basis during the class period, the damages he or she could recover in an individual suit would not be sufficient to induce the class member to commence an action. The funds required to marshal the type of evidence, including expert testimony, that would be necessary to pursue such a claim against a well-funded corporate defendant would discourage individual class members from filing suit when the expected return would be so small. See *Amchem Products*, 521 U.S. at 617 ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights").

The second factor likewise favors a finding that class certification is a superior means of litigating these claims. The only litigation raising the claims of which the court is aware is the case presently pending before it. Given the small recovery any individual plaintiff might expect, moreover, concentrating the litigation in a single forum is appropriate. Thus, the third factor also favors a finding of superiority. Finally, because the factors required to prove claims under the UCL, CLRA, and FDUTPA are essentially indistinguishable, assuming that plaintiffs can present a viable damages methodology, the cases would not appear unmanageable based on the legal theories and claims at issue. "Because the court is not in a position to certify classes now, it need not address the question of a trial plan . . . at this time. It notes simply that absent the additional information concerning [damages calculations], it is not in a position to assess how manageable or unmanageable a trial of plaintiffs' claims would be." See *ConAgra I*, 302 F.R.D. at 580.

### (3)    Conclusion Regarding Rule 23(b)(3)

Because plaintiffs have not proffered a method of calculating damages tied to their theory of liability, they have not demonstrated that common questions predominate over individual issues, and have not satisfied Rule 23(b)(3).

## III.  CONCLUSION

For the reasons stated, the court denies plaintiffs' motion for certification of a Rule 23(b)(3) class without prejudice.  Although plaintiffs have satisfied the Rule 23(a) requirements, they have failed to tie their damages calculation methodology to their theory of recovery.  Because they have not demonstrated that damages can be calculated on a classwide basis, individualized issues predominate.  If plaintiffs can address the deficiencies noted in this order, they can file an amended motion for class certification within forty (40) days of the date of this order.

DATED: August 14, 2015

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE