PAUL L. GALE (SBN 065873)
paul.gale@troutmansanders.com
EDWARD S. KIM (SBN 192856)
edward.kim@troutmansanders.com
S. DANIEL RASHTIAN (SBN 228644)
daniel.rashtian@troutmansanders.com
TROUTMAN SANDERS LLP
5 Park Plaza, Suite 1400
Irvine, CA 92614-2545
Telephone: 949.622.2700
Facsimile: 949.622.2739

JOHN R. GERSTEIN
*(admitted pro hac vice)*
jack.gerstein@troutmansanders.com
TROUTMAN SANDERS LLP
401 9th Street, N.W., Suite 1000
Washington, D.C. 20004-2134
Telephone: 202.274.2950
Facsimile: 202.274.2994

LINDSEY B. MANN
*(admitted pro hac vice)*
lindsey.mann@troutmansanders.com
TROUTMAN SANDERS LLP
600 Peachtree Street, NE, Suite 5200
Atlanta, GA 30308-2216
Telephone: 404.885.2743
Facsimile: 404.962.6538

Attorneys for Defendants
NJOY, INC. and SOTERRA, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| IN RE<br><br>NJOY, INC. CONSUMER CLASS ACTION LITIGATION | Case No. CV 14-00428-JFW (JEMx) consolidated with SACV 14-00427-MMM (RZx)<br><br>HONORABLE JOHN F. WALTER<br><br>**DECLARATION OF DENISE MARTIN IN SUPPORT OF NJOY'S RESPONSE TO PLAINTIFFS' OBJECTION TO THE DECLARATION OF DENISE MARTIN**<br><br>Date: February 1, 2016<br>Time: 10:00 a.m.<br>Place: Courtroom 16 |

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| **IN RE NJOY, INC. CONSUMER CLASS ACTION LITIGATION** | CASE NO. CV 14-00428-JFW <br><br> **DECLARATION OF DR. DENISE NEUMANN MARTIN IN RESPONSE TO PLAINTIFF' OBJECTIONS TO THE MARTIN DECLARATION (DKT. 278)** |

I, Dr. Denise Neumann Martin, declare as follows:

## I. Summary of Assignment and Opinions

1. I previously submitted a rebuttal declaration in this matter on November 23, 2015 (Dkt. 263) ("Martin Rebuttal Declaration") and provided additional testimony in a deposition on December 11, 2015 ("Martin Deposition"). I was asked to review and respond to Plaintiffs' Objection to the Declaration of Expert Denise Martin (Dkt. 278) ("Plaintiffs' Objection").

2. Plaintiffs make three assertions:

   a) That I am not qualified to testify on hedonic regression or Bayesian hedonic regression;[1]

   b) That I offer no "independent analysis" and "simply parrot" the conclusions of Dr. Kent Van Liere, another expert retained by counsel for NJOY;[2] and

   c) That I do not provide sufficient facts or data to support my conclusions."[3]

3. As summarized here and detailed more fully below, no basis exists for any of these assertions. Fundamentally, Plaintiffs attempt to fault me for not having used the precise "Bayesian hedonic regression" technique that Dr. Harris proposes here. This assertion is misleading. The proposed method is simply an application of a more general set of regression techniques in which I have received

---

[1] Plaintiffs' Objection, p. 1. While Plaintiffs also assert that I am not qualified to render opinions on conjoint analysis or direct survey methods, I have not offered any expert opinions on those topics. Instead, as discussed more fully below, I have relied on the expert opinions offered by Dr. Kent Van Liere regarding Dr. Harris' proposed conjoint analysis and direct survey, using his opinions as inputs into my fuller analysis.

[2] Plaintiffs' Objection, pp. 5-6.

[3] Plaintiffs' Objection, p. 1.

1

formal training and, indeed, which I use frequently in my work at NERA in appropriate settings. It is this training and experience that allows me to conclude, as Dr. Harris acknowledges, that the specific application he proposes is only valid under very strict conditions and that those conditions are not satisfied here.[4] Moreover, it is this training and experience that allows me to conclude, as Dr. Harris also acknowledges, that his proposed Bayesian hedonic regression will not generate a "but-for" price, which is required to estimate damages as defined by this Court.[5]

4. Hedonic regression (including Bayesian hedonic regression) is a subset of regression analysis that relies on the same statistical techniques.[6] I studied regression analysis and statistics more broadly — including hedonic regression and Bayesian methods — during my undergraduate education at Wellesley and my graduate education at Harvard.[7] In appropriate settings, I have applied these types of statistical techniques throughout my nearly 25 years as a consulting and/or testifying expert at NERA.[8] In settings where such techniques are inappropriate, such as this one, I have testified that they cannot be used to estimate any damages. While I am not offering an expert opinion on conjoint analysis, my expertise in regression analysis allows me to conclude that the results of the conjoint analysis proposed by Dr. Harris will be unable to resolve the problems that he admits will plague his hedonic regression.[9]

---

[4] Harris Reply Declaration, paragraphs 29, 33.
[5] Harris Second Deposition, p. 162: 8-19.
[6] *See, e.g.*, A. H. Studenmund, *Using Econometrics: A Practical Guide,* Fifth Edition, 2006.
[7] *See, e.g.*, Martin Rebuttal Declaration, paragraphs 6-8 and Exhibit 1 and Martin Deposition, 47:20-24; 48:7-20; 53:8-10.
[8] Martin Rebuttal Declaration, paragraphs 6-8 and Exhibit 1.
[9] Martin Rebuttal Declaration, paragraphs 5c, 40-45.

2

5. I am not "parroting" the opinions offered by Dr. Kent Van Liere. Rather, I relied on Dr. Van Liere's opinions regarding Dr. Harris' proposed conjoint analysis for generally accepted principles relating to such conjoint surveys, as Dr. Harris proposes to include the results from this conjoint analysis in a Bayesian hedonic regression model.[10] Dr. Van Liere explains that the proposed conjoint analysis will be unreliable. Because I have expertise in Bayesian hedonic regression, I can therefore conclude that the unreliable output from Dr. Harris' proposed conjoint analysis will not solve the problems that he has conceded will plague his hedonic regression.[11]

6. Even assuming it were possible in this case to generate reliable results using conjoint analysis, Plaintiffs ignore my independent conclusion that Bayesian hedonic regression still cannot be used to generate an estimate of the price of NJOY e-cigarettes absent the alleged misstatements and omissions.[12] According to his testimony, Dr. Harris and I are in agreement on this point.[13] This conclusion does not rely on Dr. Van Liere's opinion in any respect and, on its own, means Dr. Harris' approach cannot be used to estimate damages in this matter. My opinions and conclusions are based on economic theory and statistical techniques that can be found in accepted textbooks and published, peer-reviewed scholarly articles, as well as on testimony from fact witnesses in this case.[14]

---

[10] *Ibid.*

[11] *Ibid.*

[12] *See*, *e.g.*, Martin Rebuttal Declaration, paragraphs 3-4, 14-25 and Martin Deposition, 131:17-25; 132:2; 212:9-24.

[13] Harris Reply Declaration, paragraphs 29, 33 and Harris Second Deposition, p. 162: 8-19.

[14] *See*, *e.g.*, Martin Rebuttal Declaration, footnotes 8, 10, 34, 35 and Martin Deposition, 155:25; 156:2-25.

3

## II. Materials Relied Upon

7. In addition to the materials relied upon in preparing the Martin Rebuttal Declaration, I relied on Plaintiffs' Objection, the Martin Deposition, and academic texts, articles and web searches referenced in this declaration.

## III. Plaintiffs' Assertion That I Lack Expertise in Hedonic Regression, Including Bayesian Hedonic Regression, Is Without Basis

### A. *An Overview of Regression, Hedonic Regression and Bayesian Hedonic Regression*

8. Dr. Harris describes his proposed approach as "Bayesian hedonic regression." In Plaintiffs' Objection, Plaintiffs reference this approach, as well as hedonic regression, as if they are entirely different from regression analysis more broadly. In fact, hedonic regression (including Bayesian hedonic regression) is just one type of regression analysis and is conducted using the same statistical techniques as other types of regressions.

9. More specifically, regression analysis is a statistical technique that estimates the relationship between a dependent (or explained) variable and one or more independent (or explanatory) variables. In the simplest regression models, this relationship is assumed to be linear, with the dependent variable "Y" explained in terms of one independent variable "X", a fixed constant term "$\alpha$", and an unobserved error term "$u$", of the form:

$$Y = \alpha + \beta * X + u,$$

where "$\beta$" measures the quantitative relationship between the dependent and independent variable in terms of units of X. For example, the "Y" might be the grades that students received on an exam, which is what an analyst wants to explain, while the "X" could be the amount of time they spent studying, measured in minutes. The "$\alpha$" estimated in such a regression would reflect the average grade for a student who had not studied, while the "$\beta$" would reflect the average increase in the grade on the exam for a student for each extra minute spent studying. Such a

4

model would be unlikely to explain the variation in grades perfectly. For a given student, the "$u$" or error term equals the difference between the actual grade and the grade that would be predicted using the estimated equation.

10. The statistical technique used in hedonic regression is exactly the same.[15] Instead of grades, the dependent variable that the analyst is trying to explain is the price of products. Instead of the hours spent studying, the independent variables that are used to attempt to explain price are the product's attributes.[16] Given that a key input to hedonic regression is price data, however, it is only appropriate to use the technique when certain quite stringent conditions apply. In particular, to be able to interpret the coefficients, or $\beta$s, on the product attributes as implicit prices for those attributes, and to further conclude that the price of the product without the attribute would be the actual price less the estimated implicit price for the attribute, the analyst must have reason to assume that the market is stable and that both firms and consumers are "price takers."[17] If these conditions do not hold, the link between the price of the product and the

---

[15] *See, e.g.,* Studenmund, (2006). In Chapter 1, "An Overview of Regression Analysis", a hedonic regression of housing prices on house attributes is used as example of the "basic regression model."

[16] *See, e.g.,* Jeffrey M. Woolridge, Introductory Econometrics: A Modern Approach (2000), Chapter 2.

[17] Firms and consumers that are price takers believe that they do not have control over price. That is, firms are able to sell their product at the established market price but would be unable to do so if they raised price and have no incentive to lower price. Price-taking consumers similarly are able to buy products at the established market price, but do not have sufficient purchasing power in the market to be able to pay less for a product than the market price. *See, e.g.,* definition for "price taker" in Black, John, Nigar Hashimzade, and Gareth D. Myles. *Oxford Dictionary of Economics.* Oxford: Oxford University Press, 2009. If the market is not sufficiently stable or mature (*e.g.*, if the product in question was introduced recently, so that firms are still entering and exiting and new product variations are still being introduced), market-clearing prices will be in flux so that hedonic regression cannot reliably measure the implicit price associated with any particular product attribute. Dr. Harris acknowledges this point in his Reply Declaration, paragraph 33.

5

implicit prices of the underlying product attributes is severed. Under those conditions, hedonic regression fails to generate estimates of implicit prices that measure the value of any attribute to consumers.[18]

11. As proposed in this context, the term "Bayesian" refers to a statistical model in which the information considered in the regression analysis is supplemented with some form of outside (or "prior") information.[19] That outside information can come from a variety of sources. Therefore, Dr. Harris's "Bayesian" approach is simply a variant of regression analysis in which he proposes to supplement the price/attributes dataset used in the regression with the results from his conjoint analysis or direct survey.[20] To apply Bayesian hedonic regression, the same market conditions must hold as those needed to apply standard hedonic regression.[21]

---

[18] *See*, *e.g.*, Martin Rebuttal Declaration, Section V and Martin Deposition, 131:17-25; 132-134; 135:2-7; 150:3-25; 151; 152:2-4.

[19] Harris Supplemental Declaration, paragraph 39.

[20] Martin Rebuttal Declaration, Section IV.

[21] For a discussion of the assumed market conditions that underlie hedonic models, *see*, *e.g.,* Sherwin Rosen, "Hedonic Prices and Implicit Markets: Product Differentiation in Pure Competition," Journal of Political Economy, Volume 82, Issue 1 (Jan. — Feb., 1974), pp. 34-55 (Rosen (1974)) and Jan de Haan and Erwin Diewert, "Hedonic Regression Methods," (de Haan and Diewert (2013)). de Haan and Diewert (2013) was included as Chapter 5 in OECD et al., *Handbook on Residential Property Price Indices*, 2013, Eurostat, Equation 5.3. As an example, the necessary market conditions for application of hedonic models (whether classical or Bayesian) may be met in the housing market. Consequently, hedonic analyses are frequently used study of the real estate market, because the housing supply in the short-run can be considered fixed and because individual homeowners act as price takers who do not typically believe they can affect the equilibrium prices of houses in the market.

6

### B. Review of My Experience with Regression Analysis, Hedonic Regression and Bayesian Methods

12. I was trained in regression analysis, including hedonic regression, as well as in Bayesian methods, during my undergraduate education at Wellesley College and my graduate education at Harvard University.[22]

13. Since joining NERA, I have used regression analysis frequently in the hundreds of projects on which I have been retained. Indeed, during my deposition, Plaintiffs' counsel had me identify the projects in which I had submitted reports or given testimony in the past five years and 8 of the 21 matters involved regression analysis.[23] I have been retained as an economist to run regressions, including wage regressions and stock price regressions, since 1991 when I joined NERA, including Bayesian regression, where I have incorporated information from outside the available regression data.[24]

14. Plaintiffs also assert that because I have focused my work in the areas of "securities litigation, product liability and mass torts valuation and labor economics", I lack expertise in consumer fraud matters.[25] However, many of the cases for which I have been retained involve allegations of consumer fraud. NERA's website classifies "Class Actions and Class Certification" as a practice consisting of antitrust, labor and employment, product liability, and securities, with consumer class actions dealing with fraud and misrepresentation included as a

---

[22] *See, e.g.*, Martin Rebuttal Declaration, paragraphs 6-8 and Martin Deposition, 47:20-24; 48:7-20; 53:8-10. While I testified in response to a very specific question that I did not take any courses devoted solely to hedonic regression or Bayesian hedonic regression, to my knowledge, no such classes existed during my course of study. Given that the methods are applications of the broader regression analysis, and given that hedonic regression is only appropriate under a set of very stringent conditions, the absence of entire courses devoted exclusively to these topics is not surprising.

[23] Martin Deposition, 262:13-25; 263; 264:2-10.

[24] *See, e.g.*, Martin Rebuttal Declaration, paragraph 7 and Martin Deposition, 53:11-25; 54; 55:2-9.

[25] Plaintiffs' Objection, p. 4.

7

subset of product liability."[26] Consumer class actions are considered a "focus area" for the practice. I am the designated practice chair at NERA for the class action practice as a whole, as well as the focus area.

15. Plaintiffs also suggest that because I estimate I have spent 10% of my time at NERA on consumer class actions, I lack expertise to offer opinions in this matter.[27] This assertion is inaccurate for at least three reasons:

a) First, my education includes graduate level studies in regression analysis and statistics, which incorporates Bayesian methods and hedonic regression, and thus, gives me a basis to render the opinions I have in this matter about why Bayesian hedonic regression is not appropriate.

b) Second, having spent 10% of a nearly 25-year career on consumer class action projects gives me substantial practical expertise in these cases, enabling me to render the opinions I have about damages calculations in the context of consumer class actions. As explained in the Martin Deposition and reflected on my CV, this experience includes submitting two reports in a consumer class action matter in which plaintiffs' expert proposed using hedonic regression.

c) Finally, my experience serving as a consulting and testifying expert in more than 100 other class actions (including securities class actions and employment class actions) has given me substantial practical experience in addressing similar economic questions to those present in this case. While the contexts have been different, the assignment in each of those cases has often been the same: to estimate damages, if

---

[26] http://www.nera.com/practice-areas/class-actions-and-class-certification.html

[27] Plaintiffs' Objection, p. 4.

8

possible, using the difference between the price paid and the price that would have been paid absent certain alleged wrongdoing. For example, in dozens of securities class actions, I have performed regression analyses to estimate the price investors would have paid for a security absent any alleged misstatements or omissions by a defendant, controlling for market and industry factors.[28] In settings where the market conditions necessary for the application of such statistical techniques have not been met, I have testified that the application of regression analysis cannot be used to estimate damages.[29]

16. My updated CV, including 4 years of testimony and 10 years of publications, is attached as **Exhibit 1**.

### IV. Plaintiffs' Assertion That I "Simply Parrot" Dr. Van Liere's Opinions Is Unfounded

#### A. *For Limited Conclusions, Dr. Van Liere's Opinions Are One Input into My Fuller Analysis*

17. Relying on the opinions of other experts in formulating expert testimony is customary. Indeed, each reference to an accepted treatise cited in an expert report, as both Dr. Harris and I have made in this matter, is an explicit

---

[28] While the reports themselves are confidential, without revealing any confidential information, I am able to disclose that I applied regression analysis in, e.g., "Affidavit, in *Marvin Neil Silver and Cliff Cohen vs. IMAX Corporation, et al.*, Ontario Superior Court of Justice, 2012"; "Rebuttal Report and Declaration, In the United States District Court District of Puerto Rico, in *Samuel Hildenbrand, et al. vs. W Holding Company, Inc., et al.*, 2012"; "Deposition and Reports in the United States District Court District of New Jersey, *In Re: Schering-Plough Corporation/ENHANCE Securities Litigation*, 2011"; and "Deposition and Reports in the United States District Court District of New Jersey, *In Re: Merck & Co., Inc., Vytorin/Zetia Securities Litigation*, 2011." These matters are reflected on my CV, attached as Exhibit 1.

[29] For example, I testified in *In re Polymedica Securities Litigation* that because the market for the company's stock was not efficient, it was not possible to use regression analysis to measure the impact of the alleged misstatements and omissions.

9

reliance on work or conclusions reached by another. Here, in reaching my conclusions, I similarly rely on the conclusions of another expert, Dr. Kent Van Liere. Dr. Van Liere has an M.A. and Ph.D. in Sociology from Washington State University. He has been accepted many times by courts as an expert in conjoint analysis and direct surveys, and I rely on his opinions in those specific areas.

18.   However, I am not merely reiterating Dr. Van Liere's opinions or holding out those opinions as my own, as Plaintiffs assert. Instead, I am using those opinions as one *factor* in my complete analysis of Dr. Harris's proposed Bayesian hedonic regression model. Dr. Harris acknowledges that an array of problems will plague his hedonic regression, including collinearity, omitted variable bias, and misspecification. He asserts that using the results of his proposed conjoint analysis as an input or "priors" into his hedonic regression would allow him resolve those problems.[30] I rely on the opinions of Dr. Van Liere regarding the unreliability of this proposed outside information as but one factor that influences my conclusion that Dr. Harris's Bayesian hedonic regression analysis cannot be used to accurately measure any alleged damage in this case.[31] Specifically, I offer the independent opinion that Dr. Harris will be unable to resolve problems in his *hedonic regression* by incorporating results from his proposed conjoint analysis. Not only will he be unable to tether his conjoint results back to his regression, he will be unable to resolve problems of collinearity, omitted variable bias, and misclassification in his hedonic regression by bringing in unreliable estimates of the associated variables from a conjoint analysis or direct survey.[32]

---

[30]   Harris Supplemental Declaration, paragraphs 33-37.
[31]   *See*, *e.g.*, Martin Rebuttal Declaration, paragraphs 5c; 40-46 and Martin Deposition, 77:12-25; 78:2; 127:15-25; 128:2-8.
[32]   *See*, *e.g.*, Martin Rebuttal Declaration, paragraphs 5c; 40-46 and Martin Deposition, 134:22-25; 135:2-7; 248:17-25; 249:2-11.

10

### B. My Opinion That Bayesian Hedonic Regression Cannot Generate an Estimate of Damages in This Case Is Independent of Dr. Van Liere's Testimony

19. I conclude without reference to Dr. Van Liere's opinion that the application of Bayesian hedonic regression in this matter will not and cannot generate an estimate of damages based on the definition used by this Court (*i.e.*, the difference between the price paid and the price that would have been paid absent the alleged misstatements and omissions.)[33] First, given the immature and unstable market conditions, the method cannot yield a price premium for any attribute, including the alleged "safety claim."[34] Dr. Harris conceded this point in his prior Reply Declaration in this case, offering it as a reason that hedonic regression should not be applied in the context of the e-cigarette market.[35] Importantly, in his later Supplemental Declaration, he did not claim that he could use the results from conjoint analysis or direct survey to address the fundamental problem that make hedonic regression inapplicable to the market at issue.[36] Second, I cite economic theory and peer-reviewed academic articles to conclude that Bayesian hedonic regression is not designed to generate a "but for" price where market conditions would change, which Dr. Harris also agreed with in his deposition.[37] These additional opinions are independent of Dr. Van Liere's opinions and are ignored in Plaintiffs' Objection.

## V. Plaintiffs' Assertion That My Opinions Lack Foundation Is Unfounded

---

[33] *See, e.g.*, Martin Rebuttal Declaration, Section V and Martin Deposition, 212:9-24; 249:12-25; 250:2-4.

[34] *See, e.g.*, Martin Rebuttal Declaration, paragraph 24 and Martin Deposition, 157:17-25; 158:2-4; 250:5-21.

[35] Harris Reply Declaration, paragraphs 29, 33.

[36] *See, e.g.*, Rosen (1974) and de Haan and Diewert (2013), for discussion of the assumptions needed to apply hedonic regression to a market.

[37] *See, e.g.*, Martin Rebuttal Declaration, footnotes 8 and 10 and Section V and Harris Second Deposition, 162:8-19.

11

20. Plaintiffs make several assertions that I do not provide sufficient information and data to support my conclusions. Again, each assertion lacks any basis.

21. Plaintiffs claim I offer no support for my opinions that: (1) demand and supply for e-cigarettes would have been different absent the alleged misstatements and omissions, and (2) Bayesian hedonic regression is not designed to provide an estimate of how supply or demand would change in response to changes in the composition of product attributes available in the market.[38] However, Plaintiffs do not provide any evidence to contradict these opinions, and instead reiterate their incorrect assertion that I have no experience with Bayesian hedonic regression.[39] For the reasons stated above, Plaintiffs' unfounded assertion is incorrect. Moreover, in support of these opinions, I referenced: coursework taken at Wellesley and Harvard that included hedonic regression and Bayesian methods; my own work at NERA with regression analysis, including Bayesian regression, wage regressions, and stock price regressions; the seminal article on hedonic regression, authored by Sherwin Rosen in 1974, which has been cited in thousands of articles since; an accepted textbook on econometric methods that includes a detailed review of hedonic regression; and a chapter on Bayesian methods written by Dr. Kenneth Train, adjunct professor at U.C. Berkeley.[40] Finally, as Plaintiffs acknowledge, I cite the testimony of Dr. Harris, who agrees that Bayesian hedonic analysis is not a tool that can estimate how demand and

---

[38] Plaintiffs' Objection, p. 12.

[39] Plaintiffs' Objection, p. 12, Section VI.1.

[40] *See*, *e.g.*, Martin Rebuttal Report, footnotes 8 and 10; Kenneth Train, *Discrete Choice Methods with Simulation,* Second Edition, 2009 (Chapter 12 is devoted to Bayesian methods). A search of Google Scholar Citations on January 6, 2016 indicates that Rosen (1974) has been cited by 8,592 other articles to date.

12

supply would have changed absent the alleged misstatements and omissions and that his approach will not yield a "but-for" price.[41]

22. Plaintiffs assert that I rely on the testimony of Andrew Beaver, the former Chief Marketing Officer of NJOY, and Craig Weiss, the former Chief Executive Office of NJOY, to conclude that the weights of the product attributes making up the price of NJOY's products were changing in ways that Dr. Harris's model cannot track. Here, I relied on certain *facts* provided by their testimony as an input to my analysis, not as the sole basis for my conclusions.[42] Dr. Harris acknowledges that his conjoint analysis and direct survey will yield, at best, current estimates of the willingness to pay for the alleged "safety claim."[43] I understand from the testimony provided by Mr. Beaver and Mr. Weiss that the market was changing over the alleged class period – there was entry and exit of manufacturers, changes in product attributes, and changes in the mix of information available in the market regarding e-cigarettes.[44] These are matters of fact, and I chose to cite the testimony of the company executives for those facts. I could have conducted, but did not need to conduct, independent research to arrive at those same conclusions. I combined those facts with my knowledge of Bayesian hedonic regression to generate an independent expert opinion about the reliability of Dr. Harris's proposed model. In particular, I concluded that, even putting aside the other infirmities, Dr. Harris's proposed approach cannot yield a reliable estimate of any alleged "safety premium" over time. Lastly, it is common practice for experts to rely on facts or assumptions when providing their expert opinions.

---

[41] Harris Second Deposition, p. 162: 8-19
[42] Plaintiffs have not cited any evidence to counter the facts from the depositions, and I am not aware of any evidence to the contrary.
[43] Harris Second Deposition, p. 162: 8-19.
[44] Martin Rebuttal Declaration footnotes 34 and 35.

13

23. Plaintiffs assert that I provide "no evidence as to why Dr. Harris would be unable to obtain the accurate data to conduct his methods."[45] At the time I prepared the Martin Rebuttal Declaration, Dr. Harris had testified that he had not investigated whether IRI or Nielsen would provide the requested data, and there was unrebutted evidence in the record that Nielsen was unwilling to provide its data for use in litigation.[46] As I testified at my deposition, NERA contacted both IRI and Nielsen and was told it would be unable to obtain their data for use in litigation. Since that time, Dr. Harris filed another declaration indicating from an unidentified source that data can be acquired from Nielsen and/or IRI.[47] Even if Dr. Harris is able to obtain data from Nielsen or IRI, such new information will not yield historical data for Dr. Harris's proposed conjoint analysis because conjoint only capture current willingness to pay data and not historical willingness to pay. As such, in addition to all of the other infirmities, my conclusion that Dr. Harris will be unable to estimate any "safety premium" over time remains true even if Dr. Harris obtains information from Nielsen or IRI.

24. Plaintiffs assert that I am "not qualified to testify on the conjoint or hedonic damages analysis" and so I cannot offer the opinion that Dr. Harris cannot "constrain his conjoint results when applying them to the hedonic regression to 'tether' these average, non-market valuations to actual market prices."[48] As reiterated above, I have expertise in hedonic regression and have submitted two reports in another consumer class action matter on the proposed use of hedonic

---

[45] Plaintiffs' Objection, p. 13.
[46] Harris Deposition, pp. 62-64; Declaration of Sanjog Misra, Ph.D. in Support of Plaintiff's Renewed Motion to Certify the California Class," in *Altamura, et al., vs. L'Oreal, USA, Inc.,* January 6, 2014, paragraph 32.
[47] Second Supplemental Declaration of Dr. Jeffrey E. Harris.
[48] Plaintiffs' Objection, p. 13.

14

regression to estimate damages.[49] While I am not offering expert testimony regarding the proper implementation of a conjoint analysis, my expertise with hedonic regression allows me to conclude that the results of that analysis cannot be tethered to market price via inclusion in hedonic regression. Given Dr. Harris's proposed approach, such tethering is not possible.[50]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

My work in this case is on-going. I reserve the right to modify the opinions expressed in this declaration if further information becomes available to me.

Executed this 8th day of January, 2016, in New York, NY.

_____
Denise Neumann Martin

---

[49] See "Expert and Rebuttal Reports, In the United States District Court Eastern District of New York, in *D. Joseph Kurtz, et al. vs. Kimberly-Clark Corporation and Costco Wholesale Corporation*, 2015" on my CV in Exhibit 1.

[50] Martin Rebuttal Declaration, Section VI.E; Martin Deposition, 225:7-25; 226; 227:2-18.