**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES -- GENERAL**

Case No.    **CV 14-428-JFW (JEMx)**                          Date: February 2, 2016

Title:    In re NJOY, Inc. Consumer Class Action Litigation

---

**PRESENT:**
            **HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE**

    **Shannon Reilly**                          **None Present**
    **Courtroom Deputy**                         **Court Reporter**


**ATTORNEYS PRESENT FOR PLAINTIFFS:**       **ATTORNEYS PRESENT FOR DEFENDANTS:**
            None                                        None

**PROCEEDINGS (IN CHAMBERS):**       **ORDER DENYING PLAINTIFFS' AMENDED MOTION**
                                     **FOR CLASS CERTIFICATION**
                                     **[filed 9/23/2015; Docket No. 245];**

                                     **ORDER DENYING NJOY'S MOTION TO STRIKE THE**
                                     **DECLARATION OF JEFFREY E. HARRIS**
                                     **[filed 11/23/2015; Docket No. 255]**


        On September 23, 2015, Plaintiffs Ben Z. Halberstam and Kathryn Thomas (collectively, "Plaintiffs") filed an Amended Motion for Class Certification, and, on September 25, 2015, a Corrected Memorandum of Points and Authorities in Support of Amended Motion for Class Certification.  On November 23, 2015, Defendants NJOY, Inc. and Soterra, Inc. (collectively, "NJOY") filed their Opposition.  On January 8, 2016, Plaintiffs filed a Reply, and, on January 20, 2016, a Corrected Reply.

        On November 23, 2015, NJOY filed a Motion to Strike the Declaration of Jeffrey E. Harris. On December 14, 2015, Plaintiffs filed their Opposition. On January 8, 2016, NJOY filed a Reply, and, on January 11, 2016, an Amended Reply.

        Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court found these matters appropriate for submission on the papers without oral argument.  The matters were, therefore, removed from the Court's February 1, 2016 hearing calendar and the parties were given advance notice.  After considering the moving, opposing, and reply papers, and the arguments therein, the Court rules as follows:

## I.        FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs have filed a putative class action, alleging that: (1) NJOY engaged in a false and misleading advertising campaign conveying the message that its electronic cigarettes ("e-cigarettes") are safer than regular tobacco cigarettes; and (2) NJOY omitted material information from its packaging, including both an ingredient list and the potential risks associated with certain ingredients.  Halberstam, on behalf of himself and a California class, alleges two claims for relief: (1) violation of the California Consumers Legal Remedies Act ("CLRA"), California Civil Code §§ 1770(a)(5), (a)(7), and (a)(9); and (2) violation of California's Unfair Competition Law ("UCL"), California Business & Professions Code §§ 17200, *et seq.*  Thomas, on behalf of herself and a Florida class, alleges a single claim for relief for violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUPTA"), § 501.201, Florida Statutes, *et seq.*

On May 21, 2015, Plaintiffs filed a motion to certify two statewide classes of purchasers of NJOY e-cigarettes pursuant to Federal Rule of Civil Procedure 23(b)(3): (1) a California class with claims based on both the alleged affirmative misrepresentations in NJOY's advertising and the alleged omissions from NJOY's packaging; and (2) a Florida class with claims based on the alleged omissions from NJOY's packaging.

On August 14, 2015, Judge Margaret M. Morrow denied Plaintiffs' original class certification motion (the "August 14 Order") without prejudice, holding, in relevant part, that: (1) "Because Halberstam admitted that he would have purchased NJOY e-cigarettes even if the packaging disclosed that it contained propylene glycol and glycerin," Halberstam "lack[ed] standing to assert an omissions claim based on NJOY's failure to disclose the fact that propylene glycol and glycerin were among the ingredients in its e-cigarette product;" (2)  Plaintiffs failed to demonstrate that NJOY's advertising was sufficiently pervasive to warrant a presumption that all members of the class saw advertisements with the implied safety message; (3) Plaintiffs failed to demonstrate that they could prove, on a classwide basis, that NJOY's failure to warn of the risks of propylene glycol and glycerin on the product packaging was a material omission; and (4) Plaintiffs failed to demonstrate that damages were capable of measurement on a classwide basis.  Although Judge Morrow concluded that "individualized issues predominate[d]," she allowed Plaintiffs an opportunity to file an amended motion for class certification addressing the deficiencies identified in the August 14 Order.  On September 23, 2015, Plaintiffs filed their Amended Motion for Class Certification, attempting to address the deficiencies identified by Judge Morrow.

On January 4, 2016, this action was reassigned to the calendar of this Court due to Judge Morrow's retirement.[1]

---

[1]Judge Morrow was a distinguished member of this Court for nearly 18 years and she will be missed by federal practitioners as well as her colleagues.  A detailed description of the factual and procedural background as well as an analysis of the class certification issues that were previously decided by Judge Morrow may be found in the August 14 Order [Docket No. 230] and will not be repeated here.

Initials of Deputy Clerk  _sr_

## II.    LEGAL STANDARD GOVERNING CLASS CERTIFICATION

Before certifying a class, the trial court must conduct a "rigorous analysis" to determine whether the party seeking certification has met the prerequisites of Federal Rule of Civil Procedure 23.  *Zinser v. Accufix Research Institute, Inc.*. 253 F. 3d 1180, 1186 (9th Cir. 2001), *as amended*, 273 F.3d 1266 (9th Cir. 2001).  The party seeking class certification bears the burden of demonstrating that the four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b) have been satisfied.  *Id.*

Under Rule 23(a), a class action is only proper if:

(1)    the class is so numerous that joinder of all members is impracticable;

(2)    there are questions of law or fact common to the class;

(3)    the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4)    the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. Proc. 23(a).

If the Rule 23(a) prerequisites are met, the Court must decide if certification is appropriate under Rule 23(b).  In this case, Plaintiffs seek certification of the California and Florida classes under Rule 23(b)(3), which authorizes certification if:

[T]he court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  The matters pertinent to these findings include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

"Rule 23 does not set forth a mere pleading standard.  A party seeking class certification must affirmatively demonstrate his compliance with the Rule -- that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc."

Initials of Deputy Clerk _sr_

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). "When considering class certification under Rule 23, district courts are not only at liberty to, but must perform 'a rigorous analysis [to ensure] that the prerequisites of Rule 23(a) have been satisfied.'" *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 980 (9th Cir. 2011) (quoting *Dukes*, 131 S. Ct. at 2551). "In many cases, 'that rigorous analysis will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped.'" *Id.*

## III.  DISCUSSION

The Court concludes that Plaintiffs have again failed to meet their burden of demonstrating that questions of law or fact common to class members predominate over any questions affecting only individual members. Specifically, the Court concludes that Plaintiffs have failed to demonstrate that damages can be proven on a classwide basis*.*

### A.  NJOY's Motion to Strike the Declaration of Jeffrey E. Harris and Plaintiffs' Objections to NJOY's Experts

Before addressing the merits of the Amended Motion for Class Certification, the Court will rule on NJOY's Motion to Strike the Declaration of Jeffrey E. Harris [Docket No. 255], Plaintiffs' Objection to the Declaration of Expert Denise Martin [Docket Nos. 276, 278], and Plaintiffs' Objection to the Declaration of Expert Kent Van Liere [Docket No. 277, 279].[2]

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In other words, for an expert's testimony to be admissible, (1) the expert must be qualified; (2) the expert's testimony must be relevant, i.e., must help the trier of fact to understand the evidence or determine a fact in issue; and (3) the expert's testimony must be reliable. *See, e.g., United States v. Diaz*, 300 F.3d 66, 73 (1st Cir. 2002) ("As recently amended, [Rule 702] provides that a proposed expert witness must be sufficiently qualified to assist the trier of fact, and that his or her expert testimony must be relevant to the task at hand and rest on a reliable basis."). The Court has a basic gatekeeping function to ensure that testimony meets these requirements, and is entitled to broad discretion in discharging this function. *See, e.g.,*

---

[2]To the extent that the Court has relied on any other evidence to which the parties have objected, the Court has considered and overruled those objections. As to the remaining objections, the Court finds that it is unnecessary to rule on those objections because the disputed evidence was not relied on by the Court. In addition, the parties' unopposed Requests for Judicial Notice [Docket Nos. 261 and 283-6] are **GRANTED**.

Initials of Deputy Clerk  sr

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999); *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt, Inc.*, 618 F.3d 1025, 1035-36 (9th Cir. 2010); *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000).

The Supreme Court in *Daubert* provided the Court with a non-exclusive, nondispositive list of factors to use in assessing the reliability of an expert's testimony: (1) whether the theory or technique can be, or has been, tested; (2) whether it has been subjected to peer review and publication; (3) whether it has a known or potential rate of error; and (4) whether it has been generally accepted by the scientific community. *Daubert v. Merrell Dow Pharm.*, Inc., 509 U.S. 579, 593-94 (1993) . However, these factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire Co.*, 526 U.S. at 150. Indeed, the Court has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.* at 152. The key question is whether the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* "The test for reliability, however, is not the correctness of the expert's conclusions but the soundness of his methodology." *Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1192 (9th Cir. 2007) (quotations and citations omitted); *see also Daubert*, 509 U.S. at 595 ("The focus . . . must be solely on principles and methodology, not on the conclusions that they generate."). "A court may admit somewhat questionable testimony if it falls within 'the range where experts might reasonably differ, and where the jury must decide among the conflicting views.'" *S.M. v. J.K.*, 262 F.3d 914, 921 (9th Cir. 2001) (quoting *Kumho*, 526 U.S. at 153). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

The proponent of the expert testimony has the burden of establishing Rule 702's admissibility requirements by a preponderance of the evidence. *See* Fed. R. Evid. 702 Advisory Committee's Note.

### 1. Plaintiffs' Expert Dr. Jeffrey E. Harris

The Court concludes that the opinions in the Supplemental Declaration of Jeffrey E. Harris [Docket No. 249-1] are admissible under Federal Rule of Evidence 702. Indeed, in Judge Morrow's August 14 Order, she concluded that Harris's proffered conjoint analysis and direct method were admissible under Federal Rule of Evidence 702, and NJOY does not offer any persuasive reason to modify that ruling. As Judge Morrow stated, "NJOY does not seriously contend that Harris's method fails to comport with accepted principles, or that his analysis is irrelevant to the issues in the case. Rather, it challenges the weight that should be given to his testimony." August 14 Order at 23.

The Court also concludes that Dr. Harris's opinions regarding his proposed Bayesian hedonic regression analysis are admissible under Federal Rule of Evidence 702. The Bayesian hedonic regression model proffered by Harris is a statistical model in which "classical regression analysis is supplemented by sources of information outside the narrow regression database." Supplemental Declaration of Jeffrey E. Harris ("Harris Supp. Decl.") [Docket No. 249-1] at ¶ 39. Bayesian hedonic regression is generally recognized and accepted by economists as a valid statistical technique, including by NJOY's expert, Denise Martin, who explains:

Bayesian hedonic regression is a technique by which such additional outside
information about the implicit value of an attribute in the model, *a prior distribution or
priors*, can be included in the regression.  By combining the priors with the regression
data, a *posterior distribution* of the attribute's implicit value is generated.  That is,
Bayesian regression takes what one assumes about the implicit value of an attribute
before seeing the data (the prior) and updates the prior based on the data available
for the regression to create a posterior, which now incorporates all one knows about
the relative value of the attribute.

Declaration of Denise Martin [Docket No. 263] at ¶ 10(c).

NJOY does not dispute that Bayesian hedonic regression analysis is a valid statistical tool,
and, in fact, NJOY's economic and marketing experts, and its own chief science officer, have used
it.  Although NJOY argues that Harris's Bayesian hedonic regression model is flawed for various
reasons, these arguments go to the weight, rather than the admissibility of his testimony.

Accordingly, NJOY's Motion to Strike the Declaration of Jeffrey E. Harris is **DENIED**.

2.      NJOY's Expert Dr. Denise Martin

Plaintiffs object to the Declaration of Denise Martin [Docket No. 263] on the grounds that
she: (1) is not qualified to offer opinions on Bayesian hedonic regression analysis, hedonic
regression, conjoint analysis, or direct method; (2) is impermissibly "piggybacking" on NJOY's
other proposed testifying expert, Dr. Kent Van Liere; and (3) lacks foundation to support her
conclusions and opinions because she does not provide sufficient facts or data.

The Court overrules  Plaintiffs' Objection to the Declaration of Expert Denise Martin [Docket
Nos. 276, 278].  The Court concludes that Dr. Martin is qualified to offer opinions on Bayesian
hedonic regression analysis and hedonic regression.  Dr. Martin is a Senior Vice President at
NERA Economic Consulting ("NERA"). Before joining NERA, she earned a B.A. in Economics from
Wellesley College and an M.A. and Ph.D. in Economics from Harvard University.  She studied
regression analysis and statistics -- including hedonic regression and Bayesian methods -- during
her undergraduate education at Wellesley and her graduate education at Harvard.  Throughout her
nearly 25 years  as a consulting and/or testifying expert at NERA, she has applied these statistical
techniques.  Moreover, contrary to Plaintiffs' argument, the Court finds that Dr. Martin has not
offered an expert opinion on the design or implementation of conjoint analysis or direct method.
Rather, she has offered an opinion on whether the Bayesian hedonic regression analysis proposed
by Dr. Harris could be used to reliably estimate the difference between the price paid by NJOY
consumers and the price they would have paid absent the alleged misrepresentations and
omissions.

The Court also concludes that Dr. Martin does not impermissibly "piggyback" on Dr. Kent
Van Liere's opinions, and rejects, as frivolous,  Plaintiffs' claim that her opinions lack foundation.
Her opinions are admissible under Federal Rule of Evidence 702.

Initials of Deputy Clerk  _sr_

3.      NJOY's Expert Dr. Kent Van Liere

Plaintiffs object to the Declaration of Kent Van Liere [Docket No. 264] to the extent that he: "(1) seeks to support his opinions with outdated drafts of authorities that are invalid and superseded by published versions that have been peer reviewed, which he neither sought to review nor reviewed; (2) seeks to offer any opinion on Bayesian hedonic regression or hedonic regression analysis since he is not an expert and has no experience with these kind of damages analyses; and (3) is impermissibly 'piggybacking' on the . . . conclusions of another of Defendant's proposed testifying experts, Dr. Denise Martin."  Plaintiffs' Amended (to Include Tables) Objection to the Declaration of Expert Kent Van Liere [Docket No. 279] at 1.

The Court overrules Plaintiffs' Objection to the Declaration of Expert Kent Van Liere [Docket Nos. 277, 279].  Dr. Van Liere's citation to a working paper does not render his opinions unreliable; he is not providing any opinions on Bayesian or hedonic regression analysis, and he does not impermissibly "piggyback" on the conclusions of Dr. Martin.  The Court concludes that the opinions in Dr. Van Liere's opinions in his Declaration are admissible under Federal Rule of Evidence 702.

**B.      Plaintiffs fail to demonstrate that damages are capable of measurement on a classwide basis.**

Plaintiffs seek to certify a class under Federal Rule of Civil Procedure 23(b)(3).  That provision only permits certification if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3). In order to satisfy this requirement, Plaintiffs must show that "damages are capable of measurement on a classwide basis."  *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013).

As the Supreme Court held in *Comcast*, Plaintiffs' method of proving damages must be tied to their theory of liability.  *Id.*   In other words, Plaintiffs' damages "model purporting to serve as evidence of damages in this class action must measure *only those damages attributable to [the defendant's conduct]*.  If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)."  *Id* (emphasis added).

As Judge Morrow determined, the proper measure of damages in this case is "the difference between the market price actually paid by consumers and the true market price that reflects the impact of the unlawful, unfair, or fraudulent business practices."  August 14 Order at 85 (quotations and citations omitted).  Accordingly, in order to satisfy *Comcast*, "plaintiffs must present evidence of a damages methodology that can determine the price premium attributable to NJOY's use of the misleading advertisements and product labeling omissions."  *Id.*

In connection with Plaintiffs' initial motion for class certification, Plaintiffs' expert, Dr. Harris, proposed to calculate damages using either a conjoint or direct method analysis, which were rejected by Judge Morrow.   In an effort to overcome the flaws exposed by Judge Morrow, he now proposes using a "modified" conjoint or direct method analysis, or an entirely new model -- Bayesian hedonic regression.

Initials of Deputy Clerk __sr__

1.      Conjoint Analysis and Direct Method

"Conjoint analysis is a statistical technique capable of using survey data to determine how consumers value a product's attributes -- often called the market's willingness to pay."  August 14 Order at 85 (quoting *Saavedra v. Eli Lilly and Co.*, 2014 WL 7338930, at *4 (C.D. Cal. Dec. 18, 2014)).  "[I]n conjoint analysis, survey respondents are asked to make a series of choices between different combinations of product attributes. . . . Combining the responses to all of the choice sets, the analyst can then use established statistical methods to estimate the separate value (or part-worth) that consumers attach to each product attribute."  August 14 Order at 85 (quoting Harris Declaration, Docket No. 115-14, at ¶ 45)*.*  "With respect to the price attribute, the alternative levels can be expressed either in dollar units or in percentage terms."  *Id.* (quoting Harris Declaration, Docket No. 115-14, at ¶ 52).  In connection with Plaintiffs' initial motion for class certification, Dr. Harris claimed that using a percentage made more sense, given that the purchase price of NJOY e-cigarettes varied from year to year.  "Thus, once the price premium for the safety messages is isolated, the resulting price premium attributable to the safety claim can be computed as a percentage of the purchase price -- i.e., the safety message was 'worth' X% of the purchase price."  *Id.*

In the August 14 Order, Judge Morrow soundly rejected Harris's initial conjoint analysis, holding that it did not satisfy *Comcast.*  She explained:

> His conjoint methodology could quantify the relative value a class of consumers ascribed to the safety message, but it does not permit the court to turn the relative valuation into an absolute valuation to be awarded as damages. The ultimate price of a product is a combination of market demand and market supply.  Harris's model looks only to the demand side of the market equation, converting what is properly an objective evaluation of relative fair market values into a seemingly subjective inquiry of what an average consumer wants.

August 14 Order at 85-86 (internal quotations and citations omitted).

Judge Morrow also rejected Dr. Harris's initial direct method, because "[i]t too focuses on the consumer's subjective  valuation."  August 14 Order at 86.  "In the direct method, representative members of the class are directly asked what they would be willing to pay for additional safety."  August 14 Order at 86 (quoting Harris Declaration, Docket No. 115-14, at ¶ 54).  "The price premium attributable to the [NJOY's] safety claim [can] then be computed as the average discount among all respondents.  Since the direct method survey would likewise include class members from both California and Florida, one would be able to compute the price premium attributable to the Defendant's safety claim separately for each state."  *Id.* (quoting Harris Declaration, Docket No. 115-14, at ¶ 59).  Judge Morrow held that Dr. Harris's direct method did not satisfy *Comcast* because, like Dr. Harris's conjoint analysis, it "provide[s] only a model for testing what a consumer is willing to pay, without considering other factors in a functioning market place" and it therefore "does not address the fair *market* value of NJOY's e-cigarettes absent the misrepresentations and omissions."  August 14 Order at 87.  "Harris's methodology [for both the conjoint analysis and direct method] completely ignores the price for which NJOY is willing to sell its products, what other e-cigarette manufacturers say about their products, and the prices at which those entities are willing to sell their products.  This does not suffice under *Comcast.*"  *Id.*

Initials of Deputy Clerk _sr_

In an effort to salvage his damages models, Dr. Harris now proposes a "modified" conjoint analysis and direct method, which he contends address the defects identified by Judge Morrow. In his application of conjoint analysis, he proposes to incorporate different market brands and actual market prices directly into the choice sets offered to participants in the survey. Harris Supp. Decl. [Docket No. 249-1] at ¶¶ 11-12. Similarly, in his application of the direct method, he proposes to incorporate market prices directly into the surveys. Harris Supp. Decl. [Docket No. 249-1] at ¶ 11. He contends that these adjustments will "'tether' the results 'to a functioning market and thus to the product's fair market value.'" *Id.* (quoting *Saavedra*, 2014 WL 7338930, at *5).

Although Dr. Harris attempts to distinguish his modified models from his original models, the Court concludes that there is no meaningful distinction between them. Indeed, Dr. Harris, in his initial declaration, took the position that the price attribute used in his conjoint analysis could be expressed in percentage terms *or* dollar units. Harris Declaration [Docket No. 115-14] at ¶ 52. In other words, Dr. Harris acknowledged that expressing the price attribute in terms of dollars (i.e. actual market price) or percentages was interchangeable, and only proposed to use percentages to mitigate the problem of changing product prices during the class period. *Id.* Although Dr. Harris now proposes to use actual market prices instead of percentages, his models still only look to the demand side of the market equation, and ignores the price at which NJOY, and other e-cigarette manufacturers, would be willing to sell their products. As Judge Morrow stated, "[a] consumer's subjective valuation of the purported safety message, measured by their relative willingness to pay for products with or without the message is not an accurate indicator of restitutionary damages, because it does not permit the court to calculate the *true market price* of N-JOY e-cigarettes absent the purported misrepresentations." August 14 Order at 90; *see also Saavedra*, 2014 WL 7338930, at *5 ("By looking only to consumer demand while ignoring supply, [plaintiffs'] method of computing damages converts the lost-expectation theory from an objective evaluation of relative fair market values to a seemingly subjective inquiry of what an average consumer wants"); *McLaughlin v. American Tobacco Co.*, 522 F.3d 215, 229 (2nd Cir. 2008) (abrogated on other grounds by *Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639 (2008)) (rejecting Dr. Harris's similar "loss in value" theory as "pure speculation"). Because Dr. Harris's "modified" conjoint analysis and direct method continue to focus on a consumer's subjective valuation, and thus do not permit the court to calculate the *true market price* of N-JOY cigarettes absent the purported misrepresentations and omissions, they do not satisfy *Comcast*.

### 2.   Bayesian hedonic regression

Recognizing that he might not be able to satisfy the Court's concerns with his "modified" conjoint analysis or direct method, Dr. Harris now proposes an entirely different method of calculating damages in this case -- Bayesian hedonic regression. In the simplest terms, Dr. Harris proposes to use "classical hedonic regression" to measure the relationship between observed market prices and various product attributes that are readily quantified, and plans to supplement that data with outside data or "priors" obtained from his conjoint analysis. Dr. Harris's proposed methodology is succinctly explained by NJOY's expert, Dr. Martin, as follows:

a)   Classical hedonic regression is a tool used to measure the implicit values of product attributes. These values are revealed from observed prices of differentiated products and the specific amounts of characteristics associated with them. In other words, the analyst observes numerous prices in the

Initials of Deputy Clerk  _sr_

market for products with different combinations of attributes, and uses the statistical tool of regression analysis to measure the implicit value of each attribute in that market.  An assumption of the model is a "competitive equilibrium", that is, both firms and consumers treat market prices as given and make their supply and demand decisions accordingly.  On its own, hedonic regression can only measure the implicit value of attributes that are observed and measured in the price/attributes dataset.  If attributes are missing from this dataset or cannot be disentangled from others in this data, their value cannot be measured using a classic or stand-alone hedonic regression.

b)      Conjoint analysis begins with a survey in which participants are asked to choose between alternative product choice sets, or combinations of attributes that take on various levels or degrees, at different prices.  Statistical analysis is then used to translate these survey results into "partworths" or consumers' relative willingness to pay for different attributes.

c)      By proposing to use the results from a conjoint analysis to supplement the estimation of his hedonic regression, Dr. Harris proposes a "Bayesian hedonic" model.  Bayesian hedonic regression is a technique by which such additional outside information about the implicit value of an attribute in the model, *a prior distribution, or priors*, can be included in the regression.  By combining the priors with the regression data, a *posterior distribution* of the attribute's implicit value is generated.  That is, Bayesian regression takes what one assumes about the implicit value of an attribute before seeing the data (the prior) and updates the prior based on the data available for the regression to create a posterior, which now incorporates all one knows about the relative value of the attribute.

Declaration of Denise Martin [Docket No. 263] at ¶ 10 (quotations and citations omitted).

        The Court concludes that Dr. Harris's proposed Bayesian hedonic regression model is simply not designed to measure only those damages attributable to NJOY's misrepresentations and/or omissions, and thus does not satisfy *Comcast*.  In other words, it is not designed to calculate the fair *market* value of NJOY's e-cigarettes absent the misrepresentations and omissions.

        According to Dr. Martin, using a Bayesian hedonic regression model to estimate how the price of a product would have been different with and without an attribute requires that demand and supply conditions remain unchanged. Declaration of Denise Martin [Docket No. 263] at ¶ 3.  In other words, it requires a stable market where the price of a product is set by a competitive equilibrium.  Declaration of Denise Martin [Docket No. 263] at ¶¶ 15-25. It is not designed for use in an unstable market, where supply and demand would change significantly from the market in which the prices used as inputs were generated.  *Id.* at 25.  Dr. Harris does not dispute this basic principle nor does he dispute that the e-cigarette market is unstable, or at the very least immature. In fact, he candidly admits that his Bayesian hedonic regression model may not measure "the impact on the market price had the alleged claims not been made."  Harris Dep. at 131:9-16

[Docket No. 262 at Ex. A].

Finally, and perhaps most troubling, Dr. Harris previously opined that Bayesian hedonic regression would not be appropriate in the context of the e-cigarette market.  Specifically, he opined that a two-step approach that combines a hedonic regression and conjoint analysis (i.e., a form of Bayesian hedonic regression) "would not provide a reliable estimate of price differential attributable to NJOY's safety claim" in the context of the e-cigarette market.   Harris Reply Decl. [Docket No. 149-1] at ¶ 29.  He explained that such a model would not be reliable in the relatively new e-cigarette market, at least in part  because "the available products have not been sufficiently standardized to make reliable price comparisons across different brands."  *Id.* at ¶ 33.   He further opined, "price data from other e-cigarette brands would not help to isolate the price component attributable to NJOY's safety claims if other brands also made some form of health or safety representation."  *Id.*  Although Dr. Harris conveniently attempts to distance himself from his original opinions and claims that his new model solves certain problems arising out of classical hedonic regression, he never satisfactorily explains how Bayesian hedonic regression is capable of calculating the price premium attributable to NJOY's use of the misleading advertisements and product labeling omissions "without a model of firm behavior -- which would include supplier entry and exit decisions, product offerings, and pricing." Declaration of Denise Martin [Docket No. 263] at ¶ 24.

Accordingly, the Court concludes that Plaintiffs have not proffered a model capable of calculating damages on a classwide basis, and, despite having been given a second opportunity, have failed to meet their burden of demonstrating that questions of law or fact common to class members predominate over questions affecting only individual members.

    **C.**    **Halberstam lacks standing to assert an omissions claim based on NJOY's failure to disclose that propylene glycol and glycerin were among the ingredients in its e-cigarette product.**

Because Plaintiffs' failure to proffer a damages model that satisfies *Comcast* is sufficient to defeat class certification, it is unnecessary to address whether Plaintiffs have cured the remaining deficiencies identified by Judge Morrow in the August 14 Order.  However, given that Halberstam's standing remains relevant to his individual claims, the Court will address whether Plaintiffs cured that deficiency.

As Judge Morrow held, Plaintiffs' omissions claim "has two distinct components.  Plaintiffs allege first that NJOY's failure to include certain harmful ingredients on the label of NJOY e-cigarettes -- namely, proplyene glycol and glycerin -- was misleading because a reasonable consumer would want to know that NJOY e-cigarettes contained propylene glycol and glycerin before purchasing them.  They also allege that, even when these ingredients are disclosed, the packaging is misleading because it fails to warn of the harmful effects of inhaling such ingredients." August 14 Order at 37.

Judge Morrow then concluded:  "Because Halberstam admitted that he would have purchased NJOY e-cigarettes even if the packaging had disclosed that it contained propylene glycol and glycerin, he has conceded that he did not suffer injury in fact due to the alleged omission."  August 14 Order at 42.  "Halberstam therefore lacks standing to assert an omissions

Initials of Deputy Clerk _sr_

claim based on NJOY's failure to disclose the fact that propylene glycol and glycerin were among the ingredients in its e-cigarette product." *Id.* at 42-43.  Judge Morrow, however, concluded that Halberstam has standing to assert an omissions claim based on NJOY's failure to warn of the harmful effects of inhaling propylene glycol and glycerin.

Plaintiffs, in effect, ask the Court to reconsider Judge Morrow's prior ruling that Halberstam lacks standing to assert an omissions claim based on NJOY's failure to disclose that propylene glycol and glycerin were among the ingredients in its e-cigarette product.  Specifically, Plaintiffs argue that: (1) "the ingredients and risks omissions were pled to be part of one interconnected omissions claim;" and (2) even if the omissions claims are viewed as independent claims, Plaintiffs have presented supplemental evidence that Halberstam has standing to assert a claim based on the omission of ingredients.  Corrected Plaintiffs' Memorandum of Points and Authorities [Docket No. 249] at 2.

The Court finds no basis or reason to reconsider Judge Morrow's ruling that Plaintiffs' omissions claim has two distinct components or her ruling with respect to Halberstam's standing. Although the Court recognizes that Judge Morrow allowed Plaintiffs an opportunity to file an amended motion for class certification in order to address the deficiencies identified in the August 14 Order, there is nothing in her order that suggests that Plaintiffs would be allowed to seek reconsideration of her rulings without meeting the standard for reconsideration under Local Rule 7-18 (or, at the very least, without presenting any new evidence).  Pursuant to Local Rule 7-18, Plaintiffs may only seek reconsideration of the rulings in Judge Morrow's August 14 Order "on the grounds of (a) a material difference in fact or law from that presented to the Court before such decision that in the exercise of reasonable diligence could not have been known to the party moving for reconsideration at the time of such decision, or (b) the emergence of new material facts or a change of law occurring after the time of such decision, or (c) a manifest showing of failure to consider material facts presented to the Court before such decision.  No motion for reconsideration shall in any manner repeat any oral or written argument made in support of or in opposition to the original motion."  Plaintiffs have completely failed to meet this standard for reconsideration. Indeed, Judge Morrow previously considered the same evidence on which Plaintiffs now rely, including Halberstam's testimony that: (1) he would have bought the NJOY e-cigarette in September 2013 even if propylene glycol and glycerin had been disclosed on the packaging; (2) "'if the [ingredients had been] disclosed . . . in sort of like a warning, [Halberstam] probably would have paid more attention to it and . . . found out more about it'"; and (3) if the packaging had a "Surgeon General-type warning," he "'probably would have . . . looked into' the health risks associated with the ingredients."  August 14 Order at 41-42.  The only evidence that Plaintiffs now submit, which was not previously cited in Judge Morrow's Order, is Halberstam's deposition testimony at 75:17-76:18 and 82:13-17.  These passages provide, in relevant part:

> Q.  So do you feel that you were deceived because propylene glycol and glycerin were not disclosed on the packaging of the NJOY electronic cigarette?
>
> A.  Yes.
>
> Q.  . . . How were you deceived?
>
> A.  By -- By purchasing a product and just have -- inhaling it and putting it into my body and

Initials of Deputy Clerk __sr__

not knowing what I put into my body.

. . .

. . . [I]f I did see a warning for another chemical on there besides nicotine I probably would have researched it before I bought it."

Halberstam Depo. at 75:17-76:18.

> Q.  So even if NJOY sold its electronic cigarettes for $5 a pack, you would not buy one today; correct?

> A.  Correct.

> Q.  Or even a dollar a pack; correct?

> A.  Correct.

Halberstam Depo. 82:13-17.

This testimony is virtually identical to the testimony relied on by Judge Morrow in the August 14 Order, and merely supports her prior ruling that Halberstam has standing to assert an omissions claim based on NJOY's failure to warn of the *risks* associated with propylene glycol and glycerin. Indeed, none of this testimony changes the fact that Halberstam would have purchased NJOY's e-cigarettes even if the ingredients were included on the label. Accordingly, the Court concludes that there is no basis to change or modify Judge Morrow's ruling that Halberstam lacks standing to assert an omissions claim based on NJOY's failure to list propylene glycol and glycerin as ingredients on the product's label.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs' Amended Motion for Class Certification is **DENIED**.

IT IS SO ORDERED.

Initials of Deputy Clerk  _sr_